J. Kirby McDonough
SPENCER FANE LLP
California Bar No. 275705
201 N. Franklin St., Suite 2150
Tampa, FL 33602
Telephone: 813-424-3501
kmcdonough@spencerfane.com

*Attorney for Defendant*
*Rocket Mortgage, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| NICOLE HICKCOX,<br><br>Plaintiff,<br><br>v.<br><br>ROCKET MORTGAGE, LLC,<br><br>Defendant | **Case No. 2:22-CV-00437-TLN-KJN**<br><br>**DEFENDANT ROCKET MORTGAGE, LLC'S INDEX OF EVIDENCE IN SUPPORT OF COUNTER MOTION FOR SUMMARY JUDGMENT (EXHIBITS  A - V)**<br><br>**MSJ HEARING:**<br>**DATE: JUNE 1, 2023**<br>**TIME: 2:00 P.M.**<br>**COURT: HON. TROY L. NUNLEY, COURTROOM 2** |

For the convenience of the Court, Defendant, Rocket Mortgage LLC submits here all evidence it relies on in support of its Counter Motion for Summary Judgment, and Statement of Undisputed Facts. Issues of authenticity and admissibility as to the following exhibits are addressed in the accompanying declaration of J. Kirby McDonough.

| EXHIBIT | DESCRIPTION | DATE |
|---|---|---|
| A | Declaration of Sadaiah Wourman with Exhibits A through L | 04/06/2023 |
| B | Deposition of Patricia Wilburn | 12/30/2022 |
| C | CFP Application | 07/26/2019 |
| D | Deposition of Justin Pierce | 12/08/2022 |
| E | Change of Mortgagee Clause | 08/22/2019 |
| F | Deposition of Greg Fedler | 01/09/2023 |
| G | Email correspondence between Hickcox and AAA | 04/28/2020 |
| H | Denial Letter from CSAA | 04/27/2020 |
| I | Email voice mail from Hickcox to Wilburn | 03/28/2020 |
| J | Weather Article from Mountain Democrat | 03/18/2020 |
| K | Deposition of Christine Bender | 01/09/2023 |
| L | Assurant Notice of Claim | 07/11/2020 |
| M | ASIC Adjuster's Report | 08/24/2020 |
| N | ASIC Claim Information Notice | 10/29/2020 |
| O | Fair Plan Lexis Notes Showing Rejected Correspondence | 10/05/2021 |
| P | Notice of Cancellation Fair Plan | 10/01/2021 |
| Q | Notice from California Fair Plan | 09/21/2021 |

ROCKET MORTGAGE 'S INDEX OF EVIDENCE IN SUPPORT OF COUNTER MOTION FOR SUMMARY JUDGMENT

PH 1682214.1

| R | Email correspondence- re wrong address | 02/22/2022 |
|---|---|---|
| S | ASIC Claim Acknowledgement | 07/11/2020 |
| T | ASIC Loss Notice | 07/10/2020 |
| U | Hickcox Policy Declaration | 08/12/2019 |
| V | Hickcox California Fair Plan Policy | |

DATED this 6th day of April, 2023.

**SPENCER FANE LLP**

*/s/  J. Kirby McDonough*
J. Kirby McDonough
California Bar No. 275705
201 N. Franklin St., Suite 2150
Tampa, FL 33602
Telephone: 813-424-3501
kmcdonough@spencerfane.com

*Attorney for Defendant*
*Rocket Mortgage, LLC*

– 3 –
ROCKET MORTGAGE 'S INDEX OF EVIDENCE IN SUPPORT OF COUNTER MOTION FOR SUMMARY JUDGMENT

PH 1682214.1

# Exhibit A

J. Kirby McDonough
SPENCER FANE LLP
California Bar No. 275705
201 N. Franklin St., Suite 2150
Tampa, FL 33602
Telephone: 813-424-3501
kmcdonough@spencerfane.com

*Attorney for Defendant*
*Rocket Mortgage, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE HICKCOX, <br><br> Plaintiff, <br><br> v. <br><br> ROCKET MORTGAGE, LLC, <br><br> Defendant | **CASE NO. 2:22-cv-00437-TLN-KJN** <br><br> **DECLARATION OF SADAIAH WOURMAN** <br><br> **DATE: JUNE 1, 2023** <br> **TIME: 2:00 PM** <br> **COURT: HON. TROY L. NUNLEY, COURTROOM 2** |

1.      I am Sadaiah Wourman, Team Leader for the Insurance Loss Team for Rocket Mortgage, LLC ("**Rocket Mortgage**"). I am familiar with the facts set forth in this Declaration, and this Declaration is true and accurate. I am over 18 years old and competent to testify to the contents of this Declaration.

2.      Rocket Mortgage is the lender and mortgage servicer for Plaintiff Nicole Hickcox's ("**Hickcox**") refinance mortgage loan. The information in this affidavit is taken from Rocket Mortgage's business records. I have personal knowledge of Rocket Mortgage's procedures for creating these records. They are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by a person with personal knowledge; (b) kept in the

ordinary course of Rocket Mortgage's regularly conducted business activities; and (c) created by Rocket Mortgage as a regular business practice.

3.    On October 15, 2019, Hickcox executed a promissory note in favor of Rocket Mortgage f/k/a Quicken Loans Inc., in the amount of $171,762.00 (the "**Note**") to refinance real property located at 4371 Park Woods Dr., Pollock Pines, CA 95726 (the "**Property**"). A true and correct copy of the Note is attached hereto as **Exhibit "A"**.

4.    Also on October 15, 2019, Hickcox executed and granted a Deed of Trust in favor of Rocket Mortgage f/k/a Quicken Loans Inc., on the Property to secure payment for the Note. (the "**Deed of Trust**"). Said Deed of Trust was recorded with the County Recorder of El Dorado County, California, No. 20199004522700018. A true and correct copy of the Deed of Trust is attached hereto as **Exhibit "B"**.  (The Note and Deed of Trust will be collectively referred to as the "**Refinance Loan**").

5.    In addition to originating Hickcox's Refinance Loan, Rocket Mortgage is the servicer of the Refinance Loan.

6.    One of the tasks as servicer is to oversee impound accounts, if applicable, to ensure that taxes and insurance are paid to avoid liens and protect the collateral securing a loan.

7.    With respect to Hickcox's Refinance Loan, Paragraph five (5) of the Deed of Trust requires Hickcox to keep the Property insured against loss by fire, hazards included within the term "extended coverage", and any other hazards.

8.    Additionally, Paragraph three (3) of the Deed of Trust requires Hickcox to pay Rocket Mortgage for taxes and insurance to be held in escrow, and Rocket Mortgage is tasked with paying the taxes and insurance premiums as they come due.

9.    Per that same Paragraph, Hickcox is also required to promptly furnish to Rocket Mortgage all notices of amounts to be paid for insurance and taxes.

DECLARATION OF SADAIAH WOURMAN

PH 1682235.1

10.     Rocket Mortgage handles the initial payment of hazard insurance at closing. Thereafter, Rocket Mortgage utilizes a third-party vendor, American Security Insurance Corporation ("**ASIC**") a/k/a **"Assurant"** to handle a myriad of insurance related tasks including customer service, receipt and mailing of notices including renewal notices, and payment of insurance premiums from Rocket Mortgage impound accounts, among other tasks.

11.     Prior to closing of the Refinance Loan, Hickcox informed Rocket Mortgage that she had a hazard policy through California Fair Plan, and a Difference in Conditions policy through CSAA.

12.     Also prior to the closing of Hickcox's loan, Rocket Mortgage was in contact with Hickcox's Insurance Broker at AAA regarding her insurance policies and payment of the same.

13.     On August 21, 2019, an Insurance Specialist from Rocket Mortgage sent an email to Hickcox's insurance broker, Patricia Wilburn, at AAA requesting a copy of the declaration page and advised that the mortgagee clause is:

Quicken Loans Inc. ISAOA
PO Box 202070
Florence, SC 29502

14.     Ms. Wilburn responded on August 22, 2019, with a copy of the declaration page, and advised that she needed to change the mortgagee clause address, and that she would be requesting the change. A copy of this correspondence is attached hereto as **Exhibit "C"**.

15.     AAA advised Rocket Mortgage that Hickcox would have two policies; one from CSAA and one from California Fair Plan. However, the CSAA plan was boarded into the servicing platform, SSP, as the top line policy.

16.     During the time period that a policy is considered top line, the servicing platform will only ensure that payment is made for that policy.

– 3 –
DECLARATION OF SADAIAH WOURMAN

17.     The mortgagee clause address in Florence, South Carolina is overseen by Rocket Mortgage's vendor, ASIC. Because the California Fair Plan policy was not in the servicing platform as a top line policy, the billing notices and the notice of cancellation were inadvertently ignored, and the California Fair Plan was not paid at closing of the Refinance Loan.

18.     However, the origination team was unaware that the policies were entered into the system incorrectly. At closing of the Refinance Loan the full amount of the hazard insurance due was sent to AAA instead of one payment to AAA, and a separate payment to California Fair Plan. A true and correct copy of the Closing Disclosure and Closing Ledger are attached hereto as **Composite Exhibit "D"**.

19.     Despite AAA cautioning Rocket Mortgage prior to closing that the California Fair Plan policy was not paid, the origination team thought that it would get funded at closing and advised AAA of the same.

20.     After the loan closed, Rocket Mortgage did not hear from AAA or Hickcox advising that the California Fair Plan was not paid, or that it had lapsed, until June 2020.

21.     Rocket Mortgage's records reflected that Hickcox's hazard insurance was in place and that another payment was not due until August 2020.

22.     On June 9, 2020, Rocket Mortgage received a telephone call from Hickcox advising that she had damage to her deck and that her California Fair Plan policy was never paid and that it had lapsed.

23.     This was the first time that Rocket Mortgage became aware that her policy had lapsed. Rocket Mortgage had contacted Hickcox just a month earlier on May 13, 2020, to discuss possible re-finance options, and Hickcox did not mention anything regarding a lapsed policy or suffering a loss to her home, despite that being nearly two months after the alleged loss.

DECLARATION OF SADAIAH WOURMAN

PH 1682235.1

24.     Additionally, per Paragraph five (5) of Hickcox's Deed of Trust, in the event of loss, Hickcox was required to give prompt notice to Rocket Mortgage, which she did not do.

25.     Nevertheless, Rocket Mortgage forwarded the information to its insurance vendor, ASIC/Assurant, to research the issue.

26.     On August 3, 2020, Hickcox called back to Rocket Mortgage, and requested to speak with a supervisor.  Also on the call was Ryan Miller with ASIC.

27.     During the call Hickcox explained that she had two insurance policies, but that the California Fair Plan had lapsed due to non-payment at closing. Hickcox further explained that she suffered a loss to her deck, and that her other carrier CSAA would not cover the loss.

28.     Mr. Miller advised Hickcox to send him a copy of the denial letter and that he would get with Rocket Mortgage to see if they can implement a policy retroactively to adjust the loss.

29.     Also on the call, Hickcox advised that she does not know what took the deck down. She advised that there was wind, hail, snow, rain, and trees down in her yard. She stated "[t]o say what took the deck down, I don't know, but nobody can." A true and correct transcription of the recording of this call is attached hereto as **Exhibit "E"**.

30.     Last, Hickcox advised that she had received a refund check after closing from AAA, but that she did not investigate as to why she received the refund.

31.     Hickcox agreed to the plan of Rocket Mortgage setting up a policy through ASIC that would retroactively apply to the date of loss, and ASIC would investigate and adjust the loss.

32.     On August 7, 2020, a Resolution Associate from Rocket Mortgage sent an email to the ASIC team advising that Hickcox is seeking Rocket Mortgage to cover the damage under a lender policy.

– 5 –
DECLARATION OF SADAIAH WOURMAN

33.   On that same day, ASIC responded and advised that it contacted both CSAA and California Fair Plan to confirm that CSAA would not cover the claim, and that the California Fair Plan policy was cancelled due to nonpayment of premium because Fair Plan funds were incorrectly sent to AAA at closing and refunded to Hickcox.

34.   ASIC further advised that it updated the policy coverage types in the servicing platform, SSP, and that an uninsured claim form was submitted to management so that they can instant issue a hazard policy for Hickcox to file her claim. A true and correct copy of the correspondence in Paragraphs 33-35 is attached hereto as **Exhibit "F"**.

35.   On August 12, 2020, a Rocket Mortgage Resolution Advocate contacted Hickox to advise that an uninsured claim had been submitted on her behalf. On August 13, 2020, Hickcox responded and stated "Looking forward to resolving this issue. Thank you for your attention to this matter." A true and correct copy of the correspondence is attached hereto as **Exhibit "G"**.

36.   Thereafter, Rocket Mortgage followed up to advise Hickcox that the Lender Policy was established so that she can move forward with the claim for the deck.

37.   On August 19, 2020, Rocket Mortgage was notified by ASIC that the policy was issued and that the ASIC Claims Department had been advised to process the claim.

38.   Due to certain triggers in Rocket Mortgage's servicing platform, prior to issuance of the lender policy form notices were sent to Hickcox to comply with RESPA, but they were not, in fact, accusing Hickcox of failing to pay her insurance premiums. It was simply form documents that are sent under normal course of business when lender placed insurance is implemented. The scenario at hand is a one-off.

39.   Thereafter, Rocket Mortgage was not involved with Hickcox's insurance claim regarding her deck. ASIC was tasked with processing and adjusting the claim under the policy. Rocket Mortgage did not investigate the claim, did not adjust the claim, did not negotiate a

DECLARATION OF SADAIAH WOURMAN

PH 1682235.1

settlement, nor did it pay on the claim. Rocket Mortgage is not an insurance company, and does not have the ability to adjust or process insurance claims. Rocket Mortgage is simply a named insured on the lender policy, and Hickcox is an additional insured.

40. Rocket Mortgage was later notified that Hickcox was setting up a new California Fair Plan policy, and on October 9, 2020, a check was issued to California Fair Plan for the policy.

41. On October 12, 2020, Rocket Mortgage notified Hickcox that the lender policy had been cancelled.

42. On November 4, 2020, Rocket Mortgage received a check from California Fair Plan in the amount of $578 dollars due to an overage from the October 9, 2020 payment. A true and correct copy of the check is attached hereto as **Exhibit "H"**. The funds were applied to Hickcox's escrow account, per the terms of the Deed of Trust.

43. On April 4, 2021, Rocket Mortgage received a check from ASIC in the amount of $5,170.33, made payable to Quicken Loans, LLC and Nicole Hickcox. All of the funds were provided to Ms. Hickcox. A true and correct copy of the check is attached hereto as **Exhibit "I"**.

44. Thereafter, Rocket Mortgage never heard from Hickcox regarding the insurance settlement with ASIC, or that she was unsatisfied with the amount of settlement funds that she received.

45. On September 27, 2021, Rocket Mortgage sent a letter to Hickcox advising that her hazard insurance had expired and that it did not have evidence that she obtained new coverage. Rocket Mortgage cautioned that it would buy insurance for the Property if it did not receive proof of hazard insurance. A true and correct copy of the letter is attached hereto as **Exhibit "J"**.

DECLARATION OF SADAIAH WOURMAN

46.     On November 1, 2021, Rocket Mortgage sent a reminder letter to Hickcox advising that this was her second and final notice to provide proof of hazard insurance or Rocket Mortgage would buy insurance for the Property. A true and correct copy of the letter is attached hereto as **Exhibit "K"**.

47.     On December 13, 2021, Rocket Mortgage sent to Hickcox a Notice of Lender-Placed Insurance. The letter advised Hickcox that Rocket Mortgage had purchased a Lender Policy on her behalf because it had not received proof of hazard insurance, despite two prior notices. A true and correct copy of the notice is attached hereto as **Exhibit "L".**

48.     Rocket Mortgage never received a Notice of Error from Hickcox related to the servicing of her loan or as to the payment of escrow funds for hazard insurance.

49.     Likewise, Rocket Mortgage never received a notice and opportunity to cure, as required by the Deed of Trust, regarding the insufficiency of insurance settlement funds prior to filing the instant lawsuit.

.

State of Michigan
County of Wayne

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2023.

Sadaiah Wourman

Digitally signed by Sadaiah Wourman
Date: 2023.04.05 17:28:38 -04'00'

Sadaiah Wourman

DECLARATION OF SADAIAH WOURMAN

PH 1682235.1

J. Kirby McDonough
SPENCER FANE LLP
California Bar No. 275705
201 N. Franklin St., Suite 2150
Tampa, FL 33602
Telephone: 813-424-3501
kmcdonough@spencerfane.com

*Attorney for Defendant*
*Rocket Mortgage, LLC*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE HICKCOX,<br><br>    Plaintiff,<br><br>v.<br><br>ROCKET MORTGAGE, LLC,<br><br>    Defendant | **Case No. 2:22-CV-00437-TLN-KJN**<br><br>**DEFENDANT ROCKET MORTGAGE, LLC'S INDEX OF EVIDENCE DECLARATION OF SADAIAH WOURMAN**<br>**(EXHIBITS  A - L )**<br><br>**MSJ HEARING:**<br>**DATE: JUNE 1, 2023**<br>**TIME: 2:00 P.M.**<br>**COURT: HON. TROY L. NUNLEY, COURTROOM 2** |

For the convenience of the Court, Defendant, Rocket Mortgage LLC submits here all evidence stated in the Declaration of Sadaiah Wourman. Issues of authenticity and admissibility as to the following exhibits that are addressed and attached in the accompanying declaration of Sadaiah Wourman, Team Leader for the Insurance Loss Team for Rocket Mortgage, LLC.

| EXHIBIT | DESCRIPTION | DATE |
|---------|-------------|------|
| A | Promissory Note | 10/15/2019 |
| B | Deed of Trust | 10/15/2019 |
| C | Hickcox Correspondence re change the mortgagee clause address | 08/22/2019 |
| D (Composite) | Closing Disclosure and Closing Ledger | 10/10/2019 |
| E | Transcription of Recording | 08/03/2020 |
| F | Escalation email from Assurant - Correspondence (Paragraphs 33-35) | 08/08/2020 |
| G | Email re claim submitted | 08/12/2020 |
| H | Check from California Fair Plan in the amount of $578 | 11/04/2020 |
| I | ASIC Settlement Check in the amount of $5,170.33, made payable to Quicken Loans, LLC and Nicole Hickcox | 04/04/2021 |
| J | LPI First Letter | 09/27/2021 |
| K | LPI Reminder Letter | 11/01/2021 |
| L | LPI Hazard Policy | 12/13/2021 |

DATED this 6th day of April, 2023.

– 2 –
INDEX OF EVIDENCE - DECLARATION OF SADAIAH WOURMAN PH 1682233.1

**SPENCER FANE LLP**

*/s/  J. Kirby McDonough*
J. Kirby McDonough
California Bar No. 275705
201 N. Franklin St., Suite 2150
Tampa, FL 33602
Telephone: 813-424-3501
kmcdonough@spencerfane.com

*Attorney for Defendant*
*Rocket Mortgage, LLC*

# Exhibit A

# Note

3432945629
Hickcox, Nicole

MERS MIN: 1000390034329456299

**FHA Case No.**
049-1048662-703

October 15, 2019
*(Date)*

Pollock Pines
*(City)*

CA
*(State)*

4371 Park Woods Dr
Pollock Pines, CA 95726-9580
*(Property Address)*

1. **BORROWER'S PROMISE TO PAY.** In return for a loan that I have received, I promise to pay U.S. $ 171,762.00 (this amount is called "Principal"), plus interest to the order of the Lender. The Lender is Quicken Loans Inc.

   I will make all payments under this Note in the form of cash, check or money order.

   I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2. **INTEREST.** Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 3.500%.

   The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

3. **PAYMENTS**

   **(A) Time and Place of Payments.** I will pay principal and interest by making a payment every month.

   I will make my monthly payment on the 1st day of each month beginning on December 1, 2019. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest and other items in the order described in the Security Instrument before Principal. If, on November 1, 2049, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

   I will make my monthly payments at P.O. Box 6577, Carol Stream, IL 60197 or at a different place if required by the Note Holder.

   **(B) Amount of Monthly Payments.** My monthly payment will be in the amount of U.S. $771.29

4. **BORROWER'S RIGHT TO PREPAY.** I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

   I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to any accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

4879482049
FHA Multistate Fixed Rate Note
Bankers Systems™ VMP®
Wolters Kluwer Financial Services


q03432945629 0140 464 0103

1/21/2015
VMP1R (1502).00
Page 1 of 3

5. **LOAN CHARGES.** If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

6. **BORROWER'S FAILURE TO PAY AS REQUIRED**

   (A) **Late Charge for Overdue Payments.** If the Note Holder has not received the full amount of any monthly payment by the end of      Fifteen     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      4.000% of my overdue payment of principal and interest.

   I will pay this late charge promptly but only once on each late payment.

   (B) **Default.** If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

   (C) **Notice of Default.** If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

   (D) **No Waiver By Note Holder.** Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

   (E) **Payment of Note Holder's Costs and Expenses.** If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

7. **GIVING OF NOTICES.** Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

   Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8. **OBLIGATIONS OF PERSONS UNDER THIS NOTE.** If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9. **WAIVERS.** I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

FHA Multistate Fixed Rate Note
Bankers Systems™ VMP®
Wolters Kluwer Financial Services

1/21/2015
VMP1R (1502).00
Page 2 of 3

q03432945629 0140 464 0203

**10. UNIFORM SECURED NOTE.** This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Nicole Hickcox_    10/15/2019   *(Seal)*
Nicole Hickcox          **-Borrower**

_____ *(Seal)*
**-Borrower**

_____ *(Seal)*
**-Borrower**

_____ *(Seal)*
**-Borrower**

*(Sign Original Only)*

☐ Refer to the attached *Signature Addendum* for additional parties and signatures.

**Loan Origination Organization:** Quicken Loans Inc.
**NMLS ID:** 3030
**Loan Originator:** James W Lott
**NMLS ID:** 1792571

Without Recourse
Pay To the Order of

QUICKEN LOANS INC.

By_____
ASHLEY GRAY
CAPTURE MANAGER

FHA Multistate Fixed Rate Note
Bankers Systems℠ VMP®
Wolters Kluwer Financial Services

q03432945629 0140 464 0303

1/21/2015
VMP1R (1502).00
Page 3 of 3

# Exhibit B

2019900452270018
El Dorado, County Recorder
Janelle K. Horne Co Recorder Office
DOC 2019-0045227-00
Acct 1326-AMROCK TITLE CALIFORNIA INC
Thursday, OCT 24, 2019 14:45:39
Ttl Pd $142.00     Nbr-0002047974
RAB/C1/1-18

**Recording Requested By:**
See 'Return To:' Name

**Return To:**
Document Management
Quicken Loans Inc.
1050 Woodward Ave
Detroit, MI 48226-1906

**Prepared By:** Arica Hanna
1050 Woodward Ave
Detroit, MI 48226-1906
(313)373-0000

| 66028916 | 5198339 | Deed of Trust | 3432945629 |

**Property Address:** 4371 Park Woods Dr
Pollock Pines, CA 95726-9580
**APN:** 042533009000

**FHA Case No.**
049-1048662-703

**MIN:** 100039034329456299

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 15.

**(A)** **"Security Instrument"** means this document, which is dated October 15, 2019 , together with all Riders to this document.

**(B)** **"Borrower"** is Nicole Hickcox, a married woman, as her Sole and Separate Property

Borrower's address is 4371 Park Woods Dr, Pollock Pines, CA 95726-9580 . Borrower is the trustor under this Security Instrument.

**(C)** **"Lender"** is Quicken Loans Inc.

Lender is a Corporation

4879482061
FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services



q03432945629 0233 466 0117

9/30/2014
VMP4N(CA) (1605).00
Page 1 of 17

organized and existing under the laws of , the State of Michigan
Lender's address is 1050 Woodward Ave, Detroit, MI  48226-1906

**(D)** **"Trustee"** is Heather Lovier

**(E)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)** **"Note"** means the promissory note signed by Borrower and dated October 15, 2019 . The Note states that Borrower owes Lender One Hundred Seventy One Thousand Seven Hundred Sixty Two and 00/100
Dollars (U.S. $ 171,762.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  November 1, 2049 .

**(G)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** **"Loan"** means the debt evidenced by the Note, plus interest, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Planned Unit Development Rider
☒ Other Legal Attached
☐ Rehabilitation Loan Rider

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items"** means those items that are described in Section 3.

**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 0217

9/30/2014
VMP4N(CA) (1605).00
Page 2 of 17

damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** **"Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.

**(S)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | El Dorado | : |
|--------|-----|-----------|---|
| *(Type of Recording Jurisdiction)* | | *(Name of Recording Jurisdiction)* | |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

**Parcel ID Number:** 042533009000                          which currently has the address of
4371 Park Woods Dr                                                              *(Street)*
                 Pollock Pines                      *(City)*, California 95726-9580 *(Zip Code)*
("Property Address"):

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

q03432945629 0233 466 0317

9/30/2014
VMP4N(CA) (1605).00
Page 3 of 17

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as expressly stated otherwise in this Security Instrument or the Note, all payments accepted and applied by Lender shall be applied in the following order of priority:

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

q03432945629 0233 466 0417

9/30/2014
VMP4N(CA) (1605).00
Page 4 of 17

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.    Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified

---

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 0517

9/30/2014
VMP4N(CA) (1605).00
Page 5 of 17

under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

**5.    Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

q03432945629 0233 466 0617

9/30/2014
VMP4N(CA) (1605).00
Page 6 of 17

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 0717

9/30/2014
VMP4N(CA) (1605).00
Page 7 of 17

Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

q03432945629 0233, 466 0817

9/30/2014
VMP4N(CA) (1605).00
Page 8 of 17

repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold. Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 0917

9/30/2014
VMP4N(CA) (1605).00
Page 9 of 17

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

12. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 1017

9/30/2014
VMP4N(CA) (1605).00
Page 10 of 17

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

13. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Lender agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

14. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

15. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 1117

9/30/2014
VMP4N(CA) (1605).00
Page 11 of 17

conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

16. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding; (ii) reinstatement will preclude foreclosure on different grounds in the future; or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 1217

9/30/2014
VMP4N(CA) (1605).00
Page 12 of 17

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 1317

9/30/2014
VMP4N(CA) (1605).00
Page 13 of 17

Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services


q03432945629 0233 466 1417

9/30/2014
VMP4N(CA) (1605).00
Page 14 of 17

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

26. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

27. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services



q03432945629 0233 466 1517

9/30/2014
VMP4N(CA) (1605).00
Page 15 of 17

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.



_____  10/15/2019 _(Seal)_
Nicole Hickcox                                      **-Borrower**

_____ _(Seal)_
                                                    **-Borrower**

_____ _(Seal)_
                                                    **-Borrower**

_____ _(Seal)_
                                                    **-Borrower**

☐ Refer to the attached _Signature Addendum_ for additional parties and signatures.

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

q03432945629 0233 466 1617

9/30/2014
VMP4N(CA) (1605).00
Page 16 of 17

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of** California
**County of** El Dorado
On   October 15, 2019   , before me   CHERYL ADLER                    ,
Notary Public, personally appeared   Nicole Hickcox

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> **CHERYL ADLER**
> **COMM. #2270825**
> Notary Public - California
> El Dorado County
> My Comm. Expires Dec. 14, 2022



*Notary Public*

*My commission expires:*

**Loan Origination Organization:** Quicken Loans Inc.
**NMLS ID:** 3030
**Loan Originator:** James W Lott
**NMLS ID:** 1792571

---

FHA Deed of Trust With MERS-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

q03432945629 0233 466 1717

9/30/2014
VMP4N(CA) (1605).00
Page 17 of 17

## EXHIBIT A - LEGAL DESCRIPTION

Tax Id Number(s): 042533009000

Land situated in the County of El Dorado in the State of CA

LOT 41, AS SHOWN ON THE OFFICIAL MAP OF LAKEWOOD SIERRA UNIT NO. 1, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY ON NOVEMBER 4, 1969 IN MAP BOOK E, PAGE 47.

Commonly known as:    4371 Park Woods Drive, Pollock Pines, CA 95726-9580

THE PROPERTY ADDRESS AND TAX PARCEL IDENTIFICATION NUMBER LISTED ARE PROVIDED SOLELY FOR INFORMATIONAL PURPOSES

# Exhibit C

| | |
|---|---|
| **From:** | Wilburn, Patty on behalf of Wilburn, Patty <patricia.wilburn@norcal.aaa.com> |
| **To:** | O"Neil, Marques |
| **Subject:** | Re: Nicole Hickcox |
| **Date:** | Thursday, August 22, 2019 2:09:28 PM |
| **Attachments:** | hickcoxfairplan.pdf |
| | image001.png |

Here is a dec page.  I see the address needs to be changed.  This was the original address I was given.  Requesting change now.

On Wed, Aug 21, 2019 at 9:09 AM O'Neil, Marques <MarquesONeil@quickenloans.com> wrote:

Thank you so much



**Marques O'Neil** | Insurance Specialist
Direct: (313) 373-9257
Fax: (855) 902-1978

**HIGHEST IN CUSTOMER SATISFACTION IN THE U.S. – J.D. POWER**

**9** Consecutive Years 2010 – 2018  Primary Mortgage Origination

**6** Consecutive Years 2014 – 2019  Mortgage Servicing

**From:** Wilburn, Patty <patricia.wilburn@norcal.aaa.com>
**Sent:** Wednesday, August 21, 2019 12:08 PM
**To:** O'Neil, Marques <MarquesONeil@quickenloans.com>
**Subject:** Re: Nicole Hickcox

I will check and see if CA Fair Plan has sent out a Dec Page yet.  I will work on this today.  You will get 2 dec pages.  One is for fire only and the other is Hazard excluding fire.

On Wed, Aug 21, 2019 at 7:14 AM O'Neil, Marques <MarquesONeil@quickenloans.com> wrote:

Hello Patricia,

I left a voicemail stating that our mutual client, Nicole, is currently going through a refinance with us at Quicken Loans. The closing date is 08/27, so I was hoping you could

send me a declaration page with an effective date beginning on or before 08/27. Our mortgagee clause is:

Quicken Loans Inc. ISAOA

PO Box 202070

Florence, SC 29502

If you prefer faxing (disregard the fax number below), ours is 877-614-7414.

Thank you in advance.



**Marques O'Neil**  |  Insurance Specialist
Direct: (313) 373-9257
Fax: (855) 902-1978

--

*Patty Wilburn*

Insurance Agent

phone (916) 478-7513

fax (916) 691-5866

**\*Receive a $20 gift card each time someone you refer to me purchases a policy!\***

*Get more. Get AAA.*

This electronic transmission contains information from [AAA Northern California, Nevada & Utah, AAA Arizona Inc., AAA MountainWest Inc., or its affiliates ("AAA")] that may be confidential or privileged. The information is intended solely for the recipient and use by any other party is not authorized. This email and its contents shall not attach any liability on the originator or AAA. Views or opinions presented in this email are solely those of the author and may not necessarily reflect those of AAA. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us immediately by telephone or by electronic mail. Thank you.

--

*Patty Wilburn*

Insurance Agent

phone (916) 478-7513

fax (916) 691-5866

**\*Receive a $20 gift card each time someone you refer to me purchases a policy!\***

*Get more. Get AAA.*

# Composite Exhibit D

# Closing Disclosure

This form is a statement of final loan terms and closing costs. Compare this document with your Loan Estimate.

## Closing Information

| | |
|---|---|
| Date Issued | 10/10/2019 |
| Closing Date | 10/15/2019 |
| Disbursement Date | 10/21/2019 |
| Settlement Agent | Amrock Title California Inc. |
| File # | 66028916 |
| Property | 4371 Park Woods Dr |
| | Pollock Pines, CA 95726-9580 |
| Appraised Prop. Value | $ 355,000 |

## Transaction Information

| | |
|---|---|
| Borrower | Nicole Hickcox |
| | 4371 Park Woods Dr |
| | Pollock Pines, CA 95726-9580 |
| Lender | Quicken Loans Inc. |

## Loan Information

| | |
|---|---|
| Loan Term | 30 years |
| Purpose | Refinance |
| Product | Fixed Rate |
| Loan Type | ☐ Conventional ☒ FHA ☐ VA ☐ _____ |
| Loan ID # | 3432945629 |
| MIC # | 049-1048662 |

## Loan Terms

| | | Can this amount increase after closing? |
|---|---|---|
| **Loan Amount** | $ 171,762 | **NO** |
| **Interest Rate** | 3.5% | **NO** |
| **Monthly Principal & Interest** *See Projected Payments below for your Estimated Total Monthly Payment* | $ 771.29 | **NO** |
| | | **Does the loan have these features?** |
| **Prepayment Penalty** | | **NO** |
| **Balloon Payment** | | **NO** |

## Projected Payments

| Payment Calculation | Years 1-11 | Years 12-30 |
|---|---|---|
| Principal & Interest | $771.29 | $771.29 |
| Mortgage Insurance | + $111.56 | + -- |
| Estimated Escrow *Amount can increase over time* | + $238.66 | + $238.66 |
| **Estimated Total Monthly Payment** | **$1,121.51** | **$1,009.95** |

| Estimated Taxes, Insurance & Assessments *Amount can increase over time* *See page 4 for details* | $ 238.66 a month | This estimate includes ☒ Property Taxes ☒ Homeowner's Insurance ☐ Other: *See Escrow Account on page 4 for details. You must pay for other property costs separately.* | In escrow? Yes Yes |
|---|---|---|---|

## Costs at Closing

| **Closing Costs** | $ 18,030.07 | Includes $ 10,104.22 in Loan Costs +$ 7,925.85 in Other Costs - $ 0.00 in Lender Credits. *See page 2 for details.* |
|---|---|---|
| **Cash to Close** | $ 32,881.56 | Includes Closing Costs. *See Calculating Cash to Close on page 3 for details.* ☐ From ☒ To Borrower |

CLOSING DISCLOSURE
ed5f18949405c9a95c148813104b7e93
Wolters Kluwer Financial Services © 2014
10/10/2019 16:02:36 EDT


q03432945629 2342 456 0106

PAGE 1 OF 5 · LOAN ID # 3432945629

VMP6612F (1407).00

## Closing Cost Details

| Loan Costs | | Borrower-Paid At Closing | Borrower-Paid Before Closing | Paid by Others |
|---|---|---|---|---|
| **A. Origination Charges** | | | $5,512.13 | |
| 01  2.25 % of Loan Amount (Points) | | $3,864.65 | | |
| 02 Origination Fee | | $1,647.48 | | (L) $40.60 |
| 03 | | | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| **B. Services Borrower Did Not Shop For** | | | $4,592.09 | |
| 01 Appraisal Fee | to Amrock Inc. | $580.00 | | |
| 02 Credit Report/AUS | to FactualData-SB | $37.45 | | |
| 03 Flood Determination Fee | to CoreLogic Flood Services | $10.50 | | |
| 04 Flood Life of Loan Coverage | to CoreLogic Flood Services | $6.00 | | |
| 05 Life of Loan Tax Service | to CoreLogic Tax Services | $54.00 | | |
| 06 MIP Paid in Cash | to Federal Housing Administration | $0.14 | | |
| 07 Tax Certification Fee | to Amrock Title California Inc. | $25.00 | | |
| 08 Title-Express Mail/Courier Fee | to Amrock Title California Inc. | $45.00 | | |
| 09 Title-Lenders Title Policy | to Amrock Title California Inc. | $450.00 | | |
| 10 Title-Settlement or Closing Fee | to Amrock Title California Inc. | $430.00 | | |
| 11 Upfront Mortgage Insurance Premium | to Federal Housing Administration | $2,954.00 | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| **C. Services Borrower Did Shop For** | | | $0.00 | |
| 01 | | | | |
| 02 | | | | |
| 03 | | | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| 07 | | | | |
| 08 | | | | |
| 09 | | | | |
| 10 | | | | |
| **D. TOTAL LOAN COSTS (Borrower-Paid)** | | | $10,104.22 | |
| Loan Costs Subtotals (A + B + C) | | $10,104.22 | | |

| Other Costs | | | | |
|---|---|---|---|---|
| **E. Taxes and Other Government Fees** | | | $142.00 | |
| 01 Recording Fees    Deed:    Mortgage: $142.00 | | $142.00 | | |
| 02 | | | | |
| **F. Prepaids** | | | $7,120.82 | |
| 01 Homeowner's Insurance Premium (30  mo.) to Aaa * | | $1,445.00 | | |
| 02 Mortgage Insurance Premium (  mo.) | | | | |
| 03 Prepaid Interest $16.47  per day from 10/21/2019 to 11/01/2019 | | $181.17 | | |
| 04 Property Taxes ( 6  mo.) to El Dorado County | | $1,140.33 | | |
| 05 Delinquent Taxes County Taxes to C.I. Raffety, El Dorado Co | | $4,354.32 | | |
| **G. Initial Escrow Payment at Closing** | | | $663.03 | |
| 01 Homeowner's Insurance  $48.60  per month for 5  mo. | | $243.00 | | |
| 02 Mortgage Insurance  per month for  mo. | | | | |
| 03 Property Taxes  $190.06  per month for 4  mo. | | $760.24 | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| 07 Aggregate Adjustment | | $-340.21 | | |
| **H. Other** | | | $0.00 | |
| 01 | | | | |
| 02 | | | | |
| 03 | | | | |
| 04 | | | | |
| **I. TOTAL OTHER COSTS (Borrower-Paid)** | | | $7,925.85 | |
| Other Costs Subtotal (E + F + G + H) | | $7,925.85 | | |
| **J. TOTAL CLOSING COSTS (Borrower-Paid)** | | | $18,030.07 | |
| Closing Costs Subtotals (D + I) | | $18,030.07 | | $40.60 |
| Lender Credits | | | | |

CLOSING DISCLOSURE
Wolters Kluwer Financial Services © 2014


q03432945629 2342 456 0206

QKN-V662B-1 (1509).00

## Payoffs and Payments

**Use this table to see a summary of your payoffs and payments to others from your loan amount.**

| TO | AMOUNT |
|---|---|
| 01 Ellen K. Fischer Surviving Trustee | $121,350.37 |
| 02 Good Faith Deposit to Quicken Loans Inc. | $-500.00 |
| 03 | |
| 04 | |
| 05 | |
| 06 | |
| 07 | |
| 08 | |
| 09 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| **K. TOTAL PAYOFFS AND PAYMENTS** | $120,850.37 |

## Calculating Cash to Close

**Use this table to see what has changed from your Loan Estimate.**

| | Loan Estimate | Final | Did this change? |
|---|---|---|---|
| Loan Amount | $151,098 | $171,762.00 | YES • This amount **increased** |
| Total Closing Costs (J) | $-11,566 | $-18,030.07 | YES • See Total Loan Costs(D) and Total Other Costs(I) |
| Closing Costs Paid Before Closing | $0 | $ 0 | NO |
| Total Payoffs and Payments (K) | $-117,007 | $-120,850.37 | YES • See Payoffs and Payments (K) |
| **Cash to Close** | $22,525.00 | $32,881.56 | |
| | ☐ From ☒ To Borrower | ☐ From ☒ To Borrower | Closing Costs Financed (Paid from your Loan Amount)    $18,030.07 |

CLOSING DISCLOSURE

q03432945629 2342 456 0306

VMP663B (1407).00

# Additional Information About This Loan

## Loan Disclosures

### Assumption

If you sell or transfer this property to another person, your lender

[X] will allow, under certain conditions, this person to assume this loan on the original terms.

[ ] will not allow assumption of this loan on the original terms.

### Demand Feature

Your loan

[ ] has a demand feature, which permits your lender to require early repayment of the loan. You should review your note for details.

[X] does not have a demand feature.

### Late Payment

If your payment is more than 15 days late, your lender will charge a late fee of *4% of the monthly principal and interest payment.*

### Negative Amortization (Increase in Loan Amount)

Under your loan terms, you

[ ] are scheduled to make monthly payments that do not pay all of the interest due that month. As a result, your loan amount will increase (negatively amortize), and your loan amount will likely become larger than your original loan amount. Increases in your loan amount lower the equity you have in this property.

[ ] may have monthly payments that do not pay all of the interest due that month. If you do, your loan amount will increase (negatively amortize), and, as a result, your loan amount may become larger than your original loan amount. Increases in your loan amount lower the equity you have in this property.

[X] do not have a negative amortization feature.

### Partial Payments

Your lender

[ ] may accept payments that are less than the full amount due (partial payments) and apply them to your loan.

[X] may hold them in a separate account until you pay the rest of the payment, and then apply the full payment to your loan.

[ ] does not accept any partial payments.

If this loan is sold, your new lender may have a different policy.

### Security Interest

You are granting a security interest in
*4371 Park Woods Dr*
*Pollock Pines, CA 95726-9580*

You may lose this property if you do not make your payments or satisfy other obligations for this loan.

### Escrow Account

*For now,* your loan

[X] will have an escrow account (also called an "impound" or "trust" account) to pay the property costs listed below. Without an escrow account, you would pay them directly, possibly in one or two large payments a year. Your lender may be liable for penalties and interest for failing to make a payment.

| Escrow | | |
|---|---|---|
| Escrowed Property Costs over Year 1 | $4,202.64 | Estimated total amount over year 1 for your escrowed property costs: *Homeowners Insurance County Taxes Mortgage Insurance* |
| Non-Escrowed Property Costs over Year 1 | $0.00 | Estimated total amount over year 1 for your non-escrowed property costs: You may have other property costs. |
| Initial Escrow Payment | $663.03 | A cushion for the escrow account you pay at closing. See Section G on page 2. |
| Monthly Escrow Payment | $350.22 | The amount included in your total monthly payment. |

[ ] will not have an escrow account because [ ] you declined it [ ] your lender does not offer one. You must directly pay your property costs, such as taxes and homeowner's insurance. Contact your lender to ask if your loan can have an escrow account.

| No Escrow | | |
|---|---|---|
| Estimated Property Costs over Year 1 | $0.00 | Estimated total amount over year 1. You must pay these costs directly, possibly in one or two large payments a year. |
| Escrow Waiver Fee | $0.00 | |

### In the future,

Your property costs may change and, as a result, your escrow payment may change. You may be able to cancel your escrow account, but if you do, you must pay your property costs directly. If you fail to pay your property taxes, your state or local government may (1) impose fines and penalties or (2) place a tax lien on this property. If you fail to pay any of your property costs, your lender may (1) add the amounts to your loan balance, (2) add an escrow account to your loan, or (3) require you to pay for property insurance that the lender buys on your behalf, which likely would cost more and provide fewer benefits than what you could buy on your own.

## Loan Calculations

| | |
|---|---|
| **Total of Payments.** Total you will have paid after you make all payments of principal, interest, mortgage insurance, and loan costs, as scheduled. | $301,060.51 |
| **Finance Charge.** The dollar amount the loan will cost you. | $128,220.56 |
| **Amount Financed.** The loan amount available after paying your upfront finance charge. | $162,554.56 |
| **Annual Percentage Rate (APR).** Your costs over the loan term expressed as a rate. This is not your interest rate. | 4.506 % |
| **Total Interest Percentage (TIP).** The total amount of interest that you will pay over the loan term as a percentage of your loan amount. | 61.761 % |

**Questions?** If you have questions about the loan terms or costs on this form, use the contact information below. To get more information or make a complaint, contact the Consumer Financial Protection Bureau at **www.consumerfinance.gov/mortgage-closing**

## Other Disclosures

**Appraisal**
If the property was appraised for your loan, your lender is required to give you a copy at no additional cost at least 3 days before closing. If you have not yet received it, please contact your lender at the information listed below.

**Contract Details**
See your note and security instrument for information about
- what happens if you fail to make your payments,
- what is a default on the loan,
- situations in which your lender can require early repayment of the loan, and
- the rules for making payments before they are due.

**Liability after Foreclosure**
If your lender forecloses on this property and the foreclosure does not cover the amount of unpaid balance on this loan,

☒ state law may protect you from liability for the unpaid balance. If you refinance or take on any additional debt on this property, you may lose this protection and have to pay any debt remaining even after foreclosure. You may want to consult a lawyer for more information.

☐ state law does not protect you from liability for the unpaid balance.

**Refinance**
Refinancing this loan will depend on your future financial situation, the property value, and market conditions. You may not be able to refinance this loan.

**Tax Deductions**
If you borrow more than this property is worth, the interest on the loan amount above this property's fair market value is not deductible from your federal income taxes. You should consult a tax advisor for more information.

## Contact Information

| | Lender | Mortgage Broker | Real Estate Broker (B) | Real Estate Broker (S) | Settlement Agent |
|---|---|---|---|---|---|
| **Name** | Quicken Loans Inc. | | | | Amrock Title California Inc. |
| **Address** | 1050 Woodward Ave  Detroit, MI 48226-1906 | | | | 17785 Center Court Dr., Ste. 760  Cerritos, CA 90703 |
| **NMLS ID** | 3030 | | | | |
| **CA License ID** | | | | | U-3124-5 |
| **Contact** | James W Lott | | | | Gary Wallace |
| **Contact NMLS ID** | 1792571 | | | | |
| **Contact CA License ID** | | | | | |
| **Email** | JamesLott@quickenloans.com | | | | cdqwallace@amrock.com |
| **Phone** | (800) 226-6308 | | | | (866) 313-6336 |

## Confirm Receipt

By signing, you are only confirming that you have received this form. You do not have to accept this loan because you have signed or received this form.



| | |
|---|---|
| **Applicant Signature**  Nicole Hickcox | 10/15/2019  **Date** |
| **Co-Applicant Signature** | **Date** |

Wolters Kluwer Financial Services © 2014                              VMP1665 (1407).00

Checking Account #: 465890320

Borrower Name: Nicole Hickcox

Seller Name:

CLOSING Ledger

Order #: 66028916

Client Name/Number: Quicken Loans, Inc. / 20555

Property Address: 4371 Park Woods Dr, Pollock Pines, CA 95726-9580

| Transaction Date/Time | Transaction Type | Line Description | Transaction Number | Escheat Status | Comments | Memo Line | Payable To | Amount |
|---|---|---|---|---|---|---|---|---|
| 10/21/2019 8:34:57 AM | WIREIN | | 90514214 | | | RECONCILED | Quicken Loans | $162,238.58 |
| 10/23/2019 4:05:01 PM | WIREIN | | 90515582 | | | | Quicken Loans Inc. | $16.47 |
| | | | | | | | **Total Funds In:** | **$162,255.05** |
| 10/22/2019 1:49:10 PM | QUICKENOVERAGE | Principal Curtailment | 0 | | Section(s) K | Principal CurtailmentPENDING | Quicken Loans, Inc. | $16.47 |
| 2019-10-22T1 3:49:11.49 | CHECK | Hazard Insurance | 1189393 | | Section(s) F | CAH3211083025 | AAA * | $1,444.00 |
| 2019-10-22T1 3:49:11.77 | CHECK | County Taxes | 1189394 | | Section(s) F | Property Tax ID: 042533009000 1ST HALF | EL DORADO COUNTY | $1,149.33 |
| 2019-10-22T1 3:49:12.29 | CHECK | County Taxes | 1189395 | | Section(s) F | Property Tax ID: 042533009000 DEFAULT | EL DORADO COUNTY | $4,354.32 |
| 2019-10-22T1 3:49:12.58 | WIREOUT | [ ] From [X] To Borrower | 1189396 | | Section(s) O | Loan ProceedsRECONCILED | Nicole Hickcox | $32,885.56 |
| 2019-10-22T1 3:49:13.37 | INTERNALTXFER | Bundled transaction | 0 | | Section(s) B | | Amrock Title California Inc. | $925.00 |
| 2019-10-22T1 3:49:13.71 | RECORDINGCOSTS | | 0 | | Section(s) E | | Amrock Title California Inc. | $142.00 |
| 10/23/2019 6:19:58 PM | CHECK | 4371 Park Woods Dr | 1190920 | | Section(s) K | 4371 Park Woods/ Hickcox | Ellen K. Fischer Surviving Trustee | $121,355.37 |
| | | | | | | | **Total Funds Out:** | **($162,255.05)** |
| | | | | | | | **Ledger Balance:** | **$0.00** |

Case 2:22-cv-00439-TLN-CSK Document 99-3 Filed 04/06/23 Page 49 of 261

**Amrock Title California Inc.**

17785 Center Court Dr N, Ste 760
Cerritos, CA  90703
PH: (562) 356-0712



JP Morgan Chase Bank
California
File: 66028916

9-32
720

1189393

| | Date | Amount |
|---|---|---|
| | October 22, 2019 | $**1,445.00 |

One Thousand Four Hundred Forty Five Dollars And 00 Cents

PAY TO THE    AAA *
ORDER OF      ,

COPY

Void after Six Months

CAH3211083025

C 0 1 1 8 9 3 9 3 C   A 0 7 2 0 0 0 3 2 6 A     4 6 5 8 9 0 3 2 0 C

Payee:    AAA *

HUD Lines:
F1. Homeowner's Insurance Premium  $1,445.00

,

| | |
|---|---|
| Order Number: | 66028916 |
| Check Number: | 1189393 |
| Comments: | Section(s) F |
| Cut By: | mi\MFernandez1 |
| Date: | October 22, 2019 |
| Amount: | $1,445.00 |
| Borrower: | Nicole Hickcox |
| Address: | 4371 Park Woods Dr |
| | Pollock Pines, CA  95726-9580 |
| Brief Legal: | ACRES: 0.3285 / L 41  41 |

# Exhibit E

**In the Matter Of:**

HICKCOX V ROCKET MORTGAGE

**RECORDED CUSTOMER SERVICE CALL**

*August 03, 2020*



800.211.DEPO (3376)
*EsquireSolutions.com*

A RECORDED CUSTOMER SERVICE CALL
AUDIO FILE:  dec-28274-16-48-59(1380996.1)

Monday, August 3, 2020


IN RE:  NICOLE HICKCOX v. ROCKET MORTGAGE, LLC

Transcribed by:
Christine Aiello

J9480431



* * *

QUICKEN LOANS AGENT:  Thank you for calling Quicken Loans senior research team.  My name is Nikki Vance.  Who do I have the pleasure of speaking to?

QUICKEN LOANS AGENT:  Hi, Nikki.  This is Autumn from servicing.  I have a loan number when you're ready.

QUICKEN LOANS AGENT:  Thank you, Autumn.

QUICKEN LOANS AGENT:  It's 343 --

QUICKEN LOANS AGENT:  Uh-huh.

QUICKEN LOANS AGENT:  -- 2945629.

QUICKEN LOANS AGENT:  For Nic -- Nicole?

QUICKEN LOANS AGENT:  Yes.  We have Nicole fully disclosed and verified.

QUICKEN LOANS AGENT:  Okay.  How can I help her?

QUICKEN LOANS AGENT:  She's calling in today because she's been dealing with an insurance issue.  We did not pay one of her policies, and it is -- she's been dealing with this since March.  And she does not want to speak to anybody else but a supervisor.

QUICKEN LOANS AGENT:  Okay.  Did you reach out to insurance regarding this matter?

QUICKEN LOANS AGENT:  No.  She wants a



800.211.DEPO (3376)
EsquireSolutions.com

supervisor.  She -- she wants to sue us.

QUICKEN LOANS AGENT:  Oh, okay.  Give me just one second.

QUICKEN LOANS AGENT:  Sure.

QUICKEN LOANS AGENT:  Go ahead and bring her on.

QUICKEN LOANS AGENT:  Thank you.

QUICKEN LOANS AGENT:  Did she say which policy wasn't paid?

QUICKEN LOANS AGENT:  FAIR -- FAIR life.

QUICKEN LOANS AGENT:  FAIR -- FAIR plan?

QUICKEN LOANS AGENT:  For her deck policy, FAIR plan, yeah.

QUICKEN LOANS AGENT:  Okay.

QUICKEN LOANS AGENT:  For her deck.

QUICKEN LOANS AGENT:  Okay.  Go ahead and bring her over.

QUICKEN LOANS AGENT:  Thank you.

All right.  (Indiscernible).  Thank you for your patience, Nicole.  I did go ahead and bring Nikki on the line from my executive team.  She's going to take the call over from here.

NICOLE HICKCOX:  Thank you.

QUICKEN LOANS AGENT:  You're welcome.

NICOLE HICKCOX:  Hi, Ryan.  Are you on line,



as well?

ASSURANT AGENT:  Yes, I am.

NICOLE HICKCOX:  Okay.  Hi.  I don't -- Nikki, my name is Nic -- Nicky, as well, and I have Ryan with your insurance department who just called.  And I'm calling because this situation with my deck is not getting resolved.

Ryan, I am aware that AAA is also one of my coverages.  It doesn't cover the deck.  The insurance that was supposed to cover the deck was not paid by Quicken Loans.  So it is up to Quicken Loans to figure out how this deck is supposed to be paid.  This month that deck has been on the ground for five months.  I have been told, call AAA, call Quicken Loans, call AAA, call Quicken Loans.  Nothing is getting resolved.

I know that I paid for a loan on this home with Quicken Loans.  I've been -- I've paid over the minimum amount.  I've paid extra payments.  I'm a good client.  And I have had it.  AAA is saying it's the FAIR plan, which was not paid.  That cancel -- that -- that policy was canceled in January because it was not paid by Quicken Loans.  I already have that acknowledged by a Quicken Loans representative, you're right, we didn't pay that.

My deck is still on the ground.  And hey, I'm



sorry, it's AAA's problem, is not going to cut it anymore.  AAA is saying, hey, it's not; it's FAIR plan's problem, that wasn't paid.  That's not going to cut it anymore.  I am going to take my loan to someone else and I am going to hire an attorney and someone is going to get sued.

I'm on a second-story home.  My deck is required to gain entry to my home.  This isn't for aesthetics.  This isn't so it's pretty.  It's required to enter the home.  So someone needs to figure it out.  I'm not making any more calls.  I want this handled in a professional manner.  I'm not a mortgage broker.  I didn't put this loan together.  My loan includes my insurance and my taxes.

Now I'm being told that this isn't covered because my insurance wasn't paid.  So where do I go from here?

ASSURANT AGENT:  Okay.  Well, first, I'm very sorry for all the back-and-forth you've had to go through.  I -- you know --

NICOLE HICKCOX:  Well, my --

ASSURANT AGENT:  -- I -- you know, I'm sorry you're so frustrated.  I am going to do what I can to help you out.  I wasn't aware that AAA canceled your policy back in January.  Because when I -- like I said,



when I had reached out to them, you know -- or rather, when I reached out to Quicken Loans, you know, according to them, you were still insured with AAA at the time of the loss.  So --

NICOLE HICKCOX:  I have two insurance policies, Ryan.  One is with AAA; and the other one is called a FAIR plan, and that handles the disasters, wind, hail, fire, that kind of thing, storms, okay?

ASSURANT AGENT:  Sure.

NICOLE HICKCOX:  That insurance policy with FAIR plan was not paid by Quicken Loans, admittedly, no, we did not pay it.  They -- it was an error.  I don't have a problem with that, but there's GAP insurance, there's something to cover this.  This deck needs to be --

ASSURANT AGENT:  Okay.

NICOLE HICKCOX:  -- be replaced.

ASSURANT AGENT:  Okay.  So -- okay.  So both of your policies with the FAIR plan and with AAA were canceled prior to the date of loss, that's what you're telling me, correct?

NICOLE HICKCOX:  I'm telling you AAA is still in play.  That was not canceled.  FAIR plan never got their money, so that was canceled due to nonpayment by Quicken Loans, yes.



ASSURANT AGENT:  Okay.  So -- okay.  So your AAA policy was active during the date of loss, but they're saying they're not going to cover it, is that what you're --

NICOLE HICKCOX:  Correct.

ASSURANT AGENT:  -- telling me?

NICOLE HICKCOX:  Correct.  And I'm not an insurance agent, so I don't know where this falls.  I just know my deck has been on the ground for five months and I keep calling everybody and it's not -- I'm -- I am no further ahead today than I was when that deck fell on the ground on March 13th.

ASSURANT AGENT:  Okay.  Well, again, I'm sorry.  I didn't -- I didn't know that AAA wasn't going to cover it.  So here -- here's what I would like you to do for me, if you could, get a copy of the denial letter from AAA and email it to me, I will send it to my -- my company's account executives, as well as my research team.  We will get with Quicken Loans to see if there is a way we can get a force-placed policy, which -- which our policy, just to be upfront with you, our policies only cover structure, which -- which could potentially cover the deck, and then we could get someone out there to help you out with the repairs.

But again, I am going to let you know that



we're still leaving it up to Quicken Loans as to if they're going to take a policy out with us so that we can try and cover this for you.  But if you can still give me a copy of that cancelation letter, then we can at least move forward in that direction and see about at least getting a policy with us.

NICOLE HICKCOX:  Okay.  Here's the deal, the cancelation letter would have went to Quicken Loans, because that's where the payment was come -- coming from because it was a part of my loan.  I will get ahold of AAA, a final time, to get a copy of that if they can get it for me.

QUICKEN LOANS AGENT:  I'm sorry to interrupt --

NICOLE HICKCOX:  So what --

QUICKEN LOANS AGENT:  -- Nicole.

NICOLE HICKCOX:  Yes, ma'am.  Yes, go --

QUICKEN LOANS AGENT:  This is --

NICOLE HICKCOX:  -- ahead.

QUICKEN LOANS AGENT:  -- Nikki.  Well, I have one --

NICOLE HICKCOX:  Yes, ma'am.

QUICKEN LOANS AGENT:  -- question.

Ryan, what company do you represent?

ASSURANT AGENT:  I work for Assurant.  We're



also known as --

QUICKEN LOANS AGENT:  Okay.

ASSURANT AGENT:  -- American Security Insurance.

QUICKEN LOANS AGENT:  Okay.  I just wanted to make sure that I knew where you were talking -- what company you was representing.

Okay.  Nicole, you can carry on.

NICOLE HICKCOX:  Yeah.

QUICKEN LOANS AGENT:  I'm sorry.  I just wanted to make sure I was --

NICOLE HICKCOX:  No, you're --

QUICKEN LOANS AGENT:  -- on the same page --

NICOLE HICKCOX:  -- fine.

QUICKEN LOANS AGENT:  -- as everybody.

NICOLE HICKCOX:  You're fine.  Any questions, you're probably as confused as I am.  So I don't care if we have a board meeting over this, I need this resolved.  So let me just please, because -- and I guess let's go on simple.

I'm going to give you a copy of my cancelation.  What is that going to do, in layman terms?  What is the next steps, to see if I can get covered by the GAP insurance?

ASSURANT AGENT:  Yes, that is correct.  That



is pretty much what we'll do is take the (indiscernible) and we will pretty much, we'll take a look at that and our underwriters will get with Quicken Loans and we'll determine if -- if Quicken Loans is going to take out a policy with us in which to cover the date of loss and to see if we can get someone. Because, you know, for what -- for -- for whatever reason, AAA said they're not going to cover it.  You know, I don't -- I don't know the reason for why they denied -- denied the claim, but maybe it's something that we could potentially cover.

You know, I'm just trying to give you another option, you know, before we flat out just say, no, we're not going to cover anything.  Because there --

NICOLE HICKCOX:  But there is a --

ASSURANT AGENT:  -- does need to be some --

NICOLE HICKCOX:  -- possibility that --

ASSURANT AGENT:  -- kind of coverage --

NICOLE HICKCOX:  -- might --

ASSURANT AGENT:  -- for the --

NICOLE HICKCOX:  -- happen, correct?

ASSURANT AGENT:  That is correct.  There is a possibility that our account executives will say, no, because there was primary insurance in place, you know, we're not going to cover this.  But again, I'd still



want to at least try, you know, before just not, you know, not exhausting all options.

NICOLE HICKCOX:  Okay, all right.  Well, then I will get a copy of that.  And I have made my agent with AAA -- AAA very aware that if I am told, and that's fine, if I am told, hey, we're not covering this, and then AAA wants to stand on that, as well, you're both getting sued.  Someone is going to pay for this.  And I am going to move my loan over to somebody more qualified.  Not trying to be rude.

And, Ryan, this has nothing to do with you because you're insurance.

So, Nikki, this is back at you.  When I applied for my loan for my home, I -- I started in July.  It didn't close until October.  And now I've been dealing with this deck mess, as well.  And like I said, I'm ahead in my payments.  I always pay over, and I've paid extra payments.  So I'm a really good client.  And I'm just not going to -- this is not okay with me, and I'm not going to let it be okay and just be out of pocket here for a deck that should have been covered.

And I don't care who it should have been covered with.  I'm really at that place.  I am just really frustrated.  So I just want everyone to know, and we're all on the same page.



800.211.DEPO (3376)
EsquireSolutions.com

QUICKEN LOANS AGENT:  All right.  And definitely, I do understand that --

ASSURANT AGENT:  Can I give you --

QUICKEN LOANS AGENT:  -- Nicole.

Go ahead.

ASSURANT AGENT:  Okay.  I was --

QUICKEN LOANS AGENT:  Go ahead.

ASSURANT AGENT:  -- just going to see -- I was going to see if I could just give you my direct email address so you can send me a copy of that letter.

NICOLE HICKCOX:  That would be great.

ASSURANT AGENT:  Okay.  Let me know when you are ready.

NICOLE HICKCOX:  I am ready.

ASSURANT AGENT:  Okay.  So my email address is Ryan, R-y-a-n --

NICOLE HICKCOX:  Uh-huh.

ASSURANT AGENT:  -- dot -- dot D as in dog, dot Miller@assurant.com.

NICOLE HICKCOX:  All right, all right.  Thank you, Ryan.  I will get --

QUICKEN LOANS AGENT:  I'm sorry.

NICOLE HICKCOX:  -- that to you --

QUICKEN LOANS AGENT:  I just want --

NICOLE HICKCOX:  -- and --


ESQUIRE
DEPOSITION SOLUTIONS

QUICKEN LOANS AGENT:  I'm sorry, I just wanted to add --

NICOLE HICKCOX:  Oh.

QUICKEN LOANS AGENT:  I -- I just have a few questions just so I can help through trying -- because I'm also going to do some research on my end, Nicole, because I'm seeing that --

NICOLE HICKCOX:  Okay.  Do you --

QUICKEN LOANS AGENT:  -- you --

NICOLE HICKCOX:  -- need Ryan on the line for that?  Because I can let him go because I think he and I --

QUICKEN LOANS AGENT:  Yeah.

NICOLE HICKCOX:  -- have gone as far as we --

QUICKEN LOANS AGENT:  I may need him just to answer a few of these questions, also.  I just have a --

NICOLE HICKCOX:  Okay.

QUICKEN LOANS AGENT:  -- question, because I pulled up you're closing disclosure, and I'm seeing that at the time of the closing, the only party that was listed was AAA for your homeowners insurance --

NICOLE HICKCOX:  That's not --

QUICKEN LOANS AGENT:  -- provider.

NICOLE HICKCOX:  Yeah, that's not correct.



Actually, my agent with AAA was on the phone with the man, and I think his name was Jonathan, I'm sorry, it may be wrong, but I believe it was Jonathan --

QUICKEN LOANS AGENT:  Uh-huh.

NICOLE HICKCOX:  -- who was putting my loan together.  He was very aware there was -- there was two insurance policies in terms of this loan, and they both had to be paid prior to acceding this loan because that was a requirement to close the loan.  So that was --

QUICKEN LOANS AGENT:  Okay.

NICOLE HICKCOX:  -- done.  Money was sent to Quicken Loans to cover that policy.  And in error, rather than send FAIR plan their money, they accidentally sent that to AAA with no note, no, hey, this is where this goes, just sent them the money.  So by law, they were required, and I'm sure Ryan can say, yes, this is true, they were required to give me the overpayment.  There was no instructions.  And -- and so I was given the money that was beyond the -- the policy that AAA honored.  I -- with -- again, with no information, hey, this is to go back to FAIR plan.

The money was not the issue.  I had the money for the loan.  So it wasn't because I didn't -- it was because it wasn't handled correctly.  And I had no idea.  And then my policy lapsed in January with them,



which I will see what information, Ryan, I will get on that --

ASSURANT AGENT:  Okay.

NICOLE HICKCOX:  -- and give it back to you. And then in March my deck fell, so it wasn't covered. Now here I sit five months later.  And I've got two grandbabies that are at my house, and I have to put furniture in front of the door because it's not safe.

QUICKEN LOANS AGENT:  Okay, all right.  So what I'm going to do --

NICOLE HICKCOX:  So that's --

QUICKEN LOANS AGENT:  -- on my --

NICOLE HICKCOX:  -- it.

QUICKEN LOANS AGENT:  -- end is I am going to research the portion of the California plan that should have been disbursed at --

NICOLE HICKCOX:  In place.

QUICKEN LOANS AGENT:  -- at closing.

NICOLE HICKCOX:  Uh-huh.

QUICKEN LOANS AGENT:  Because I do see that payment for the amount, that was corrected --

NICOLE HICKCOX:  Uh-huh.

QUICKEN LOANS AGENT:  -- at your closing, does match the amount that was -- that indicates FAIR plan's premium for renewal --



NICOLE HICKCOX:  Thank you.

QUICKEN LOANS AGENT:  -- that was --

NICOLE HICKCOX:  Correct.

QUICKEN LOANS AGENT:  -- disbursed in January. So I will look into that on my end.

And collectively, Ryan, if you have any questions for me, did you want me to give you my extension or direct phone number?

ASSURANT AGENT:  Sure, that would be great just in case.

QUICKEN LOANS AGENT:  Sure.  So my direct phone number is (313) 782-8274.

ASSURANT AGENT:  Okay.  And your extension?

QUICKEN LOANS AGENT:  My extension is 28274.

ASSURANT AGENT:  28274.  All right.  So just to confirm, your number is (313) 782-8 -- 8274, and your extension is 28274?

QUICKEN LOANS AGENT:  Correct.

ASSURANT AGENT:  Okay, all right.  I'll make sure I put that in my notes and then I will be on the look out for that cancelation letter and we can see what we can do for you.

NICOLE HICKCOX:  You'll have it in the next couple days, okay?

ASSURANT AGENT:  All right.  Sounds --



NICOLE HICKCOX:  Thank you.

ASSURANT AGENT:  -- good.  I hope to -- all right.

NICOLE HICKCOX:  Thank you.

ASSURANT AGENT:  Awesome.  Thank you.

NICOLE HICKCOX:  Oh, Ryan, one more thing before you go, I do want to clarify, because I don't know --

ASSURANT AGENT:  Sure.

NICOLE HICKCOX:  -- what took the deck down. I'm sorry, I -- I think that this is vital to the conversation.  It was a hell of a storm.  We had wind advisories.  We had hail.  We had snow.  I mean, it was rain.  I've got trees down in my yard.  So what -- you know, to say what took the deck down, I don't know, but nobody can.  I mean, you know, and so I -- what I guess I'm getting at is I don't want split hairs, well, it could have been the hail and not the wind, so, therefore, it's not covered.

I'm not -- do you understand what I'm trying to say?

ASSURANT AGENT:  Yes, I absolutely understand --

NICOLE HICKCOX:  Okay.

ASSURANT AGENT:  -- what you're trying to say.



NICOLE HICKCOX:  Thank you.

ASSURANT AGENT:  And so -- so in the -- in the event, and this is hypothetical -- a hypothetical, but in the event that, you know, a policy is taken out with my company, you know, and --

NICOLE HICKCOX:  Yeah.

ASSURANT AGENT:  -- what -- and what we would do is if it was, is that we would backdate it to when your policy lapsed with the FAIR plan.  You know, if --

NICOLE HICKCOX:  Okay.

ASSURANT AGENT:  -- you know, if -- so our -- our -- our policies do cover windstorms, as well as hailstorms.  So --

NICOLE HICKCOX:  Oh, okay.

ASSURANT AGENT:  -- we -- we -- we would -- it would -- it would still allow us to get someone out there to at least take a look at everything regardless of, you know, what -- what type of, you know, wind or hail was coming down.

NICOLE HICKCOX:  Correct.  Okay.  Thank you very much.

ASSURANT AGENT:  Yes, no problem.

NICOLE HICKCOX:  All right.  Thank you.

Nikki, do you need anything else from me?

QUICKEN LOANS AGENT:  No, ma'am, I don't need



anything else, but I do just want to go over a recap to make sure we are all leaving out on the same page.  So right --

NICOLE HICKCOX:  Yes.

QUICKEN LOANS AGENT:  -- now, Nicole, you'll be forwarding over to Ryan a copy of your cancelation letter, which is --

NICOLE HICKCOX:  Yes, ma'am.

QUICKEN LOANS AGENT:  -- the California FAIR plan --

NICOLE HICKCOX:  Yes.

QUICKEN LOANS AGENT:  -- or a different, AAA?

NICOLE HICKCOX:  Correct.

QUICKEN LOANS AGENT:  Okay.  So you'll be sending a denial --

ASSURANT AGENT:  Both --

QUICKEN LOANS AGENT:  -- letter from California --

ASSURANT AGENT:  Both would be awesome.

NICOLE HICKCOX:  Okay.

QUICKEN LOANS AGENT:  Okay.  So you'll be sending over a denial letter from both California FAIR plan, as well as the AAA.  And then --

NICOLE HICKCOX:  AAA was no -- oh, the denial, yes, yes.  Okay.



ASSURANT AGENT:  Yes.

QUICKEN LOANS AGENT:  All right.

NICOLE HICKCOX:  Yes, ma'am.

QUICKEN LOANS AGENT:  And then once Ryan receives that, he's going to seek options to see if we can implement the force-placed policy.  I'm going to --

NICOLE HICKCOX:  Okay.

QUICKEN LOANS AGENT:  -- research the disbursement that was issued to AAA for the --

NICOLE HICKCOX:  Okay.

QUICKEN LOANS AGENT:  -- $1,445 that should have gone to California FAIR plan.

NICOLE HICKCOX:  Thank you.

QUICKEN LOANS AGENT:  And then I just have one last question, and then I'll let you go, Nicole.  So you did --

NICOLE HICKCOX:  Yes.

QUICKEN LOANS AGENT:  -- receive the difference of the policy --

NICOLE HICKCOX:  I received --

QUICKEN LOANS AGENT:  -- that was issued at --

NICOLE HICKCOX:  -- a --

QUICKEN LOANS AGENT:  -- closing?

NICOLE HICKCOX:  -- check.  I received -- if you're talking about the funds, I received a check from



AAA with no explanation.  It was just in form of like an overpayment.  And this is the first time I've ever taken a loan out for a home, so a little bit novice on that end.  I didn't investigate and dig in as to why. Maybe I'm naive for trusting, but that's really what happened.  And yes --

QUICKEN LOANS AGENT:  All right.  So --

NICOLE HICKCOX:  -- I did deposit those funds.

QUICKEN LOANS AGENT:  And that was in the -- what was the amount of the refund, was it $772.85 approximately?

NICOLE HICKCOX:  You know what, Nikki, I would have to go back and look.  It was a large sum.  It was -- it was probably $700 or more.  I -- I want to say nine-something, but don't quote me, because I would have to pull it up to see, to remember.

QUICKEN LOANS AGENT:  Okay, all right.  Sorry, I just wanted to make sure I have all of my bases covered.  And if you have any questions, Nicole, prior to Ryan or myself following up with you, you have my direct phone number, you're more than welcome to reach me.

Ryan, do we have --

NICOLE HICKCOX:  Okay.

QUICKEN LOANS AGENT:  -- an anticipated turn



time that you would collectively have the information for your research portion?

NICOLE HICKCOX:  I'm going to -- are you talking about the AAA denial and the cancelation from FAIR plan?

QUICKEN LOANS AGENT:  Yes, but I'm --

NICOLE HICKCOX:  Because he --

QUICKEN LOANS AGENT:  -- saying --

NICOLE HICKCOX:  -- will have that --

QUICKEN LOANS AGENT:  -- once you --

NICOLE HICKCOX:  -- within --

QUICKEN LOANS AGENT:  -- receive it -- once you receive it, I'm just trying to see what the turnaround time of before we know which direction we're going.

NICOLE HICKCOX:  Oh, okay.

So, Ryan, you should have that from me no later than Wednesday.  Probably sooner --

ASSURANT AGENT:  Okay.

NICOLE HICKCOX:  -- but no later than Wednesday.

ASSURANT AGENT:  Okay.  Yeah, and then once I get it, I will forward it to my account executive/research team.  I'll ask them to expedite it. Unfortunately, I can't give -- I can't give you a



concrete timeline as to when they would get back to me, but -- but I will promise you at least I will follow -- follow up every couple of days after that until we do get some kind of answer from them, but I would think it would take, you know, no more than a week.

        But like I said, I can't give you anything until -- until I actually give it to them.

        QUICKEN LOANS AGENT:  Okay.  And --

        NICOLE HICKCOX:  Okay.

        QUICKEN LOANS AGENT:  -- is it possible you could include me on the email, that way I can stay in the loop, or not?

        NICOLE HICKCOX:  Are you --

        ASSURANT AGENT:  Yeah.

        NICOLE HICKCOX:  -- talking about me, Nikki? Oh, okay.

        QUICKEN LOANS AGENT:  Yes.  So my email address is D as in delta --

        NICOLE HICKCOX:  Yeah.

        QUICKEN LOANS AGENT:  -- W as in whiskey, U like unicorn --

        NICOLE HICKCOX:  Yeah.

        QUICKEN LOANS AGENT:  -- N as in Nancy, N as in Nancy, E --

        NICOLE HICKCOX:  Yeah.



QUICKEN LOANS AGENT:  -- K as in kilo, A as in apple --

NICOLE HICKCOX:  Uh-huh.

QUICKEN LOANS AGENT:  -- Vance, V as in Victor, a-n-c-e --

NICOLE HICKCOX:  Okay.  D --

QUICKEN LOANS AGENT:  -- @quicken --

NICOLE HICKCOX:  -- W --

QUICKEN LOANS AGENT:  -- loans.com.

NICOLE HICKCOX:  I'm sorry, it's -- it's what?

QUICKEN LOANS AGENT:  @quickenloans.com.

NICOLE HICKCOX:  Okay.  Let me get this straight.  D-w-u-n-n-e-k-a-v?  And what comes after that?

QUICKEN LOANS AGENT:  A as in apple, N --

NICOLE HICKCOX:  Yeah.

QUICKEN LOANS AGENT:  -- as in Nancy, C as in Charlie, E as in echo.

NICOLE HICKCOX:  Okay.  At Quicken Loans?

QUICKEN LOANS AGENT:  Dot com, yes --

NICOLE HICKCOX:  All right.

QUICKEN LOANS AGENT:  -- ma'am.

NICOLE HICKCOX:  Got it.

And do you got that, too, Ryan?

ASSURANT AGENT:  Yes, I've got it.



NICOLE HICKCOX:  Perfect.

QUICKEN LOANS AGENT:  All right.  So --

NICOLE HICKCOX:  Okay, then.  We're all --

QUICKEN LOANS AGENT:  -- if you both would just --

NICOLE HICKCOX:  -- on the --

QUICKEN LOANS AGENT:  -- include me --

NICOLE HICKCOX:  -- same page.

QUICKEN LOANS AGENT:  -- on the email, that way we can all stay in the loop of what's going on.

NICOLE HICKCOX:  All right.  Thank you very much.

QUICKEN LOANS AGENT:  You're welcome.  Have a great day.

ASSURANT AGENT:  All right.

NICOLE HICKCOX:  You, too.  Bye-bye.

ASSURANT AGENT:  (Indiscernible).

QUICKEN LOANS AGENT:  Bye-bye.

ASSURANT AGENT:  Bye-bye.

NICOLE HICKCOX:  Yes, Rob.

                        * * *



STATE OF WASHINGTON)
                                    ) SS
COUNTY OF WHATCOM   )

            I, CHRISTINE AIELLO, do hereby certify that I transcribed the audio, and that the foregoing is a true and complete transcription of the audio transcribed under my personal direction.

            IN WITNESS WHEREOF, I do hereunto set my hand at Blaine, Washington, this 24th day of March, 2023.

_____
            Christine Aiello



**$**

$1,445
  20:11
$700
  21:14
$772.85
  21:10

**(**

(313)
  16:16

**1**

13th
  7:12

**2**

28274
  16:14,15,
  17
2945629
  2:12

**3**

313 782-
8274
  16:12
343
  2:10

**7**

782-8
  16:16

**8**

8274
  16:16

**@**

@quicken
  24:7
@
quickenloan
s.com
  24:11

**A**

a-n-c-e
  24:5
AAA
  4:8,14,19
  5:2,24
  6:3,6,19,
  22 7:2,
  14,17
  8:11 10:8
  11:5,7
  13:22
  14:1,14,
  20 19:12,
  23,24
  20:9 21:1
  22:4
AAA's
  5:1
absolutely
  17:22
acceding
  14:8
accidentall
y
  14:14

account
  7:18
  10:23
  22:23
acknowledge
d
  4:23
active
  7:2
add
  13:2
address
  12:10,15
  23:18
admittedly
  6:11
advisories
  17:13
aesthetics
  5:9
agent
  2:3,6,9,
  10,11,12,
  13,14,16,
  18,23,25
  3:2,4,5,
  7,8,10,
  11,12,14,
  15,16,18,
  24 4:2
  5:18,22
  6:9,16,18
  7:1,6,8,
  13 8:13,
  16,18,20,
  23,25
  9:2,3,5,
  10,13,15,
  25 10:16,
  18,20,22
  11:4
  12:1,3,4,
  6,7,8,12,

  15,18,22,
  24 13:1,
  4,9,13,
  15,19,24
  14:1,4,10
  15:3,9,
  12,14,18,
  20,23
  16:2,4,9,
  11,13,14,
  15,18,19,
  25 17:2,
  5,9,22,25
  18:2,7,
  11,15,22,
  25 19:5,
  9,12,14,
  16,17,19,
  21 20:1,
  2,4,8,11,
  14,18,21,
  23 21:7,
  9,17,25
  22:6,8,
  10,12,19,
  22 23:8,
  10,14,17,
  20,23
  24:1,4,7,
  9,11,15,
  17,20,22,
  25 25:2,
  4,7,9,13,
  15,17,18,
  19
ahead
  3:5,16,20
  7:11 8:19
  11:17
  12:5,7
ahold
  8:11
American
  9:3

amount
  4:18
  15:21,24
  21:10
anticipated
  21:25
anymore
  5:2,4
apple
  24:2,15
applied
  11:14
approximate
ly
  21:11
Assurant
  4:2 5:18,
  22 6:9,
  16,18
  7:1,6,13
  8:25 9:3,
  25 10:16,
  18,20,22
  12:3,6,8,
  12,15,18
  15:3
  16:9,13,
  15,19,25
  17:2,5,9,
  22,25
  18:2,7,
  11,15,22
  19:16,19
  20:1
  22:19,22
  23:14
  24:25
  25:15,17,
  19
attorney
  5:5
Autumn
  2:7,9



**aware**
4:8 5:24
11:5 14:6

**awesome**
17:5
19:19

---

**B**

**back**
5:25
11:13
14:21
15:4
21:13
23:1

**back-and-forth**
5:19

**backdate**
18:8

**bases**
21:18

**bit**
21:3

**board**
9:18

**bring**
3:5,17,20

**broker**
5:12

**Bye-bye**
25:16,18,
19

---

**C**

**California**
15:15
19:9,18,
22 20:12

**call**
3:22
4:14,15

**called**
4:5 6:7

**calling**
2:3,18
4:6 7:10

**calls**
5:11

**cancel**
4:20

**cancelation**
8:4,8
9:22
16:21
19:6 22:4

**canceled**
4:21 5:24
6:20,23,
24

**care**
9:17
11:22

**carry**
9:8

**case**
16:10

**Charlie**
24:18

**check**
20:24,25

**claim**
10:10

**clarify**
17:7

**client**
4:19
11:18

**close**

**11:15**
14:9

**closing**
13:20,21
15:18,23
20:23

**collectively**
16:6 22:1

**company**
8:24 9:7
18:5

**company's**
7:18

**concrete**
23:1

**confirm**
16:16

**confused**
9:17

**conversation**
17:12

**copy**
7:16 8:4,
11 9:21
11:4
12:10
19:6

**correct**
6:21 7:5,
7 9:25
10:21,22
13:25
16:3,18
18:20
19:13

**corrected**
15:21

**correctly**
14:24

**couple**
16:24
23:3

**cover**
4:9,10
6:14 7:3,
15,22,23
8:3 10:5,
8,11,14,
25 14:12
18:12

**coverage**
10:18

**coverages**
4:9

**covered**
5:15 9:24
11:21,23
15:5
17:19
21:19

**covering**
11:6

**cut**
5:1,4

---

**D**

**D-W-U-N-N-E-K-A-V**
24:13

**date**
6:20 7:2
10:6

**day**
25:14

**days**
16:24
23:3

**deal**
8:7

**dealing**
2:19,21
11:16

**deck**
3:12,15
4:6,9,10,
12,13,25
5:7 6:14
7:9,12,23
11:16,21
15:5
17:10,15

**delta**
23:18

**denial**
7:16
19:15,22,
24 22:4

**denied**
10:10

**department**
4:5

**deposit**
21:8

**determine**
10:4

**difference**
20:19

**dig**
21:4

**direct**
12:9
16:8,11
21:21

**direction**
8:5 22:14

**disasters**
6:7

**disbursed**
15:16
16:4



disbursemen
t
    20:9

disclosed
    2:15

disclosure
    13:20

dog
    12:18

door
    15:8

dot
    12:18,19
    24:20

due
    6:24

──────────
        E
──────────

echo
    24:18

email
    7:17
    12:9,15
    23:11,17
    25:9

end
    13:6
    15:14
    16:5 21:4

enter
    5:10

entry
    5:8

error
    6:12
    14:12

event
    18:3,4

executive

3:21

executive/
research
    22:24

executives
    7:18
    10:23

exhausting
    11:2

expedite
    22:24

explanation
    21:1

extension
    16:8,13,
    14,17

extra
    4:18
    11:18

──────────
        F
──────────

FAIR
    3:10,11,
    13 4:20
    5:2 6:7,
    11,19,23
    14:13,21
    15:24
    18:9
    19:9,22
    20:12
    22:5

falls
    7:8

fell
    7:12 15:5

figure
    4:11 5:10

final
    8:11

fine
    9:14,16
    11:6

fire
    6:8

flat
    10:13

follow
    23:2,3

force-
placed
    7:20 20:6

form
    21:1

forward
    8:5 22:23

forwarding
    19:6

front
    15:8

frustrated
    5:23
    11:24

fully
    2:15

funds
    20:25
    21:8

furniture
    15:8

──────────
        G
──────────

gain
    5:8

GAP
    6:13 9:24

give
    3:2 8:4
    9:21

10:12
    12:3,9
    14:17
    15:4 16:7
    22:25
    23:6,7

good
    4:18
    11:18
    17:2

grandbabies
    15:7

great
    12:11
    16:9
    25:14

ground
    4:13,25
    7:9,12

guess
    9:20
    17:16

──────────
        H
──────────

hail
    6:8
    17:13,18
    18:19

hailstorms
    18:13

hairs
    17:17

handled
    5:11
    14:24

handles
    6:7

happen
    10:21

happened
    21:6

hell
    17:12

hey
    4:25 5:2
    11:6
    14:14,21

HICKCOX
    3:23,25
    4:3 5:21
    6:5,10,
    17,22
    7:5,7
    8:7,15,
    17,19,22
    9:9,12,
    14,16
    10:15,17,
    19,21
    11:3
    12:11,14,
    17,20,23,
    25 13:3,
    8,10,14,
    18,23,25
    14:5,11
    15:4,11,
    13,17,19,
    22 16:1,
    3,23
    17:1,4,6,
    10,24
    18:1,6,
    10,14,20,
    23 19:4,
    8,11,13,
    20,24
    20:3,7,
    10,13,17,
    20,22,24
    21:8,12,
    24 22:3,
    7,9,11,
    16,20



23:9,13,
15,19,22,
25 24:3,
6,8,10,
12,16,19,
21,23
25:1,3,6,
8,11,16,
20

**hire**
5:5

**home**
4:16 5:7,
8,10
11:14
21:3

**homeowners**
13:22

**honored**
14:20

**hope**
17:2

**house**
15:7

**hypothetical**
18:3

---

**I**

**idea**
14:25

**implement**
20:6

**include**
23:11
25:7

**includes**
5:13

**indiscernible**

3:19 10:2
25:17

**information**
14:21
15:1 22:1

**instructions**
14:18

**insurance**
2:19,24
4:5,9
5:14,16
6:5,10,14
7:8 9:4,
24 10:24
11:12
13:22
14:7

**insured**
6:3

**interrupt**
8:14

**investigate**
21:4

**issue**
2:19
14:22

**issued**
20:9,21

---

**J**

**January**
4:21 5:25
14:25
16:4

**Jonathan**
14:2,3

**July**
11:15

---

**K**

**kilo**
24:1

**kind**
6:8 10:18
23:4

**knew**
9:6

---

**L**

**lapsed**
14:25
18:9

**large**
21:13

**law**
14:16

**layman**
9:22

**leaving**
8:1 19:2

**letter**
7:17 8:4,
8 12:10
16:21
19:7,17,
22

**life**
3:10

**listed**
13:22

**loan**
2:7 4:16
5:4,13
8:10
11:9,14
14:5,7,8,
9,23 21:3

**Loans**
2:3,4,6,
9,10,11,
12,13,14,
16,18,23,
25 3:2,4,
5,7,8,10,
11,12,14,
15,16,18,
24 4:11,
14,15,17,
22,23
6:2,11,25
7:19 8:1,
8,13,16,
18,20,23
9:2,5,10,
13,15
10:4
12:1,4,7,
22,24
13:1,4,9,
13,15,19,
24 14:4,
10,12
15:9,12,
14,18,20,
23 16:2,
4,11,14,
18 18:25
19:5,9,
12,14,17,
21 20:2,
4,8,11,
14,18,21,
23 21:7,
9,17,25
22:6,8,
10,12
23:8,10,
17,20,23
24:1,4,7,
9,11,15,
17,19,20,
22 25:2,
4,7,9,13,
18

**loans.com.**
24:9

**loop**
23:12
25:10

**loss**
6:4,20
7:2 10:6

---

**M**

**made**
11:4

**make**
9:6,11
16:19
19:2
21:18

**making**
5:11

**man**
14:2

**manner**
5:12

**March**
2:21 7:12
15:5

**match**
15:24

**matter**
2:24

**meeting**
9:18

**mess**
11:16

**Miller@
assurant.
com.**
12:19

**minimum**



4:18

**money**
6:24
14:11,13,
15,19,22

**month**
4:12

**months**
4:13 7:10
15:6

**mortgage**
5:12

**move**
8:5 11:9

---

**N**

**naive**
21:5

**Nancy**
23:23,24
24:17

**Nic**
2:13 4:4

**Nicky**
4:4

**Nicole**
2:13,14
3:20,23,
25 4:3
5:21 6:5,
10,17,22
7:5,7
8:7,15,
16,17,19,
22 9:8,9,
12,14,16
10:15,17,
19,21
11:3
12:4,11,
14,17,20,

23,25
13:3,6,8,
10,14,18,
23,25
14:5,11
15:4,11,
13,17,19,
22 16:1,
3,23
17:1,4,6,
10,24
18:1,6,
10,14,20,
23 19:4,
5,8,11,
13,20,24
20:3,7,
10,13,15,
17,20,22,
24 21:8,
12,19,24
22:3,7,9,
11,16,20
23:9,13,
15,19,22,
25 24:3,
6,8,10,
12,16,19,
21,23
25:1,3,6,
8,11,16,
20

**Nikki**
2:4,6
3:20 4:3
8:20
11:13
18:24
21:12
23:15

**nine-
something**
21:15

**nonpayment**
6:24

**note**
14:14

**notes**
16:20

**novice**
21:3

**number**
2:7 16:8,
12,16
21:21

---

**O**

**October**
11:15

**option**
10:13

**options**
11:2 20:5

**overpayment**
14:18
21:2

---

**P**

**paid**
3:9 4:10,
12,16,17,
18,20,22
5:3,16
6:11
11:18
14:8

**part**
8:10

**party**
13:21

**patience**
3:20

**pay**

2:20 4:24
6:12
11:8,17

**payment**
8:9 15:21

**payments**
4:18
11:17,18

**Perfect**
25:1

**phone**
14:1
16:8,12
21:21

**place**
10:24
11:23
15:17

**plan**
3:11,13
4:20 6:7,
11,19,23
14:13,21
15:15
18:9
19:10,23
20:12
22:5

**plan's**
5:3 15:24

**play**
6:23

**pleasure**
2:5

**pocket**
11:21

**policies**
2:20 6:6,
19 7:22
14:7
18:12

**policy**
3:8,12
4:21 5:25
6:10 7:2,
20,21
8:2,6
10:5
14:12,19,
25 18:4,9
20:6,19

**portion**
15:15
22:2

**possibility**
10:17,23

**potentially**
7:23
10:11

**premium**
15:25

**pretty**
5:9 10:1,
2

**primary**
10:24

**prior**
6:20 14:8
21:19

**problem**
5:1,3
6:13
18:22

**professiona
l**
5:12

**promise**
23:2

**provider**
13:24

**pull**
21:16



pulled
    13:20

put
    5:13 15:7
    16:20

putting
    14:5

———————————

            **Q**
———————————

qualified
    11:10

question
    8:23
    13:19
    20:15

questions
    9:16
    13:5,16
    16:7
    21:19

Quicken
    2:3,4,6,
    9,10,11,
    12,13,14,
    16,18,23,
    25 3:2,4,
    5,7,8,10,
    11,12,14,
    15,16,18,
    24 4:11,
    14,15,17,
    22,23
    6:2,11,25
    7:19 8:1,
    8,13,16,
    18,20,23
    9:2,5,10,
    13,15
    10:3,4
    12:1,4,7,
    22,24
    13:1,4,9,
    13,15,19,
    24 14:4,
    10,12
    15:9,12,
    14,18,20,
    23 16:2,
    4,11,14,
    18 18:25
    19:5,9,
    12,14,17,
    21 20:2,
    4,8,11,
    14,18,21,
    23 21:7,
    9,17,25
    22:6,8,
    10,12
    23:8,10,
    17,20,23
    24:1,4,7,
    9,11,15,
    17,19,20,
    22 25:2,
    4,7,9,13,
    18

quote
    21:15

———————————

            **R**
———————————

R-Y-A-N
    12:16

rain
    17:14

reach
    2:23
    21:21

reached
    6:1,2

ready
    2:8
    12:13,14

reason
    10:8,9

recap
    19:1

receive
    20:18
    22:12,13

received
    20:20,24,
    25

receives
    20:5

refund
    21:10

remember
    21:16

renewal
    15:25

repairs
    7:24

replaced
    6:17

represent
    8:24

representat
ive
    4:23

representin
g
    9:7

required
    5:8,9
    14:16,17

requirement
    14:9

research
    2:4 7:19
    13:6
    15:15
    20:8 22:2

resolved
    4:7,15

9:19

Rob
    25:20

rude
    11:10

Ryan
    3:25 4:4,
    8 6:6
    8:24
    11:11
    12:16,21
    13:10
    14:16
    15:1 16:6
    17:6 19:6
    20:4
    21:20,23
    22:17
    24:24

———————————

            **S**
———————————

safe
    15:8

second-
story
    5:7

Security
    9:3

seek
    20:5

send
    7:17
    12:10
    14:13

sending
    19:15,22

senior
    2:4

servicing
    2:7

simple
    9:20

sit
    15:6

situation
    4:6

snow
    17:13

sooner
    22:18

Sounds
    16:25

speak
    2:22

speaking
    2:5

split
    17:17

stand
    11:7

started
    11:14

stay
    23:11
    25:10

steps
    9:23

storm
    17:12

storms
    6:8

straight
    24:13

structure
    7:22

sue
    3:1

sued
    5:6 11:8



sum
21:13

supervisor
2:22 3:1

supposed
4:10,12

**T**

talking
9:6 20:25
22:4
23:15

taxes
5:14

team
2:4 3:21
7:19
22:24

telling
6:21,22
7:6

terms
9:23 14:7

thing
6:8 17:6

time
6:4 8:11
13:21
21:2
22:1,14

timeline
23:1

today
2:18 7:11

told
4:14 5:15
11:5,6

trees
17:14

true
14:17

trusting
21:5

turn
21:25

turnaround
22:14

type
18:18

**U**

Uh-huh
2:11
12:17
14:4
15:19,22
24:3

understand
12:2
17:20,23

underwriters
10:3

unicorn
23:21

upfront
7:21

**V**

Vance
2:5 24:4

verified
2:15

Victor
24:5

vital
17:11

**W**

wanted
9:5,11
13:1
21:18

Wednesday
22:18,21

week
23:5

whiskey
23:20

wind
6:8
17:12,18
18:18

windstorms
18:12

work
8:25

wrong
14:3

**Y**

yard
17:14



800.211.DEPO (3376)
EsquireSolutions.com

# Exhibit F

**Vance, Dwunneka**

| | |
|---|---|
| **From:** | QuickenEsc <QuickenEsc@assurant.com> |
| **Sent:** | Friday, August 7, 2020 4:30 PM |
| **To:** | Vance, Dwunneka |
| **Cc:** | xInsurance Payment Team |
| **Subject:** | RE: 3432945629 CRM:0287820 |

**Importance:** High

Good Afternoon,

Quicken Loans Finding/Request:

 I spoke with our client Nicole who has advise she has been denied claim on her deck due to the policy with California Fair Plain policy # CFP258218600 was not paid showing policy expired on 1/4/20. Client is seeking QL to cover the damage under a lender policy due to our error.

Assurant Response:

 I have contacted both CSAA Insurance and the CA Fair Plan and verified the CSAA Insurance policy will not cover the clients claim. The CA Fair Plan policy was canceled due to nonpayment of premium as it was not paid correctly at loan closing as the funds were incorrectly sent to CSAA Insurance and refunded to the client.

I have updated the policy coverage in SSP and have submitted an uninsured claim form to management for review so that we can instant issue a hazard policy for the client to file their claim.

Remediation Actions Needed/Taken:

 Updated the policy coverage types in SSP after speaking to both insurance companies. Submitted an uninsured claim form to management.

Coaching Actions Needed/Taken:

 N/A

1

[ROCKET_0344]

Donnie Floyd

Hazard Insurance Processing Center


------------------- Original Message -------------------
**From:** Vance, Dwunneka;
**Received:** Fri Aug 07 2020 10:26:45 GMT-0400 (Eastern Daylight Time)
**To:** quickenesc@assurant.com; quickenesc@assurant.com; quickenesc@assurant.com; quickenesc@assurant.com; quickenesc@assurant.com; Quicken ESC;
**Cc:** InsurancePaymentTeam@quickenloans.com;
**Subject:** 3432945629

Hello,

I spoke with our client Nicole who has advise she has been denied claim on her deck due to the policy with California Fair Plain policy # CFP258218600 was not paid showing policy expired on 1/4/20. Client is seeking QL to cover the damage under a lender policy due to our error.

Please let me know if you have any additional questions.

Thanks,



**Dwunneka Vance**
Resolution Advocate
Direct: (313)782-8274
Fax: (877) 382-9427



love.protect.amaze.

A referral is the best compliment!
Refer your friends and family now.

---

This e-mail message and all attachments transmitted with it may contain legally privileged and/or confidential information intended solely for the use of the addressee(s). If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, forwarding or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this message and all copies and backups thereof. Thank you.

[ROCKET_0345]

# Exhibit G

**Vance, Dwunneka**

**To:** note.2nicole@yahoo.com
**Subject:** Lender Policy for Insurance Loss Claim

Hello Nicole,

I tried calling you today in regards to the Lender's policy and had to leave a voicemail. I was calling to advise you the Lender Policy has been established so that you can move forward with the claim for your deck.

The Lender Policy number is 2MR0867340430.

Please let me know if you have any additional questions.

Best Regards,





**Dwunneka Vance**
Resolution Advocate
Direct: (313) 782-8274
Fax: (877) 382-9427

love.protect.amaze.

A referral is the best compliment!
Refer your friends and family now.

1

## Vance, Dwunneka

**From:** Vance, Dwunneka
**Sent:** Friday, August 14, 2020 7:35 PM
**To:** note.2nicole
**Subject:** RE: Insurance Claim

Hello Nicole,

I am happy to assist you with a resolution. You can expect a call from me on 8/21/20 with an update on the uninsured claim status and what the next step is.

Best Regards,





**Dwunneka Vance**
Resolution Advocate
Direct: (313)782-8274
Fax: (877) 382-9427

love.protect.amaze.

A referral is the best compliment!
Refer your friends and family now.

**From:** note.2nicole <note.2nicole@yahoo.com>
**Sent:** Thursday, August 13, 2020 10:41 PM
**To:** Vance, Dwunneka <DwunnekaVance@quickenloans.com>
**Subject:** RE: Insurance Claim

Looking forward to resolving this issue. Thank you for your attention to this matter.

Nicol

Sent from my Samsung Galaxy smartphone.

-------- Original message --------
From: "Vance, Dwunneka" <DwunnekaVance@quickenloans.com>
Date: 8/12/20 4:32 PM (GMT-08:00)
To: note.2nicole@yahoo.com
Subject: Insurance Claim

Hello Nicole,

1

I tried calling you today in regards to the insurance claim pertaining to your deck and had to leave a voicemail. I was calling to inform you an uninsured claim has been submitted on your behalf once a decision has been made I will follow up with you to advise. I understand the urgency to get this resolved as I am working on this matter on your behalf. Please let me know if you have any additional questions I am happy to assist you.

Kind Regards,





**Dwunneka Vance**
Resolution Advocate
Direct: (313)782-8274
Fax: (877) 382-9427

love.protect.amaze.

A referral is the best compliment!
Refer your friends and family now.

# Exhibit H

Case 2:22-cv-09473-PLN-CSK    Document 39-3    Filed 04/06/23    Page 94 of 261

| | |
|---|---|
| CALIFORNIA FAIR PLAN ASSOCIATION<br>3435 WILSHIRE BOULEVARD, SUITE 1200<br>P.O. BOX 76924<br>LOS ANGELES, CA 90076-0924<br>(213) 487-0111 | Wells Fargo Bank    11-24    CHECK NO: **3712115**<br>333 S. Grand Avenue    1210<br>Los Angeles, CA 90071 |

California FAIR Plan

CFP 2679302 00

NOV 1 2 2020

DATE
11/04/2020

AMOUNT
$578.00

Pay        *Five Hundred Seventy—Eight and NO/100 Dollars*

QUICKEN LOANS          3432945629

Cesar Flores
Vice President

To the
Order of      1050 WOODWARD AVE
DETROIT, MI 48226-1906, USA

Vice President

⑈003712115⑈ ⑈121000248⑈      460019226 4⑈ [ROCKET_0325]

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

FOR DEPOSIT ONLY
J.P.Morgan Bank, N.A.
Quicken Loans 935552513

ENDORSE IN INK

[ROCKET_0326]

# Exhibit I

THE BACK OF THIS CHECK CONTAINS A SECURITYMARK - DO NOT ACCEPT WITHOUT HOLDING AT AN ANGLE TO VERIFY SECURITYMARK.

CWS                                                                                                                    CWSCHK

**AMERICAN SECURITY INSURANCE COMPANY**
P&C Claims Department                                                                                              50-937
260 Interstate North Circle SE                                                                                        213
Atlanta, Georgia 30339                                                                          Check #            60495375
(800) 326-7781                                       JPMorgan Chase Bank, N.A.                  Date Issued        04/09/2021
                                                     Syracuse, NY
                                                                                        PAY          **********$5,170.33

Five thousand one hundred seventy and 33/100 US Dollars                                              VOID AFTER 180 DAYS

Insured          QUICKEN LOANS LLC
Claimant         NICOLE HICKCOX
Number           2MR034043000
Claim No.        00201244613                         Payment Type
Cause of Loss    WINDSTORM                           Sub Producer Code 0Y74000
                                                     Date of Loss        03/13/2020

PAY TO THE ORDER OF

QUICKEN LOANS LLC, for the account of                    APR 2 0 2021
NICOLE HICKCOX

                    34329456629

⑈0060495375⑈ ⑆021309379⑇          601840713⑈

[ROCKET_0026]

# Exhibit J

 **ROCKET** Mortgage

**Lender Placed Hazard First Letter**

P.O. BOX 202070 | FLORENCE, SC  29502

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA  95726-9580

## Loan Information

**Loan Number:** 3432945629
**Property Address:** 4371 PARK WOODS DR
POLLOCK PINES, CA  95726

**Notice Date:** September 27, 2021

RE:  Hazard expiration date: 09/26/2021
Subject: **Please provide hazard insurance information for property address**

Dear NICOLE HICKCOX:

Our records show that your hazard insurance has expired, and we do not have evidence that you have obtained new coverage. **Because hazard insurance is required on your property, we plan to buy insurance for your property. You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.**

You should immediately provide us with your insurance information. All you need to do is ask your insurance agent to include the loan number and property address above on a copy of your new/renewal policy or notice of reinstatement and fax it with a Mortgagee Clause/Lender's Loss Payable Endorsement as soon as possible to: 1-855-703-9194. You/your agent can mail the documents to:

> ROCKET MORTGAGE, LLC
> ISAOA
> P.O. BOX 202070
> FLORENCE, SC  29502
> Loan Number: 3432945629

You may also upload your insurance information by visiting our website at www.mycoverageinfo.com/rocketmortgage.

The insurance we buy:

- **May be significantly more expensive than the insurance you can buy yourself.**

- **May not provide as much coverage as an insurance policy you buy yourself.**

If you have any questions, please contact us at 1-855-282-8722.

Please review the additional important information contained on the following pages of this transmittal.

---

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722
**Secure Fax:** 1-855-703-9194

**Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
Saturday: 9:00 a.m. – 4:00 p.m. ET

867H1-0721

[ROCKET_0180]



The following information is being provided as a supplement to the Notice on page 1 of this document; it includes important information about the insurance on your mortgaged property.

**PURCHASING YOUR OWN INSURANCE:**

**You have the right to independently purchase acceptable insurance from the insurance agent or company of your choice and we urge you to do so.** Acceptable insurance is insurance that is equal to 100% of the estimated replacement cost to rebuild your home and other improvements on your property.

If you have been refused coverage, ask your agent or your state's insurance department whether your state has a Fair Access to Insurance Requirements (FAIR) plan, so that you can try to get the coverage you need.

**IMPORTANT BANKRUPTCY INFORMATION:**

**If you have an active bankruptcy or you received a bankruptcy discharge, we are sending this for informational or legal purposes only. We're not trying to collect against you personally. If you have any questions about this communication or your obligation to pay, please contact your attorney.**

**ESCROWING FOR INSURANCE:**

*Applicable to Non-Escrow*
If you have elected to pay your insurance directly, rather than having it paid for you through an escrow account. If you are currently unable to pay your hazard insurance premium, please call us as soon as possible and ask us to set up an escrow account and advance the insurance premium for you. If you choose this option, you would repay us for the advance in your future monthly payments. We may need the contact information for your insurance agent or company as well as the amount of the premium currently due. Insurance companies allow a very short time to reinstate policies that have expired and it is important that you call us immediately if you need our assistance. We cannot pay your voluntary hazard insurance premium without your cooperation.

If you do not elect to establish an escrow account pursuant to the above paragraph for the continuation of your insurance policy, we may establish one in conjunction with the insurance we obtain and that escrow account may be charged for the premiums that we pay. **As a result, your monthly mortgage payments may be increased to include the cost of this policy.**

*Applicable to Escrow*
If we purchase this insurance, your escrow account may be charged for the premiums that we pay. **Please be advised that your monthly mortgage payments may be increased to include the cost of this policy.**

**THE INSURANCE WE OBTAIN:**

The insurance we obtain will remain in effect until you provide us with evidence of acceptable coverage, at which time the policy we obtained will be cancelled, and you will receive a refund of any unearned premium.

Even if you obtain coverage that is acceptable to us, please be aware that if there is a gap between the cancellation of your insurance and the effective date of your new coverage, you will be charged for the coverage that we purchased to cover that gap period.

**The cost of the insurance we obtain is likely to be much higher than the cost of coverage you could obtain on your own.** This is because the insurance we purchase is issued automatically without evaluating the risk of insuring your property.

**Questions?** Contact Your Rocket Mortgage Team.

| | |
|---|---|
| **Phone:** 1-855-282-8722 | **Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET |
| **Secure Fax:** 1-855-703-9194 | Saturday: 9:00 a.m. – 4:00 p.m. ET |

Page 2

867H1-0721

[ROCKET_0181]

**ROCKET** Mortgage

**The hazard insurance we obtain will not cover any amount you feel your home is worth in excess of the amount of dwelling coverage that you previously obtained and we entered on our records.** If you have information to verify that the amount of coverage should be different please let us know, in writing, at the address in this notice. If we did not know the last amount of insurance coverage you obtained, we will purchase coverage in the amount of the unpaid principal balance of your loan on the date we request the insurance coverage begin. Although such coverage does not meet our property insurance requirements, we will purchase it as a default in the absence of information allowing for acceptable coverage for your property. The cost of this insurance will be charged to you, by us. This does not in any way relieve you of your obligation to provide coverage acceptable to us.

**The hazard insurance we obtain will cover only the structure of your home** (e.g. the building, walls, floors, roof and permanent attachments).

- It will **not** cover your furniture or any of your other personal belongings.
- It will **not** cover the cost of temporarily living outside of your home because it was damaged and is being repaired.
- It will **not** cover any liability incurred by you personally to someone who is injured while on your property.

ROCKET MORTGAGE, LLC will be an insured on the policy and may be the named insured. **The insurance we obtain may provide benefits to you but is primarily for our benefit.** If you incur property damage or loss, you may not have adequate coverage for any damages that you suffer because ROCKET MORTGAGE, LLC will be paid first.

The policy we obtain will supersede any lender coverage remaining in effect under your previous policy.

**IMPORTANT STATE INFORMATION:**

Your state may offer a FAIR plan which may offer coverage on your property at a lower cost. Contact your state FAIR Plan association or Department of Insurance for additional details on FAIR plan coverage.

Please be advised that the lender-placed carrier providing the coverage referenced above may be staffing our customer service telephone lines.

It's very important to have insurance on your home at all times – not only because it's part of your mortgage agreement, but also for your own protection. If you have any questions or concerns, don't forget that we're here to help! You can contact us at 1-855-282-8722, Monday – Friday, 8:30 a.m. – 9:00 p.m. ET, and Saturday, 9:00 a.m. – 4:00 p.m. ET.

Sincerely,

Your Rocket Mortgage Team

This communication is from a debt collector and is an attempt to collect a debt.

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722    **Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
**Secure Fax:** 1-855-703-9194         Saturday: 9:00 a.m. – 4:00 p.m. ET    Page 3

867H1-0721

[ROCKET_0182]

# Exhibit K

# ROCKET Mortgage

**Lender Placed Hazard Reminder Letter**

P.O. BOX 202070 | FLORENCE, SC  29502

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA  95726-9580

## Loan Information

**Loan Number:** 3432945629
**Property Address:** 4371 PARK WOODS DR
POLLOCK PINES, CA  95726

**Notice Date:** November 1, 2021

Subject:  **Second and final notice – Please provide hazard insurance information for property address**

Dear NICOLE HICKCOX:

This is your **second and final notice** that our records show that your hazard insurance has expired, and we do not have evidence that you have obtained new coverage. **Because hazard insurance is required on your property, we plan to buy insurance for your property. You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.**

You should immediately provide us with your insurance information. All you need to do is ask your insurance agent to include the loan number and property address above on a copy of your new/renewal policy or notice of reinstatement and fax it with a Mortgagee Clause/Lender's Loss Payable Endorsement as soon as possible to: 1-855-703-9194. You/your agent can mail the documents to:

ROCKET MORTGAGE, LLC
ISAOA
P.O. BOX 202070
FLORENCE, SC  29502
Loan Number: 3432945629

You may also upload your insurance information by visiting our website at www.mycoverageinfo.com/rocketmortgage.

The insurance we buy:

- **Will cost an estimated $1,206.00 annually, which may be significantly more expensive than insurance you can buy yourself.**

- **May not provide as much coverage as an insurance policy you buy yourself.**

If you have any questions, please contact us at 1-855-282-8722.

Please review the additional important information contained on the following pages of this transmittal.

---

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722
**Secure Fax:** 1-855-703-9194

**Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
Saturday: 9:00 a.m. – 4:00 p.m. ET

867H2-0721

[ROCKET_0183]



The following information is being provided as a supplement to the Notice on page 1 of this document; it includes important information about the insurance on your mortgaged property.

**PURCHASING YOUR OWN INSURANCE:**

**You have the right to independently purchase acceptable insurance from the insurance agent or company of your choice and we urge you to do so.** Acceptable insurance is insurance that is equal to 100% of the estimated replacement cost to rebuild your home and other improvements on your property.

If you have been refused coverage, ask your agent or your state's insurance department whether your state has a Fair Access to Insurance Requirements (FAIR) plan, so that you can try to get the coverage you need.

**IMPORTANT BANKRUPTCY INFORMATION:**

**If you have an active bankruptcy or you received a bankruptcy discharge, we are sending this for informational or legal purposes only. We're not trying to collect against you personally. If you have any questions about this communication or your obligation to pay, please contact your attorney.**

**ESCROWING FOR INSURANCE:**

*Applicable to Non-Escrow*
If you have elected to pay your insurance directly, rather than having it paid for you through an escrow account. If you are currently unable to pay your hazard insurance premium, please call us as soon as possible and ask us to set up an escrow account and advance the insurance premium for you. If you choose this option, you would repay us for the advance in your future monthly payments. We may need the contact information for your insurance agent or company as well as the amount of the premium currently due. Insurance companies allow a very short time to reinstate policies that have expired and it is important that you call us immediately if you need our assistance. We cannot pay your voluntary hazard insurance premium without your cooperation.

If you do not elect to establish an escrow account pursuant to the above paragraph for the continuation of your insurance policy, we may establish one in conjunction with the insurance we obtain and that escrow account may be charged for the premiums that we pay. **As a result, your monthly mortgage payments may be increased to include the cost of this policy.**

*Applicable to Escrow*
If we purchase this insurance, your escrow account may be charged for the premiums that we pay.
**Please be advised that your monthly mortgage payments may be increased to include the cost of this policy.**

**THE INSURANCE WE OBTAIN:**

The insurance we obtain will remain in effect until you provide us with evidence of acceptable coverage, at which time the policy we obtained will be cancelled, and you will receive a refund of any unearned premium.

Even if you obtain coverage that is acceptable to us, please be aware that if there is a gap between the cancellation of your insurance and the effective date of your new coverage, you will be charged for the coverage that we purchased to cover that gap period.

**The cost of the insurance we obtain is likely to be much higher than the cost of coverage you could obtain on your own.** This is because the insurance we purchase is issued automatically without evaluating the risk of insuring your property.

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722    **Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
**Secure Fax:** 1-855-703-9194    Saturday: 9:00 a.m. – 4:00 p.m. ET    Page 2

867H2-0721

[ROCKET_0184]

**ROCKET** Mortgage

**The hazard insurance we obtain will not cover any amount you feel your home is worth in excess of the amount of dwelling coverage that you previously obtained and we entered on our records.** If you have information to verify that the amount of coverage should be different please let us know, in writing, at the address in this notice. If we did not know the last amount of insurance coverage you obtained, we will purchase coverage in the amount of the unpaid principal balance of your loan on the date we request the insurance coverage begin. Although such coverage does not meet our property insurance requirements, we will purchase it as a default in the absence of information allowing for acceptable coverage for your property. The cost of this insurance will be charged to you, by us. This does not in any way relieve you of your obligation to provide coverage acceptable to us.

**The hazard insurance we obtain will cover only the structure of your home** (e.g. the building, walls, floors, roof and permanent attachments).

- It will **not** cover your furniture or any of your other personal belongings.
- It will **not** cover the cost of temporarily living outside of your home because it was damaged and is being repaired.
- It will **not** cover any liability incurred by you personally to someone who is injured while on your property.

ROCKET MORTGAGE, LLC will be an insured on the policy and may be the named insured. **The insurance we obtain may provide benefits to you but is primarily for our benefit.** If you incur property damage or loss, you may not have adequate coverage for any damages that you suffer because ROCKET MORTGAGE, LLC will be paid first.

The policy we obtain will supersede any lender coverage remaining in effect under your previous policy.

**IMPORTANT STATE INFORMATION:**

Your state may offer a FAIR plan which may offer coverage on your property at a lower cost. Contact your state FAIR Plan association or Department of Insurance for additional details on FAIR plan coverage.

Please be advised that the lender-placed carrier providing the coverage referenced above may be staffing our customer service telephone lines.

It's very important to have insurance on your home at all times – not only because it's part of your mortgage agreement, but also for your own protection. If you have any questions or concerns, don't forget that we're here to help! You can contact us at 1-855-282-8722, Monday – Friday, 8:30 a.m. – 9:00 p.m. ET, and Saturday, 9:00 a.m. – 4:00 p.m. ET.

Sincerely,

Your Rocket Mortgage Team

This communication is from a debt collector and is an attempt to collect a debt.

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722      **Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
**Secure Fax:** 1-855-703-9194                Saturday: 9:00 a.m. – 4:00 p.m. ET      Page 3

867H2-0721

[ROCKET_0185]

# Exhibit L

# ROCKET Mortgage

**Lender Placed Hazard Policy**

P.O. BOX 202070 | FLORENCE, SC  29502

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA  95726–9580

## Loan Information

**Loan Number:** 3432945629
**Property Address:** 4371 PARK WOODS DR
POLLOCK PINES, CA  95726

**Notice Date:** December 13, 2021

Subject:  NOTICE OF LENDER–PLACED INSURANCE POLICY NUMBER:  2MR08671074147
Hazard insurance expiration date:  09/26/2021

Dear NICOLE HICKCOX:

**The terms of your mortgage or deed of trust require you to continually maintain acceptable hazard insurance coverage on your property and permit us to buy it at your expense if you fail to do so.** Although we have sent you two prior requests for your hazard insurance policy information, we have not yet received proof of your coverage. **Please read the important information and instructions contained in this letter.**

**As we informed you in our previous two notices, your loan agreement requires you to maintain hazard insurance covering your home that is in effect at all times, in the form and amounts we require, and protecting our interest. If you fail to maintain this insurance effective from the expiration date shown above, or fail to provide us with proof that you have done so, we may buy hazard insurance beginning from that date, based on the amount of coverage of your previous acceptable hazard insurance policy, if available, and charge you for the cost of the insurance.**

**Because you did not provide proof of acceptable coverage, we have bought insurance on your property, and the enclosed policy's annual premium of $1,206.00 has been billed to an impound/escrow account that may have been established for your loan. The policy will have a deductible (the amount of loss you would have to pay per policy claim) in the amount shown on the policy. Please read the policy carefully to make sure you understand its terms and conditions.**

**We strongly recommend that you obtain your own insurance coverage. The annual insurance policy we bought will remain in effect until you provide us with evidence of acceptable coverage, at which time the policy we obtained will be cancelled and you will receive a refund of any unearned premium, as calculated by the insurance company. Please note that you may cancel this coverage at any time by providing us with evidence of other acceptable coverage; however, if the effective date of your acceptable coverage is after the expiration date of your previous homeowner's insurance policy, you will be charged for the number of days that coverage was provided under the policy that we bought.**

---

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722

**Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
Saturday: 9:00 a.m. – 4:00 p.m. ET

867H3-1021

[ROCKET_0218]

**ROCKET** Mortgage

**As we indicated in previous letters to you:**

**The cost of the hazard insurance we obtained is likely much higher than insurance you can obtain on your own.** The higher cost is because the insurance we purchased is issued automatically without evaluating the risk of insuring your property. When comparing premiums, remember that our policy provides very limited coverage as indicated below.

**The hazard insurance we obtained may provide benefits to you, but is primarily for the benefit of the owner of your mortgage loan.** If you incur property damage or loss, you may not have adequate coverage for any damages that you suffer because the owner of your loan will be paid first.

**The hazard insurance we obtained only covers the structure of your home (for example, the building, walls, floors, roof and permanent attachments).**

- It does **not** cover your furniture or any of your other personal belongings.
- It does **not** cover the cost of temporarily living outside of your home because it was damaged and is being repaired.
- It does **not** cover any liability incurred by you personally to someone who is injured while on your property.

**The hazard insurance we obtained does not cover any amounts you feel your home is worth in excess of the last amount of dwelling coverage that you obtained and we entered on our records. If we did not know the last amount of insurance coverage you had, we purchased coverage in the amount of the unpaid principal balance of your loan on the date we requested the insurance coverage to begin.** Although such coverage does not meet ROCKET MORTGAGE, LLC's property insurance requirements, we purchased it in the absence of information that would allow for acceptable coverage for your property. If you believe that the amount of coverage shown in the enclosed policy does not accurately represent the value of the home, please call your Rocket Mortgage Team at 1-855-282-8722.

**The hazard insurance we purchase will be effective beginning on the date that your previous acceptable insurance expired or was cancelled (regardless of whether or not your policy provided insurance coverage to the owner of your mortgage loan after that date).** Insurance that protects only the owner of your loan after your policy expiration or cancellation date is limited insurance that is not acceptable insurance coverage to us. It will be superseded by the acceptable hazard insurance policy we purchase.

**IMPORTANT BANKRUPTCY INFORMATION:**

**If you have an active bankruptcy or you received a bankruptcy discharge, we are sending this for informational or legal purposes only. We're not trying to collect against you personally. If you have any questions about this communication or your obligation to pay, please contact your attorney.**

To ensure continued coverage, here's what you need to do:

Please provide an insurance certificate, a copy of your insurance policy, a copy of the declarations page from the policy including the policy number the insurance agent's name and contact information or another similar form of written confirmation of insurance coverage. Please send this documentation with a Mortgagee Clause/Lender's Loss Payable Endorsement as soon as possible using one of the following methods:

- Online:  www.mycoverageinfo.com/RocketMortgage
- Email:   RocketMortgage@mycoverageinfo.com
- Mail:    ROCKET MORTGAGE, LLC
           ISAOA
           P.O. BOX 202070
           FLORENCE, SC  29502
           Loan Number: 3432945629

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722          **Hours:**  Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
                                              Saturday: 9:00 a.m. – 4:00 p.m. ET          Page 2

867H3-1021

[ROCKET_0219]

**ROCKET** Mortgage

Please include loan number 3432945629 on all documents.

Please be advised that the lender-placed carrier providing the coverage referenced above may be staffing our customer service telephone lines.

We hope you'll agree that obtaining your own insurance is in your best interest. If you have any questions or concerns, don't forget that we're here to help! You can contact us at 1-855-282-8722, Monday – Friday, 8:30 a.m. – 9:00 p.m. ET, and Saturday, 9:00 a.m. – 4:00 p.m. ET.

Sincerely,

Your Rocket Mortgage Team

This communication is from a debt collector and is an attempt to collect a debt.

**Questions?** Contact Your Rocket Mortgage Team.

**Phone:** 1-855-282-8722     **Hours:** Monday – Friday: 8:30 a.m. – 9:00 p.m. ET
Saturday: 9:00 a.m. – 4:00 p.m. ET

867H3-1021

[ROCKET_0220]

# Exhibit B

**Patricia Wilburn - December 30, 2022**

A. Correct. But CSAA gives me permission to do that.

Q. Understood. So other than the entities that you are allowed by CSAA to sell policies for, you are exclusively an agent for CSAA; is that right?

A. Correct. Correct.

Q. All right. Okay. It sounds like you do not recall obtaining any insurance policies for Ms. Hickcox before the summer of 2019. Right?

A. No.

Q. Okay. Do you recall that in the summer of 2019 you obtained two different insurance policies for Ms. Hickcox, one from the California FAIR Plan Association and one from CSAA?

A. Sounds right.

Q. Can you explain to me why you got two policies instead of one?

A. CSAA denied coverage for a stand-alone homeowners policy because of the fire risk. So when that occurs we can write them a California FAIR Plan and as long as that policy is in place and active, AAA will do what we call a supplement or a wrap-around policy to pick up other coverages that the FAIR Plan does not offer.

Q. And when you say AAA, you mean CSAA?

**Patricia Wilburn - December 30, 2022**

Q.   And does this -- would you agree, based on this, you can confirm that FAIR Plan issued its policy for Ms. Hickcox's home in Pollock Pines, California, for the period August 11, 2019, to August 11, 2020?

A.   Yes.

Q.   You will notice on the second page it has a paragraph that starts with 1st Mortgagee.

Do you see that?

A.   Yes.

Q.   Can you explain to me what that is.

A.   That usually is the lien holder on the house, who owns the mortgage.

Q.   So when you have a customer who has a home, who has a mortgage, when you issue an -- or apply for an insurance policy, you also provide to the carrier information about the lien holder; is that right?

A.   Yes.

Q.   Okay.  And do you recall doing that for Ms. Hickcox, as relates to her FAIR Plan application?

A.   I mean, it is on the application, so yes.

Q.   Okay.  And you typed in that application, right?

A.   Yes.

Q.   Okay.  How did you obtain the information about the mortgage company?

Q.   So safe to say that as of August 15th, 2019, Ms. Hickcox's FAIR Plan policy is in place, right?

A.   Yes.

Q.   Okay.  All right.

On August 21 I have an email from Marques O'Neil, that's M-a-r-q-u-e-s O'Neil at Quicken Loans to you regarding Ms. Hickcox.

Do you see that on your screen?

A.   Yes.

Q.   And here he has an email in which he explains that Ms. Hickcox is going through a refinance, he provides the closing date, and he asks for a declaration page with an effective date of August 27, which is the closing date.  Right?

A.   Yes.

Q.   He also provides a mortgage clause.

Do you see that?

A.   I do.

Q.   Okay.  And he provided this mortgage clause. Would it have been your practice to ensure that you made sure that that mortgage clause was associated with whatever FAIR Plan or other policies you had in place?

A.   Yes, I would update the mortgagee information.

Q.   Very good.  And then on August 21 you replied to Mr. O'Neil and you essentially told him, yes, we are

**Patricia Wilburn - December 30, 2022**

Q. Got it.

A. -- to make sure that I get that updated.

Q. Just so the record is clear, because you used the word "date," you meant address, right?

A. Yes, thank you.

Q. Mm-hmm. Thank you.

And then later you write back to Mr. O'Neil, we are now on page 26 of Exhibit 1, and you say "The address change takes 24 hours. I will check the first thing in the morning and see if it was processed. Then hopefully you will have everything that you need by tomorrow morning."

Do you see that?

A. Yes.

Q. And again, you are talking about the address change for the mortgagee, right?

A. Yes, on the FAIR Plan policy. I have to do a request and send it to them.

Q. Understood. And you recall doing that?

A. Yes.

Q. Okay. And Mr. O'Neil, as is his habit, thanked you for your help, right?

A. Yeah, I see that.

Q. Later Mr. O'Neil asks you whether the premium for the policy was paid in full. That's page 20 of

**Patricia Wilburn - December 30, 2022**

Q.   And this mortgagee clause is 1050 Woodward Avenue, Detroit, Michigan?

Do you see that?

A.   Yes.

Q.   Do you recall our prior conversation in which there was discussion about this issue about what the right mortgagee clause and addressee was, right?

A.   Yes.

Q.   When you obtained this, call it the second FAIR Plan policy for Ms. Hickcox, would you have used the same process essentially to obtain the mortgage, the mortgagee information, or do you recall how you found that information to put on the application that ended up on the dec page?

A.   I would have probably had transferred whatever information was on the canceled policy over to the new policy.

Q.   Got it.  All right.  I am next going to show you a check, this is Exhibit 31.  And this is in October of 2020.  We have a check from Quicken Loans to California FAIR Plan in the amount of $1,445?

Do you see that?

A.   Yes.

Q.   Based on your prior testimony, is it fair to say that you have no -- personally no information about

**Patricia Wilburn - December 30, 2022**

Q.   Strike that.  Let me actually ask a broader question.

Do you recall that in 2022 you sought to obtain fire insurance for Ms. Hickcox as relates to her Pollock Pines home?

A.   I attempted to write her another California FAIR Plan policy.

Q.   Okay.  I am going to ask you a few broader questions than that, but that is good for the time being.  Thank you.

So tell me what you recall.  Did you receive a call from Ms. Hickcox sort of as you had in the past, or an e-mail saying, hey, can you try to get me a new policy?

A.   I believe there was a phone call about starting another policy, and I believe I started the process.  But if I recall the FAIR Plan rejected the policy because there was damage done to her house that had not been repaired.

Q.   And do you recall that that damage was the damage relating to the March 2020 loss?

A.   Correct.

Q.   Okay.  So you recall submitting the application you recall the application being rejected.

A.   I don't know if I actually submitted the

**Patricia Wilburn - December 30, 2022**

thing?

A.   Some of them.

Q.   Okay.  Can you give me an example?  Like is it like Lloyds or one of those types of carriers?

A.   Foremost, American Modern Insurance Group --

Q.   Those are both admitted carriers.  I guess what I am asking you --

A.   Oh, not that I recall.  No.

Q.   Okay.  Do you have the white paper on your desk, that list that the DOI provides for all of the sort of approved surplus lines carriers?

A.   No.

Q.   You don't have that memorized?

A.   No.

Q.   I do.  It is right over here.  Fair enough. Okay.

Can you explain to me, if you have an understanding, of just a little more detail as to why you believe you couldn't obtain the FAIR Plan policy for my client?

A.   The -- if there's existing damage from a prior claim that has not been repaired, then they will not take on the policy.

Q.   Understood.  If the 2021 policy had been renewed, would this have been an issue?

# Exhibit C



**Please review and make modifications using links on the left if necessary.**

**Print** | **Close**

### Broker Information

**Name:** AMERICAN AUTOMOBILE ASSOC OF NORTH CAL

**Address:** 1277 TREAT BOULEVARD, STE 1000, WALNUT CREEK, CA 94597

**TELEPHONE #:** (833) 760-9976

**LICENSE #:** 0175868

### Applicant Information

**Name:** NICOLE HICKCOX

**Additional Name Info:** N/A

**Business Name:** N/A

**Mailing Address:** 4371 PARK WOODS DR,  , POLLOCK PINES, CA  95726 USA

**Work Phone:** N/A     **Home Phone:** (530) 409-0520

**Email Address:** NOTE.2NICOLE@YAHOO.COM

**Contact Person:** NICOLE     **Contact Phone:** (530) 409-0520

### Dwelling Location Info

**Location Address:** 4371 PARK WOODS DR, POLLOCK PINES,  CA  95726

Is this application for tenant or condominium unit owners' household personal property coverage?  **NO**

### Dwelling Rate Info

| | |
|---|---|
| **Building Type:** | Dwelling |
| Is the mobile/manufactured home permanently anchored to the foundation? | N/A |
| **Perils:** | Fire; Extended Coverage; Vandalism |
| **Units(Under 1 Roof)** | Single Family |
| **Construction Year:** | 2000 |
| **Construction Class:** | Frame |
| **Num of Stories:** | 1 |
| **Deductible Requested:** | 2500 |
| **Occupancy:** | Owner |
| Would you like the Dwelling Replacement Cost option? | **YES** |
| Would you like the Inflation Guard option? | **YES** |
| Would you like the Personal Property Replacement Cost option? | **YES** |

### Dwelling Coverage Info

| Description | Coverage Limit | Coverage Parameter |
|---|---|---|
| Dwelling | 323,000 | |

[FAIR Plan_071]

| | |
|---|---|
| Personal Property | 100,000 |
| Fair Rental Value | 64,000 |
| Ordinance or Law Coverage | 15,000 |
| Debris Removal | 15,000 |

### Replacement Cost Option

NOTICE TO BROKER: The FAIR Plan does not make an independent estimate of the cost to rebuild the applicant's dwelling or other structures, or the cost of labor and materials where they are located. It is the applicant's responsibility to ensure that the policy's limit of liability for damage to the dwelling or other structures is adequate and that the type of coverage is appropriate.

### Additional Interests

**Mortgagee Type:** Mortgagee     **Is Mortgagee Bill:** Yes

**Mortgagee No.:** 1 (Primary)

**Name:**      QUICKEN LOANS

**address:**      1050 WOODWARD AVE, DETROIT, MI 482261906 USA

**Loan No.:** 3432945629

### Insurer Questions

| | |
|---|---|
| Is the property currently insured? | **NO** |
| Present Insurer Name | **N/A** |
| Policy No | **N/A** |
| Coverage Cancellation or Expiration Date | **N/A** |
| Reason for Termination: **N/A** | |
| Has the FAIR Plan ever refused coverage, cancelled coverage or non-renewed coverage at this location? | **NO** |

### Prior/Existing Damage and Use Information

| | |
|---|---|
| Have there been any damage losses to this property in the past five years? | **NO** |
| Is there any unrepaired damage at this location or is the property intended to be demolished? | **NO** |
| Has a contract been signed to complete the repairs? | **N/A** |
| A copy of the signed contract faxed or mailed to the FAIR Plan? | **N/A** |
| Estimated Date of Repair Completion | **N/A** |
| Has the property been condemned or ordered uninhabitable by any authority? | **NO** |
| Is this a rehabilitation/renovation? | **NO** |
| Is the applicant a bank, lender, or financial institution? | **NO** |
| Is the property being used for any purpose in violation of federal, state or local law? | **NO** |

### Location

| | |
|---|---|
| Protection Class | **4** |
| Territory Code | **45** |
| Is the property inside City Limits? | **NO** |
| Approximate Miles from Responding Fire Station | **3** |
| Fire Station Name (City or County) | **ELK DORADO COUNTY FIRE PROTECTION STATION 17** |
| Is the property within 1000 feet from a Public Fire Hydrant? | **YES** |
| Is the property in a Firewise Community? | **NO** |

[FAIR Plan_072]

FireWise Community Name Entered

**Comments and Questions for Underwriting Review**

N/A

2019 California FAIR Plan Association. All rights reserved.     |     Terms of Use     |     Privacy Policies

[FAIR Plan_073]

# Exhibit D

Q.  And can you confirm that this is essentially the Declaration page reflecting the policy that was applied for and quoted in those prior documents I showed you?

A.  Yes, it is.

Q.  Okay.  So as of -- and I don't know if you can see this, but up here it says 8/12/19.

Do you see that?

A.  Yes, I do.

Q.  Okay.  So fair to say that as of August 12, 2019, Ms. Hickcox had in place, in force, an insurance policy from California FAIR Plan insuring the property listed on this document?

A.  Yes.

Q.  Now, the document shows a total annual premium of $1,445.

Do you see that?

A.  Yes.

Q.  But it is also true it says this is not a bill, right?

A.  Yes.

Q.  And it is true at this time that while the total annual premium was the amount I just mentioned, in fact, the amount of money that was left on that premium was somewhat less than that, correct?

**Justin Pierce - December 8, 2022**

would really help.

MS. KLEIN:  How about if you ask questions  --

MR. SCHAFFER:  I will withdraw it.  I will withdraw it.  Let me try again.

Q.  You understand when I say the word lender, right?

A.  Yes.

Q.  And you understand that in some cases, insureds have mortgages on their homes, right?

A.  Yes.

Q.  So when an insured obtains an insurance policy from California FAIR Plan, but the insured has a loan on the home, the lender is an additional insured on any policy that FAIR Plan issues under those circumstances, right?

A.  I am not sure I understand.

Q.  Okay.  I will try again.  You understand what I mean by a lender, right?

A.  Yes.

Q.  Okay.  And you understand that in some cases insureds have mortgages on their homes, right?

A.  Yes.

Q.  Okay.  So when an insured with a mortgage on their home comes and buys an insurance policy from California FAIR Plan, does California FAIR Plan list as

**Justin Pierce - December 8, 2022**

an additional insured on the policy the lender?

A.    The lender is listed as a mortgagee.

Q.    Okay.  Fair enough, as a mortgagee.  And how does California FAIR Plan obtain the information regarding the mortgagee on a policy?

A.    The information is provided by the broker on the application.

Q.    Okay.  And then typically the FAIR Plan lists the broker -- sorry, lists the mortgagee on the Declaration page, right?

A.    That is correct.

Q.    Okay.  And you rely on -- strike that.

      Who do you rely on to provide the correct mortgagee information so that you can list it correctly on your Declaration page?

A.    The broker.

Q.    Okay.  Going back to Exhibit 5 now, this is the Hickcox Declaration page in 2019.  Right?

A.    That is correct.

Q.    Okay.  And so here we have, under mortgagee loss payees, we have a first mortgagee and it lists Quicken Loans.

      Do you see that?

A.    Yes.

Q.    And it also lists an address and also a loan

number.  Right?

A.  Yes.

Q.  And your testimony is that this information was provided to you by the broker who submitted an application on behalf of Ms. Hickcox, correct?

A.  Yes.

Q.  Excellent.  So next question relates to billing, where a policyholder has obtained a policy from FAIR Plan, put some money down to obtain the policy, but not paid the full premium.

Explain the procedure that FAIR Plan uses to obtain the rest of that premium from the policyholder, please.

A.  If an insured has opted for the installment plan, where they pay a portion of the money to get the policy issued rather than paying it annually, it is a three-pay installment plan.  So after the policy is issued, the policy sends out a bill for the second installment, and that's due three months after the policy effective date.  And once that is paid, the third installment bill goes out, that's due three months after the date of the second installment due date.

Q.  Who does the bill go to?

A.  It goes to the designated billing party.

Q.  And how does FAIR Plan decide who the

**Justin Pierce - December 8, 2022**

number.  Right?

A.  Yes.

Q.  And your testimony is that this information was provided to you by the broker who submitted an application on behalf of Ms. Hickcox, correct?

A.  Yes.

Q.  Excellent.  So next question relates to billing, where a policyholder has obtained a policy from FAIR Plan, put some money down to obtain the policy, but not paid the full premium.

Explain the procedure that FAIR Plan uses to obtain the rest of that premium from the policyholder, please.

A.  If an insured has opted for the installment plan, where they pay a portion of the money to get the policy issued rather than paying it annually, it is a three-pay installment plan.  So after the policy is issued, the policy sends out a bill for the second installment, and that's due three months after the policy effective date.  And once that is paid, the third installment bill goes out, that's due three months after the date of the second installment due date.

Q.  Who does the bill go to?

A.  It goes to the designated billing party.

Q.  And how does FAIR Plan decide who the

**Justin Pierce - December 8, 2022**

designated billing party is?

A.    The FAIR Plan doesn't decide that.

Q.    How does FAIR Plan know who that is?

A.    It is based on the information entered by the broker on the application.

Q.    Okay.  So somewhere on that application there's something that says Designated Billing Party.

A.    If there is a mortgagee entered, the broker has the option to designate that as a mortgagee billed policy.

Q.    Would that be reflected on that three-page application I showed you earlier, Exhibit 3?

A.    Yes, it should.

Q.    Let me show that to you, because I am -- I haven't seen that.  I probably just missed it.

Showing you again Exhibit 3, can you just point me to where you think it is indicated on here?

A.    Sure.  If you can go to the next page and then -- there.  So about a third of the way down, under the Additional Interests section, if you go up a little bit.

Q.    Ah.

A.    The mortgagee information.  It says "Mortgagee Type: Mortgagee," then the next one it says "Is Mortgagee Bill: Yes."

**Justin Pierce - December 8, 2022**

Q.  Very good.  So in a situation -- so that's extremely helpful, Mr. Pierce.  So thank you.

So in this Hickcox policy, the broker had indicated that the mortgagee would be billed going forward.

A.  That is correct.

Q.  And the mortgagee is listed here as Quicken Loans, with an address and a loan number, right?

A.  That is correct.

Q.  And so that information is the information we then found on the Declaration page under the listed mortgagee, right?

A.  That is correct.

Q.  Okay.  So now returning to the question of that interim billing.  If the mortgagee is listed as the payor on the further policy premiums, it sounds like your testimony is that the interim billing statements go to whoever is listed there, in this case it would be to Quicken Loans, right?

A.  That is correct.

Q.  Okay.  Does that interim billing also go to the policyholder?

A.  Yes, it does.

Q.  Okay.  Showing you now Exhibit 8, which is a one-page document.  And is this the sort of installment

**Justin Pierce - December 8, 2022**

due notice that you were describing where FAIR Plan is informing the payor that it owed some money on the policy?

A.   That is correct.

Q.   Okay.  And here you have got an address for Quicken Loans in Florence, South Carolina.

Do you see that?

A.   That is correct.

Q.   Can you tell me why -- do you recall that the address on the earlier document, the application as well as the Declaration page, was an address in Michigan?

Do you recall that?

A.   Yes, I do.

Q.   Okay.  Can you -- do you have any explanation why the address here is different?

A.   Yes.

Q.   Please do.

A.   The mailing address for the mortgagee was endorsed, changed.

Q.   I'm sorry.  You said changed?

A.   Yes.

Q.   Why, and who changed it?

A.   Can you rephrase that?

Q.   You said the mortgagee information was changed. I am asking who asked for it to be changed?

A.   I am sorry, something cut off.  Could you repeat that?

Q.   Absolutely.  As I understand it, between the issuance of the Declaration and the issuance of this Installment Notice, something happened to change the address that FAIR Plan was using to send the mailing; is that right?

A.   Yes.

Q.   Can you explain to me what occurred.

A.   The broker requested a change of mailing address for the mortgagee.

Q.   Do you have a date that that occurred?

A.   I don't know it offhand.

Q.   Okay.  So you would agree that in November of 2019, FAIR Plan sent essentially a bill to Quicken Loans in Florence, South Carolina, right?

A.   Yes.

Q.   Okay.  I will show you Exhibit 11, which is a further Premium Due Notice.

Do you see that on your screen, Mr. Pierce?

A.   Yes, I do.

Q.   And would you agree with me, again, sometime in November FAIR Plan again sent a bill to Quicken Loans in Florence, South Carolina, as relates to the Hickcox policy?

**Justin Pierce - December 8, 2022**

A.    Yes.

Q.    And like the '19 policy it expected to be paid in installments over the course of the policy period, correct?

A.    I wouldn't say we expected.

Q.    You weren't going to keep the policy in force unless you got more money, right?

A.    That is correct.

Q.    Okay.  So I am going to show you the second page of this policy.  And now this one has a mortgagee, also Quicken Loans.  And on this one, again, it has that Detroit address with the loan number.

Do you see that?

A.    Yes, I do.

Q.    And fair to say that the reason FAIR Plan was using the Detroit address, as opposed to the South Carolina address, is because this is the address that was used on the application, right?

A.    That is correct.

Q.    Okay.  So FAIR Plan doesn't try to find where these lenders are, it just uses the information that's provided to it, correct?

A.    That is correct.

Q.    Okay.  As relates to the 2020 policy, does the file reflect any changes or complaints or comments from

**Justin Pierce - December 8, 2022**

any source, as relates to how the mortgagee was listed?

A. I am not aware of any.

Q. Okay. And based on your review of the file, FAIR Plan was, in fact, paid the premiums due for the entire 2020 policy period, right?

A. That is correct.

Q. And that policy period was September 26, 2020, through September 26th, 2021, right?

A. Yes.

Q. Showing you now Exhibit 31, which is a one-page document which looks like a check from Quicken Loans to California FAIR Plan, in October of 2020, with the full premium amount of 1,445.

Do you see that?

A. Yes, I do.

Q. So is it your understanding from the file that around October of 2020 Quicken Loans sent FAIR Plan money to cover the policy premium for Ms. Hickcox?

A. Yes.

Q. But it paid too much, right?

A. That is correct.

Q. And at some point FAIR Plan sent Quicken Loans back a refund, right?

A. I don't know if it was to Quicken Loans. I know there was a refund.

**Justin Pierce - December 8, 2022**

Q.  I think I asked this, but let me just confirm. The policy stayed in force for that entire period of September 2020 to September 2021, correct?

A.  Yes.

Q.  Thank you.

Mr. Pierce, can you explain to me what happens when you have a policy in force and the policy period is going to be up in some period of time.  Does California have -- FAIR Plan have some procedures it uses to go through sort of an automatic renewal of the policy?

A.  Yes.

Q.  Can you explain that procedure for me.

A.  Approximately 60 days prior to the expiration date for the policy term, a renewal offer and Declaration page is mailed out.

Q.  And would that be mailed out, as well, again to the -- whatever entity is listed as that payee on the application?

A.  It would be mailed out to the insured and sent to the mortgagee as well.

Q.  Is it also sent to the broker?

A.  The broker receives an email transaction advising that a renewal has been offered for that particular policy.

Q.  Showing you Exhibit 38, would you agree with me

**Justin Pierce - December 8, 2022**

policyholder -- strike that.

If, in fact, Ms. Hickcox's broker sought insurance for my client in 2022, after that previous policy went out of force, and she had an open claim with another carrier, would that preclude her from obtaining insurance from FAIR Plan?

A.   Possibly.

Q.   What about if she had unrepaired damage to her home?  Would that make her ineligible for obtaining insurance from FAIR Plan?

A.   Yes, it would.

MR. SCHAFFER:  Okay.  Mr. Pierce, normally I would take a break about every hour.  I have only one document left to go through with you, but it will probably take 15 or 20 minutes.  So if you would like, we can take a break now or we can just kind of push through.  Either way is okay with me.

THE WITNESS:  I am okay pushing through, if that works for everyone else.

MR. SCHAFFER:  Counsel, court reporter, everyone okay?

MS. KLEIN:  Yes, thank you for asking.

MR. MCDONOUGH:  That's okay with me, Dylan. Thank you.

MR. SCHAFFER:  Thank you.

**Justin Pierce - December 8, 2022**

new plan?

MS. KLEIN:  Objection; vague and ambiguous.

THE WITNESS:  Yes.

MS. KLEIN:  I think you misspoke.  I think you meant to ask about a policy not a plan.

MR. MCDONOUGH:  Okay.  A policy, I am sorry.

Q.  So if there is a -- Mr. Schaffer asked you whether or not if there was an open claim would California FAIR Plan re-up -- start a new policy for Ms. Hickcox, and you said maybe not.

Do you recall that?

A.  Yes, I do.

Q.  And then you said if there was unrepaired damage, she cannot get a FAIR Plan; is that correct?

A.  Yes.

Q.  Why could she not get a new policy if there was unrepaired damage?

A.  The Fair Plan has an underwriting rule that says we won't write a policy for a property that has unrepaired damage.

Q.  So when you said maybe not for an open claim, why is that, because it may be unrepaired damage?

A.  Yeah, there may be unrepaired damage or may be another type of claim.

Q.  Are you aware that Mrs. Hickcox's claim had

**Justin Pierce - December 8, 2022**

Q.   Mr. Pierce, in -- as part of the subpoena that I showed you earlier, I asked FAIR Plan to produce some documents as relates to the mailing of notices to the mortgage company as well as my client.

Can you explain to me -- before I show you the documents, can you explain to me the process that FAIR Plan uses to mail all of those documents we have been discussing, renewals, cancellations, various notices, to the mortgage companies?

A.   Yes.   FAIR Plan uses a company called LexisNexis, and each day a file is sent to LexisNexis, an electronic file that includes all of the transactions for FAIR Plan policies for which there is a mortgagee of record.   LexisNexis uses that file to send the notices to the mortgagee of record for all of the policies.

Q.   I am going to show you an exhibit that I have marked Exhibit 59, which is a full set of documents that were produced to my office.   The type on this is quite small.   Fair to say you cannot read that on your screen or are you able to make it out?

A.   It is a little difficult.

Q.   All right.   I am going to try to help you out here.   Is that a little better?

A.   Yes.

Q.   Okay.   So on page 1 of this document can you

This is August of -- sorry, I will blow it up. August of 2019. It is also a Premium Due -- looks like a Premium Due Notice; is that correct?

A. No.

Q. Ah. Tell me what it is.

A. It is an advisory of a change of mortgagee information.

Q. Ah. Okay. So this is a notification in August of 2019 that the information as relates to the mortgagee was changed to correct the address or place the address in South Carolina, right?

A. That is correct.

Q. Okay. And then just showing you the next page, not a similar way, FAIR Plan has a record of the fact that that was actually sent out, and that would be this Lexis report on page 6 of the exhibit, correct?

A. Yes.

Q. And it actually has a line for electronic signature, which shows that it was received by Assurant Specialty on August 26th, 2019, right?

A. Yes.

Q. Okay. Mr. Pierce, is this document and the other documents like it that were provided to us, are these documents that FAIR Plan actually has in its file or did you obtain these in response to that subpoena?

**Justin Pierce - December 8, 2022**

A.  Yes.

Q.  Okay.  And --

MR. MCDONOUGH:  Dylan, what page was that?  I am sorry.

MR. SCHAFFER:  That was page 12.

MR. MCDONOUGH:  Page 12.  All right.  Thank you.

MR. SCHAFFER:  Sorry, my computer does this thing where it wants to think.

Q.  So I now -- as relates to that document, which is the new -- essentially new policy notification, instead of the kind of the other type of proof of mailing that we see or we have been reviewing, we have this other type.

Can you explain to me what this document is.  This is page 13 of Exhibit 59.

A.  Yes, this is a proof of mailing, physical mailing, for the document we just looked at.

Q.  So as relates to that new policy, you actually -- FAIR Plan sent it by regular mail as opposed to that digital service, right?

A.  Correct.

Q.  All right.  Now I am showing you, after this silly message clears.  Showing you page 14 of Exhibit 59.

**Justin Pierce - December 8, 2022**

Can you explain to me what this document is?

A. Yes, this is a notification that LexisNexis attempted to mail the document twice and was unable to deliver it.

Q. And notification to who?

A. I don't know. Just, it is a notification.

Q. Got it. And that's in July of 2021, right?

A. That is correct.

Q. And I see the same sort of document as relates to or sent on August -- in August of '21, right?

A. Yes.

Q. And then same kind of notice in October of '21, right?

A. Yes.

Q. And do you understand -- do you have any understanding of why the -- well, strike that.

Do you understand what documents had been sent that were being -- that were rejected?

A. Yes.

Q. And what are those documents?

A. The renewal offer, the renewal bill, and the Cancellation Confirmation Notice.

Q. And do you understand or does FAIR Plan have any understanding of why those documents were rejected?

A. No, I don't.

covered under the policy.  She has a claim for wind loss, and I asked the most basic question in the world and you both lose yourselves and say objection; overbroad; and he can't answer that.  I mean, I don't understand how it could get more basic than is wind covered under the policy on a wind loss claim.

MR. SCHAFFER:  Mr. McDonough, did I instruct a person that I don't represent not to answer a question?  Do you remember me saying that --

MR. MCDONOUGH:  Well, you objected on his behalf, Mr. Schaffer.  I would love for you to take this to the court and talk to you about how you objected to questions over clients that are not yours.  Like let him answer the question whether or not the policy covers wind.  That is what you alleged in your complaint.  I am asking the witness, and you are objecting to it.  I don't get it.

MS. KLEIN:  Mr. McDonough, the witness has not been instructed not to answer.  So if you ask your questions and let the objections be made, the witness can then answer the questions, unless he is instructed.

MR. MCDONOUGH:  Okay.

Q.  Is wind -- Mr. Pierce, is wind covered under the policy?

MR. SCHAFFER:  Same objections.

**Justin Pierce - December 8, 2022**

MR. MCDONOUGH:  Okay.  Thank you.

Q.  You can answer, Mr. Pierce.

A.  Windstorm is included in the policy.

Q.  So is there a difference between wind and windstorm?

MR. SCHAFFER:  Same objections.

MS. KLEIN:  Calls for a legal conclusion.  You can answer.

THE WITNESS:  I believe so.

MR. MCDONOUGH:  Q.  Do you know the difference between wind and windstorm?

MS. KLEIN:  I am going to object that this is way beyond the scope of the deposition notice.

MR. MCDONOUGH:  I mean, we are talking about documents produced, and we're talking about the policy in place, that he said was in place and covered here.  I don't understand how I couldn't ask a question about the policy.  He's an underwriter, he certainly understands what's covered and what is not covered.  I don't understand the objection.

MS. KLEIN:  That's nice.  Go ahead and answer, Mr. Pierce, to the extent that you can.

THE WITNESS:  Windstorm would be a peril where there is a loss that occurs because of wind in excess of a certain mile per hour.

**Justin Pierce - December 8, 2022**

period.  And after the loss, she tried to set up a California FAIR Plan.

Would California FAIR Plan have implemented a policy that would have retroactively applied and adjusted her loss?

A.  No, I don't believe so.

MR. MCDONOUGH:  That are all of my questions -- those are all of my questions for today.

MR. SCHAFFER:  Mr. Pierce, thank you.  I appreciate your time.

MS. KLEIN:  Thank.

MR. MCDONOUGH:  Thank you, Mr. Pierce.

MS. KLEIN:  Run, Justin.  Run now.

THE VIDEOGRAPHER:  This concludes the proceeding in the deposition of Justin Pierce.  The time is approximately 11:50 a.m.

(Whereupon the deposition of JUSTIN PIERCE concluded at 11:50 a.m.)

-oOo-

/ / / /

/ / / /

# Exhibit E



| Policy No | 2582186 00 | Broker | AMERICAN AUTOMOBILE ASSOC OF NORTH CAL | Agency No. | 0175868 |
|---|---|---|---|---|---|
| Active | Dwelling Fire | 08/11/2019 -08/11/2020 | NICOLE HICKCOX | 4371 PARK WOODS DR, POLLOCK PINES, CA 95726 | |

**Print | Close**

## REVIEW OF CHANGES

| | |
|---|---|
| **Mortgagee Changes:** | **REPLACE FIRST MORTGAGEE** |
| **Mortgagee Type:** | **MORTGAGEE** |
| **Mortgagee No.:** | **1** |
| **Mortgagee/Loss Payee:** | **QUICKEN LOANS** |
| **Address:** | **PO BOX 202070, FLORENCE, SC 295022070** |
| **Loan No:** | **3432945629** |

**Proposed Effective Date: 08/22/2019**

2019 California FAIR Plan Association. All rights reserved.     |     Terms of Use     |     Privacy Policies

# Exhibit F

**GREG FEDLER - January 9, 2023**

ASIC?

A.   14 years.

Q.   Very good.   And what is your role at the company?

A.   I am an account executive.

Q.   Okay.   You understand that when you testify today you will be testifying on behalf of ASIC, right?

A.   Correct.

Q.   And the answers you give bind the company.   Do you understand that?

A.   Yes.

Q.   Very good.   Can you explain, if you know, at a high level or whatever level you would like, what the relationship is between ASIC and the defendant in this case, which is a company called Rocket.   I guess we'll just call it Rocket.

You understand Rocket is a lender?

A.   Yes.

Q.   Okay.   What is the relationship between ASIC and Rocket?

A.   We provide outsourcing services for Rocket Mortgage.

Q.   And included in those outsourcing services is the provision of lender placed policies?

A.   Yes.

**GREG FEDLER - January 9, 2023**

Q.   Very good.   In advance of your testimony today, Mr. Fedler, did you review any documents?

A.   I did.

Q.   Can you just give me a sense of what you looked at.

A.   The documents that were provided by our outside counsel.

Q.   What were those documents?

A.   Various email communications, lender placed letters, and internal communications between Assurant and Rocket.

Q.   Okay.   You just said communications between Assurant and Rocket.   What is Assurant?

A.   Assurant is ASIC.

Q.   Ah, so -- and very honestly, Mr. Fedler, this has been a source of confusion for me from the very beginning of this because I see lots of communications and information -- or documents with the name Assurant or the name Assurant Specialty Property on it, and I don't know what that is because the policy was issued by this company called ASIC.

So it is my understanding for purposes of today that when you talk about Assurant you are talking about ASIC; is that fair?

A.   That is fair.

**GREG FEDLER - January 9, 2023**

A.   That is correct.

Q.   Okay.  And you understand that the purpose of the issuance of that policy was to cover a loss that occurred several months earlier, in March of 2020, correct?

A.   That is correct.

Q.   Okay.  Can you explain to me why an insurance company would issue an insurance policy to cover -- to retroactively cover a loss?

A.   It is part of our contractual obligation between us and Rocket to protect their interest in the event of a loss.

Q.   So under the contract between ASIC and Rocket, any circumstance -- well, strike that.

The circumstances that you understood existed here justified the issuance of an insurance policy to Rocket to cover the loss in Pollock Pines, correct?

A.   Correct.

Q.   And the circumstances that existed here were that Rocket had not paid the premium on my client's insurance policy and, therefore, the loss was an uninsured loss, correct?

A.   That is correct.

Q.   Okay.  So notwithstanding that ASIC paid more than $5,000 in benefits to my client and received a

**GREG FEDLER - January 9, 2023**

Do you see that the notice indicates a premium due of $436?

A.   Correct.

Q.   And did ASIC, on behalf of Rocket, pay California FAIR Plan $436?

A.   No.

Q.   Why not?

A.   It was not a tracked policy.

Q.   Can you explain to me what you mean by that.

A.   We track the policies that are transmitted through the loan closing for Rocket.  This was not an actual policy that was transmitted to us.

Q.   So as a result of some communication failure on behalf of Rocket, Assurant was never told this is a policy that we need to pay premiums for, correct?

A.   That is correct.

Q.   Very good.  Okay.

Next I am going to show you page 1 of Exhibit 59, which is a similar type notice, this one dated November 13, 2019.

Do you see that?

A.   I do.

Q.   And like the other notices, this notice was sent digitally and it has the address for Assurant Specialty in Atlanta, Georgia, correct?

**GREG FEDLER - January 9, 2023**

uninsured claim loss to submit it for management for review and research.

Q.  And the research is just to figure out why the claim was uninsured?

A.  Correct.

Q.  And once you conclude that you have an uninsured claim, the next step is to issue -- to instant issue a policy, correct?

A.  That is correct.

Q.  What does it mean to instant issue?

A.  Can you repeat that question, please.

Q.  Sure.  It says instant issue, and I don't know what that means.  Can you explain it?

A.  So the lender placed process has a letter in series that goes out before an actual policy is to be issued.  Instant issue means there is a pending claim, an uninsured loss, therefore, we would have instant issued the policy versus going through the regular process to have the client customer wait.

Q.  Understood.  And the policy that we are talking about is an insurance policy issued to your client Rocket, correct?

A.  It is a dual insured policy issued to Rocket and the client customer in this case.

Q.  So my client is a named insured on the

**GREG FEDLER - January 9, 2023**

uninsured claim loss to submit it for management for review and research.

Q. And the research is just to figure out why the claim was uninsured?

A. Correct.

Q. And once you conclude that you have an uninsured claim, the next step is to issue -- to instant issue a policy, correct?

A. That is correct.

Q. What does it mean to instant issue?

A. Can you repeat that question, please.

Q. Sure. It says instant issue, and I don't know what that means. Can you explain it?

A. So the lender placed process has a letter in series that goes out before an actual policy is to be issued. Instant issue means there is a pending claim, an uninsured loss, therefore, we would have instant issued the policy versus going through the regular process to have the client customer wait.

Q. Understood. And the policy that we are talking about is an insurance policy issued to your client Rocket, correct?

A. It is a dual insured policy issued to Rocket and the client customer in this case.

Q. So my client is a named insured on the

**GREG FEDLER - January 9, 2023**

Q.  Mr. Fedler, can you explain to me -- well, strike that.

As I understand your testimony, as part of the services that ASIC provides to Rocket, pursuant to its contract, is to conduct, call it research or an investigation, when there is a problem with the property insurance from -- for a Rocket customer; is that right?

A.  That is correct.

Q.  Okay.  And in this case, after Ms. Hickcox reported an uninsured loss to Rocket, that situation was communicated over to ASIC, correct?

A.  Yes.

Q.  And as a response to that communication, ASIC conducted its investigation of the history of my client's loan, correct?

A.  That is correct.

Q.  Okay.  Can you tell me who at ASIC conducted that investigation?

A.  I don't have knowledge of who specifically conducted that investigation.

Q.  Okay.  What department conducted it?

A.  Our research department.

Q.  Okay.  And what is the standard practice?  Is it standard for a single person to be assigned to the research or a team?

**GREG FEDLER - January 9, 2023**

radar from a tracking perspective.

Q. Got it.

And then it says "After boarding documents were received for the California FAIR Plan policy and they were not updated because it was a non-top line policy," right?

A. Correct.

Q. So as per your earlier testimony, when you got those -- when ASIC got those premium due notices and that cancellation notice, because the policy was not top line, ASIC didn't do anything like pay the policy, right?

A. That is correct.

Q. Okay. Do you have any knowledge or information that my client ever asked anyone, Rocket, ASIC, or anyone else to issue a lender placed policy for her home at any time?

A. Specific to a lender placed policy?

Q. Correct.

A. No.

Q. I am going to show you Exhibit 52, page 2, we have an entry at the bottom of this page June 9, '20.

Do you see that?

A. 6/9/2020?

Q. Well, it just says 6/9/20, but I assume that's

**GREG FEDLER - January 9, 2023**

A.   For this particular policy, it had extended coverage, which did afford coverage for wind and hail.

Q.   Very good.  Thank you.

All right.  Going back to Exhibit 52.  As I understand it, Mr. Fedler, pursuant to the contract that ASIC has with Rocket, the carrier placed a forced placed policy on this property in August of 2020, correct?

A.   August 18th, '20.

Q.   Okay.  And then it says -- you will see in that entry of August 18th, it says "Lender placed policy issued due to a loss."

Do you see that?

A.   Yes.

Q.   It says "Type of loss, windstorm."

Do you see that?

A.   I do.

Q.   So this -- the investigation by ASIC determined that the type of loss at issue here was windstorm, correct?

A.   The investigation wouldn't have concluded windstorm damage, that would have been communicated to us by the insured.

Q.   Okay.  And so this finding here that -- the statement "Type of Loss: Windstorm," that's based not on a separate investigation, but rather simply from

# Exhibit G

| | |
|---|---|
| **From:** | note.2nicole on behalf of note.2nicole <note.2nicole@yahoo.com> |
| **To:** | Wilburn, Patty |
| **Subject:** | Re: Deck |
| **Date:** | Tuesday, April 28, 2020 12:23:35 AM |

I just wanted to clarify.. I'm not asking for the language in my policy to be changed. Not sure who thought that was the issue. What I'm saying pointedly is.. we don't know what caused the deck to fall?? I do have trees down too. That is from the wind. Same storm. I had wind advisories multipal times a day during the same period of March 14th through the 18th. No one can say that the wind didn't cause this. I'll wait to hear from you as to what I may need to do next to resolve this.

Sent from my Samsung Galaxy smartphone.

-------- Original message --------
From: "Wilburn, Patty" <patricia.wilburn@norcal.aaa.com>
Date: 4/27/20 3:49 PM (GMT-08:00)
To: "note.2nicole" <note.2nicole@yahoo.com>
Subject: Re: Deck

So Nicole,
I talked to the claims supervisor and they said there is no coverage.  He is sending me a copy of the letter denying coverage.  They did have several people look at your claim and according to our policy booklet, this would not be covered.  We can't change the language of the policy booklet, and it is clear that in this situation, your patio will not be covered.   I wish there was more I can do, but the language is clear in the policy booklet.

I'm so sorry about your deck....

On Mon, Apr 27, 2020 at 1:58 PM note.2nicole <note.2nicole@yahoo.com> wrote:
  Good afternoon Patty,
   I'm calling in regards to the claim I filed about my deck. I received a call from talicia in Vegas who is taking care of my claim.  I'm being told that my deck is not covered under my current policy if it was due to the snow?? The policy covers hail, wind, and fire. It does not cover snow. I assumed it was from the storm we had. But there is no way for me to know that it was strictly from the snow. I have trees that came down in my yard as well. It is very likely that it was from the wind. As I was getting high wind alerts daily. I assumed that it was the snow but I don't know that to be a fact. It was simply my guess at the time. So, I would like this re evaluated.  There is a very very high likely probability that it was caused by wind. I still have trees in my yard from the wind that I can also take pictures of. It affected everybody in my neighborhood. Not just me. Please advise how to proceed?  I thank you for All your efforts and patience with me. You have been a very good agent to me.  You are definitely the reason why I am a Triple A member and I'm sure I'm not the only one who feels that way. I hope you are doing well.

  Thank you
  Nicki  530 409 0520

4371 Park Woods Dr.
Pollock Pines Ca.
95726

Sent from my Samsung Galaxy smartphone.

--

*Patty Wilburn*

Insurance Agent

phone (916) 478-7513

fax (916) 691-5866

*Receive a $20 gift card each time someone you refer to me purchases a policy!*

*Get more. Get AAA.*

This electronic transmission contains information from [AAA Northern California, Nevada & Utah, AAA Arizona Inc., AAA MountainWest Inc., or its affiliates ("AAA")] that may be confidential or privileged. The information is intended solely for the recipient and use by any other party is not authorized. This email and its contents shall not attach any liability on the originator or AAA. Views or opinions presented in this email are solely those of the author and may not necessarily reflect those of AAA. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us immediately by telephone or by electronic mail. Thank you.

# Exhibit H



CSAA Insurance Exchange
P.O. Box 24523
Oakland, CA 94623-1523



Pȝȝȝȝȝ ȝȝȝ ȝȝȝ ȝ

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA 95726–9580

**YOUR CLAIM INFORMATION**

| | |
|---|---|
| Claim number | 1003-74-8445 |
| Policy number | CAH3211083025 |
| Policyholder | Nicole Hickcox |
| **Date of incident** | March 16, 2020 |


Questions about your claim?

Telicha Wilks
**702–790–5119**
Regular Claims Center hours are
Monday – Friday 8:00 AM – 7:00 PM,
Pacific Time

April 27, 2020

Dear Nicole Hickcox:

Thank you for choosing AAA and trusting us with your insurance needs.  We have completed our review of your claim, and, based on the facts of the review, concluded that your policy does not provide coverage for your claim.

## What you need to know

### Results of our claim review

In investigating the cause of damage, we contacted AAA Field Adjuster, Casey Murphy, to assess the damage to your property. After conducting an virtual inspection with your assistance, a report was prepared which includes detailed findings of the inspection and a determination that the damage was caused by weight of snow. This in turn caused your 2nd floor deck to collapse onto your personal property items stored belowthe deck.

Your policy includes coverage for the cost of repairing physical damage to your home, other structures and/or personal property, if applicable, unless the damage or its cause is excluded or excepted from coverage by one or more provisions in the policy. Unfortunately, the damage detailed in the report is specifically mentioned in your policy as being excluded and/or excepted from coverage. Because of this, we are unable to provide coverage for this loss.

Coverage for your reported damages was declined based on the following exclusion(s) and/or exception(s) found in the policy.

For your reference, below is the specific section(s) of your policy that pertains to this claim.
SECTION I – PERILS INSURED AGAINST
COVERAGE A – Dwelling
COVERAGE B – Other Structures
We insure against risk of direct physical loss to the property described in Coverages A and B. We do not insure, however, for loss caused by:
[...]

   3. Freezing, thawing, pressure or weight of "water", snow or ice, whether driven by wind or not, to a:
     a. Fence, pavement, patio, wood deck, swimming pool, spa or hot tub;
     b. Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building or other structure;
     c. Retaining wall or bulkhead that does not support all or part of a building or other structure; or
     d. Pier, wharf or dock;
   [...]
COVERAGE C –Personal Property
We insure for direct physical loss to property described in Coverage C caused by a peril listed below unless the loss is excluded in Section I – Exclusions.

**Please turn over**

[...]

11. Weight of ice, snow or sleet which causes damage to property contained in a "building structure".

[...]

DEFINITIONS

[...]

2. "Building structure" means a structure with walls and a roof.

[...]

## What you need to do

**Protecting your property from further damage**

Although your policy does not cover this claim, you have a responsibility to take steps to protect the property from additional or subsequent damage. If you have questions about protecting your property, please contact us at 702.790.5119.

## Other important information

**Additional facts about your claim**

We reserve the right to provide any additional facts or legal support for our decision. If you have additional information you believe is relevant to your claim, please contact us at 702.790.5119.

**Your rights**

If you believe this claim has been wrongfully denied or rejected in whole or in part, you may have the matter reviewed by the Claims Services Bureau of the California Department of Insurance, 300 South Spring Street, Los Angeles, California 90013; Telephone: 800.927.4357 or 213.897.8921.

**Actions against AAA**

Please note your insurance policy provides under SECTION I – CONDITIONS, Suit Against Us, that no action shall be brought against us unless there has been  full compliance with the policy provisions and the action is filed in a court of competent jurisdiction within one year of  the date of loss. The one year does not include the time we take to investigate your claim. It does, however, include the time  between the date of loss and the date you reported your claim, and it is again running as of the date of this letter.

## How to contact us

If you have any questions, please contact us at 702.790.5119.

We value you as our customer and appreciate the opportunity to assist you.

Sincerely,

*Telicha Wilks*

Telicha Wilks
Claims Representative

# Exhibit I

| | |
|---|---|
| **From:** | Patricia.Wilburn.4787513@goaaa.com |
| **To:** | patricia.wilburn@norcal.aaa.com |
| **Subject:** | Voice Message from 15304090520 / "HICKCOX NICOLE " |
| **Date:** | Saturday, March 28, 2020 1:21:49 PM |
| **Attachments:** | Audio_Recording_S1-437935_001_compand.wav |

Voice message copy

Caller: 15304090520
Duration: 00:53

To hear the voice message, play the attached recording or call your Messaging mailbox.

Messaging access number: 8016065230

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---------------------------------

NICOLE HICKCOX,                        :

    Plaintiff,                     :   Case No.:

                           :   2:22-CV-00437-TLN-KJN

v.                                     :

ROCKET MORTGAGE, LLC,                  :

                           :

    Defendant                      :

---------------------------------

VOICE MESSAGE RECORDING

NICOLE HICKCOX TO PATTY WILBURN AT AAA

DATE:        March 28, 2020

JOB No.:     J9499935



R E C O R D I N G

MS. HICKCOX:  Hi Patty.  This is Nicole Selman (phonetic).  My policy might be under Hickcox.  Anyway, I need you to give me a call back at your earliest convenience.  I have a claim and I've just got to figure out what to do because I've never had a claim in my life. So, give me a call, 530-409-0520, and we'll talk further. I do have a few questions; I'm sure you will, too.

So, I look forward to hearing from you then.  It's probably going to be Monday.  Today is Saturday so it's 1:20 in the afternoon and, like I said, I'll probably hear from you Monday.  I know you don't work weekends, but I wanted to get this message to you.  So, again, 530-409-0520. Thanks, Love.  All right, bye.

(Recording ends.)



C E R T I F I C A T I O N

Esquire Deposition Solutions, does hereby certify that through an independent contractor we have transcribed the audio, and that the foregoing is a true and complete transcription of the audio transcribed. Inaudible or indiscernible passages of sound are denoted.

IN WITNESS WHEREOF, I do hereunto set my hand on this 30th day of March, 2023.


        /S/
Esquire Depositions Solutions



# Exhibit J



PLACERVILLE, CALIFORNIA



About of foot of snow transforms downtown Camino from an early spring into a winter wonderland Monday. Snowfall over the weekend and into Monday dumped on communities above the snowline with some Camino and Pollock Pines residents snowed in. Democrat photo by Krysten Kellum

News

# Winter 'March'es back in — snowpack gets a boost from weekend storm

By Dawn Hodson



## • Another winter storm possible early next week

The storms that hit continuously since Saturday have brought much-needed rain and snow to the area, adding to the reservoirs and delivering additional feet of snow to the foothills and Tahoe region with the National Weather Service in Sacramento calling the three-day storm one of the strongest this season.

Continuous snow at Lake Tahoe since Saturday morning added 13% to the snowpack, according to Jeff Anderson, water supply specialist for the Natural Resources Conservation Service in Nevada. The snowpack started the weekend at 43% at the Mount Rose Snotel site and was at 56% to end the weekend, not counting the several inches to up to a foot of snow that fell Monday. Additional snowfall Monday was expected to add to the total.

The snow water content from the latest storm was 3.3 inches through Sunday, about three times the average gain for the month, which is 1.2 inches. The typical gain for January and February is 6 inches.

NWS reported the three-day storm added about 31 inches of new snow in South Lake Tahoe.

Pacific House, which is off Highway 50 east of Fresh Pond, measured 25 inches of snow.

Pollock Pines and Camino residents saw their share of rain and snow over the weekend as well with 6 inches of snow added in Camino.

In Placerville, the NWS recorded 4.7 inches of rain delivered in the three day storm and about an inch of snow on Sunday. That snow arrived first as hail. Rain washed most of the snow away by midday Monday before another dusting of snow arrived, which also melted.

Placerville forecast

There is another chance of rain and snow showers before 11 p.m. Wednesday night in the Placerville area, according to the NWS. The forecast predicts mostly cloudy skies with a low around 26 degrees with light to variable wind. The chance of rain is 30% with little or no snow accumulation expected.

On Thursday there is a 20% chance of showers after 11 a.m. Partly sunny skies are predicted with a high near 49 degrees. A light and variable wind around 6 miles per hour from the east is expected in the morning. Thursday night will be partly cloudy with a low around 31 degrees.

Friday there is a 20% chance of showers after 11 a degrees and a low around 34 degrees.

Case 2:22-cv-00437-TLN-CSK    Document 39-3    Filed 04/06/23    Page 170 of 261

staff at the NWS said another strong winter storm is possible early new week, starting Sunday and lasting through Tuesday. It is expected to may be as strong as this past weekend's storm.

As far as a forecast for March through May, the National Weather Service says there is a 43% chance for the average temperature during this period to be higher than 57.1 degrees and 24% chance for the average temperature during these three months for the temperature to be lower than 55 degrees.

Printed in the March 18, 2020 edition on page A1 | Published on March 18, 2020 | Last Modified on March 19, 2020 at 1:22 pm

Tags: <u>A1</u>, <u>featured</u>

# Exhibit K

**Christine Binder - January 9, 2023**

best qualified to answer that question, I don't believe.

Q. Do you understand that from time to time ASIC issues policies to Rocket customers?

A. Yes.

Q. Okay. You understand that to the extent there is a claim -- strike that.

Actually, the policies that get issued by ASIC are for the named insured, Quicken or Rocket, correct?

A. That is correct.

Q. Okay. So the lender placed policies we are talking about are issued to the lender for -- to cover the lender's interest in the customer's property, correct?

A. That is correct.

Q. Okay. To the extent there is a claim, whether by the lender or someone else under one of those policies, is it true that ASIC conducts a claim investigation to address the claim under that policy?

A. That is correct.

Q. Okay. To the extent that a Rocket customer has a claim under that policy that's issued to Quicken or to Rocket, when that customer has questions or concerns, the customer calls ASIC, as opposed to Rocket, right?

A. That is correct.

Q. Okay. Because the claims handling is done by

**Christine Binder - January 9, 2023**

ASIC as a service to Rocket, correct?

A.   That is correct.

Q.   All right.  You are familiar with the policy that was issued to my client, Ms. Hickcox, correct?

A.   Yes.

Q.   And that policy was issued around August of 2020, correct?

A.   That is correct.

Q.   Okay.  The policy covered damage to the dwelling and other structures, correct?

A.   Yes.

Q.   The policy did not cover any loss to contents, correct?

A.   Correct.

Q.   And the policy did not cover any loss of use of the property, right?

A.   That is correct.

Q.   And say under the policies that you are familiar with from CSAA, coverage for contents and loss of use is pretty common, right?

A.   That is correct.

Q.   Okay.  Have you seen the California FAIR Plan policy that was issued to my client in the summer or fall of 2019?

A.   I do recall seeing a declaration page, yes.

**Christine Binder - January 9, 2023**

Q.  And so you don't know why Rocket asked ASIC to issue that policy?

A.  One of the policies had lapsed.

Q.  Okay.

A.  But I do not have the specifics of what those policies would cover, so I cannot answer if it was because of the FAIR Plan.  I don't know.

Q.  Okay.  I am just trying to get a sense of what do you know.  So let's see if you do know this much.

Do you know that as a result of the lapse of some insurance policy Rocket asked ASIC to put in place a lender forced -- a force placed policy that retroactively would apply to a loss in March of 2020?

A.  That is correct.

Q.  Very good.

What do you understand occurred -- strike that.

What does ASIC understand occurred during the loss?  What happened?

A.  A windstorm ensued and a tree fell onto a deck, an exterior deck, causing damage.

Q.  And what is the basis for your understanding of what occurred during this loss?  How do you know that?

A.  That's what was reported as the occurrence.  And then a weather report was conducted to confirm that there was some storm activity that day.

Christine Binder - January 9, 2023

Q.   And so you don't know why Rocket asked ASIC to issue that policy?

A.   One of the policies had lapsed.

Q.   Okay.

A.   But I do not have the specifics of what those policies would cover, so I cannot answer if it was because of the FAIR Plan.  I don't know.

Q.   Okay.  I am just trying to get a sense of what do you know.  So let's see if you do know this much.

Do you know that as a result of the lapse of some insurance policy Rocket asked ASIC to put in place a lender forced -- a force placed policy that retroactively would apply to a loss in March of 2020?

A.   That is correct.

Q.   Very good.

What do you understand occurred -- strike that.

What does ASIC understand occurred during the loss?  What happened?

A.   A windstorm ensued and a tree fell onto a deck, an exterior deck, causing damage.

Q.   And what is the basis for your understanding of what occurred during this loss?  How do you know that?

A.   That's what was reported as the occurrence.  And then a weather report was conducted to confirm that there was some storm activity that day.

**Christine Binder - January 9, 2023**

Q.   Okay.  So let's parse it out.

You said that one of the reasons you know that this was a wind loss was because it was reported as a wind loss?

A.   Correct.

Q.   Who reported it as a wind loss?

A.   That would be the notice that we received from Quicken regarding this loss and was confirmed by talking with Ms. Hedgecock.

Q.   Hickcox.

A.   Hickcox, sorry.

Q.   No problem.

You also said that someone investigated and obtained some kind of weather report?

A.   The inspector who went out to inspect the loss confirmed that there was storm activity that day.

Q.   And how did the inspector do that?

A.   They did an internet search.

Q.   Okay.  And the results of that internet search are in some kind of document?

A.   It is in the narrative for their inspection.

Q.   I see.

A.   Yeah.

Q.   So you haven't seen some document that talks about the weather, but your understanding is that the

**Christine Binder - January 9, 2023**

Do you see that?

A. Mm-hmm, yes.

Q. Okay. And as I understand your testimony, that cause of loss is -- at this time anyway, is not based on any investigation by ASIC, but it is rather conveyed -- was conveyed to ASIC by Rocket and/or my client, correct?

A. Correct.

Q. Okay. In the description of the damage it says "Windstorm," it has a date, it says "Due to bad storm the deck of the insured got damage. Some trees fell off. No further damage reported."

Do you see that?

A. Yes.

Q. Where did that -- those facts or assertions come from, if you know?

A. So what I know is that that's what's been reported through Quicken, through Ms. -- sorry if I am saying it incorrectly -- Hickcox.

Q. Hickcox. You got it.

A. Okay. Thank you.

Q. Sure. You recognize this document, right, Ms. Binder?

A. Yes.

Q. Very good. So in that description which you

**Christine Binder - January 9, 2023**

believe came through Ms. Hickcox, it doesn't say anything about trees hitting the deck, right?

A.   It does not.

Q.   Okay.  And it doesn't say anything about snow load, right?

A.   No, it does not.

Q.   I just says windstorm, due to bad storm, the deck got damage, some trees fell off.  Right?

A.   That is correct.

Q.   All right.  Does -- is it fair to say that the claim notes that ASIC produced as relates to this claim would reflect this first notice of loss information, right?

A.   That is correct.  It will be in the documents.

Q.   By the document, you mean the claim notes?

A.   Yes.

Q.   Very good.  From your review of the file -- strike that.

From ASIC's understanding, did Ms. Hickcox at any time tell anyone that the reason her deck was damaged was because a tree hit it?

A.   Not that I -- no, I don't believe so.

Q.   All right.  Thank you.

Same question as relates to another peril.  You understand that sometimes damage is done because a lot

**Christine Binder - January 9, 2023**

of snow lands on something and it collapses or falls over, right?

A.    Right.  Can I -- I do believe -- can I just go back to the last question?

Q.    You can do anything you want, Ms. Binder.

A.    Thank you.

Q.    You are allowed.

A.    Thank you.  I do believe the inspector said a tree fell on the deck.

Q.    Okay.

A.    I do believe that was in the -- during the site inspection, he -- sorry, I shouldn't say "he" because I don't remember if it was a man or a woman.

Q.    I think it was a he.

A.    But the inspector stated that they found it was likely that a tree hit the deck.

Q.    Understood.

A.    Okay.

Q.    So let's go back, make sure the record is clear.

I asked you whether you have any information that Ms. Hickcox ever told anybody that a tree hit her deck and you said no.  Right?

A.    Right.

Q.    And then I asked you, I think, a follow-up

**Christine Binder - January 9, 2023**

Do you recall ever hearing any conversation with -- between my client and anyone, in which she described the loss -- the cause of the loss at her house was a tree hitting her deck?

A. I do not recall.

Q. Okay. I am going to show you what I have previously marked as Exhibit 16. Are you able to see that, Ms. Binder?

A. Yes.

Q. Okay. This is a one -- two-page letter from Assurant to my client dated July 11, 2020. The letter lists a claim number, it has no policy number, it has a date of loss March 13th, 2020, and it has a reported date of July 10, 2020, which is consistent with that first notice document, correct?

A. Correct.

Q. Okay. And this is a -- I would describe this as a claim acknowledgement letter; is that fair?

A. That's fair.

Q. Did ASIC send this letter -- strike that. Let me ask it a better way.

Did ASIC produce this letter?

A. Yes.

Q. Okay. So as part of the services that ASIC provides to Rocket, it -- in handling claims made to

**Christine Binder - January 9, 2023**

Q.   And consistent with your testimony, it was American Security Insurance Company's obligation when it received that claim to conduct a thorough, fair, and objective investigation of the claim, correct?

A.   Correct.

Q.   Okay.  And is it your -- from your review of the file, you believe that, in fact, ASIC did accomplish a thorough, fair, and objective investigation of my client's -- of the loss in this case, which was to my client's house?

A.   That is correct.

Q.   And it is your -- ASIC's understanding that following its thorough, fair, and objective investigation it paid my client all benefits -- strike that.

It is your testimony that after its thorough, fair, and objective investigation of the loss, Quicken paid all benefits -- strike that.  It is like after lunch my brain starts to get silly.  Apologies.

It is your testimony that after its thorough, fair, and objective investigation, American Security paid Rocket all benefits that were due under the Rocket policy, as relates to my client's property?

A.   That is correct.

Q.   All right.  Okay.  We are going to go to

**Christine Binder - January 9, 2023**

earlier and this letter?  I mean, what changed in terms of who is responsible for it and who drafted it?

A.  The only change that I am aware of is that this one includes the policy that is serviced by American Insurance.  That's the only difference that I am aware of.

Q.  So this letter, it says -- at page 4, it says "Your Quicken Loans Team."

Do you see that?

A.  Yes.

Q.  But it is your testimony that, in fact, this letter was created by and sent by ASIC, right?

A.  I believe so, yes.

Q.  Okay.  In the fourth paragraph on the first page it says "Because you did not provide proof of acceptable coverage, we have bought insurance on your property."

Do you see that?

A.  Yes.

Q.  Is that true, that assertion?

A.  Because there was not acceptable coverage -- you know, I'm not sure if this is -- thank you for making it larger.

Q.  Sure.

A.  It's a form letter, so I don't believe it

**Christine Binder - January 9, 2023**

speaks specifically to what's going on with Mrs. Hickcox.

Q. That wasn't my question, Ms. Binder, so let me try again. It says that because she did not provide proof of acceptable coverage, someone, presumably Quicken Loans, have bought insurance on your property.

Is it true that the reason someone bought insurance on her property is because Ms. Hickcox did not provide proof of acceptable coverage?

A. There was no proof of acceptable coverage, which is why the policy was put into place by Quicken Loans.

Q. But it has got nothing to do with what she did or didn't do, right?

A. I have no knowledge of that.

Q. Okay. Then it says the policy premium of $1,206 has been billed to an impound/escrow account that may have been established for your loan, right?

A. That is correct.

Q. So Rocket is buying an insurance policy for itself but charging Ms. Hickcox for the premium, right?

A. Yes.

Q. Okay. On the second page, it says, "The cost of hazard insurance we obtained is likely much higher than insurance you can obtain on your own."

**Christine Binder - January 9, 2023**

Q.  Understood.  But the letter told Ms. Hickcox, hey, this loan -- this policy may not cover the extent of your interest.  It is limited to the lender's interest, right?

A.  Correct.

Q.  Okay.  So having received the -- strike that.

Having issued its policy and having received the claim, what were the next steps that ASIC did to address this circumstance?

A.  Set up an inspection for the property to evaluate the damages.

Q.  Okay.  And does ASIC or American Banker or Assurant have folks who actually go out and look at losses and determine scope of damage and coverage -- and causation and so forth?

A.  I want to make sure that I understand the question.  So are you asking if it's people employed --

Q.  Let me withdraw it, because it was probably too long a question.

A.  Okay.

Q.  You know what I mean by a field adjuster, right?

A.  Yes.

Q.  Does ASIC employ field adjusters?

A.  Yes.

**Christine Binder - January 9, 2023**

Q. Okay. Meaning they are actually employed by either ASIC or some other Assurant entity, correct?

A. Correct.

Q. Okay. But also from this claim it looks like in some circumstances ASIC hires what we call outside adjusters to do site inspections and write loss reports, right?

A. That is correct.

Q. And what circumstances lead to the hiring of the outside adjuster here, as opposed to reliance on an inside adjuster?

A. There was no availability of the outside adjuster.

Q. Okay. And so the outside adjuster that ASIC hired to adjust this claim acts as the eyes and ears of ASIC as relates to the loss, right?

A. That is correct.

Q. Okay. Every carrier does this differently, so let me ask what ASIC does. Does ASIC empower the outside adjuster to determine coverage?

A. No.

Q. Okay. Does the -- does ASIC empower the adjuster to determine the scope of damage or benefits due under the policy?

A. The outside -- the independent adjuster is

**Christine Binder - January 9, 2023**

Q.   Okay.   Meaning they are actually employed by either ASIC or some other Assurant entity, correct?

A.   Correct.

Q.   Okay.   But also from this claim it looks like in some circumstances ASIC hires what we call outside adjusters to do site inspections and write loss reports, right?

A.   That is correct.

Q.   And what circumstances lead to the hiring of the outside adjuster here, as opposed to reliance on an inside adjuster?

A.   There was no availability of the outside adjuster.

Q.   Okay.   And so the outside adjuster that ASIC hired to adjust this claim acts as the eyes and ears of ASIC as relates to the loss, right?

A.   That is correct.

Q.   Okay.   Every carrier does this differently, so let me ask what ASIC does.   Does ASIC empower the outside adjuster to determine coverage?

A.   No.

Q.   Okay.   Does the -- does ASIC empower the adjuster to determine the scope of damage or benefits due under the policy?

A.   The outside -- the independent adjuster is

**Christine Binder - January 9, 2023**

providing the scope of what's inspected at the time of the loss.

Q.   Okay.   So the outside adjuster looks at the loss and makes findings based on his or her inspection and sends those -- that information to ASIC?

A.   That is correct.

Q.   But it is ultimately ASIC's role to determine cause of loss, coverage, scope of damage, and benefits due, right?

A.   That is correct.

Q.   And would you agree with me --

A.   Sorry.   Can we go back?   You said determine cause of loss?

Q.   Correct.

A.   So the inspector will go out there and complete the site inspection and relay the cause of loss as it is discovered at the site.   So the inside adjuster has the opportunity to review that for coverage within the policy.

Q.   Understood.   So let me go through it again, because this is not -- this is important.

As I understand it, sort of at a high level, the role of an insurance investigation is to determine what happened, whether it is covered under the policy, the scope of damage, meaning the extent of damage, and

Christine Binder - January 9, 2023

You said the first, the initial, and I am saying something slightly different. So what I am saying is that, would you agree that the rule in California is that the most important cause of loss is the predominant cause?

A. I would say yes, in terms of determining coverage.

Q. Very good.

A. Okay.

Q. And as I understand your testimony, it was the inspector's conclusion, which ASIC defers to, that the cause -- the most important cause of the loss at Ms. Hickcox's house was wind, correct?

A. That is correct.

Q. Okay. Based on your review of the file, can you explain to me how ASIC's outside adjuster came to that conclusion? What were the facts upon which the adjuster based that? You mentioned earlier the weather report and some statement by my client. Right?

A. That is correct. So in the inspection report that came back to us, that was what has been reported to them, that during high winds a large cedar tree fell on the deck.

Q. So other than those facts, what my client says about some tree falling on her deck and the weather

**Christine Binder - January 9, 2023**

California license to make repairs on the house.

A.    Thank you.  No, we did not.

Q.    Okay.  Did you ever -- did ASIC ever send an engineer to determine whether the deck had caused any structural damage to any part of the house?

A.    No.

Q.    Okay.  Let me ask that again, because that was a terrible question.

Did ASIC ever send an engineer or other building professional to determine whether the loss, meaning the way the deck came off the house, caused any structural damage to the home?

A.    No.

Q.    Okay.  At some point, as I recall, the outside adjusting company that ASIC hired to investigate this loss and determine the cause was a company called Pilot Catastrophe Services; is that right?

A.    Yes.

Q.    Okay.

A.    Correct.

Q.    Is that a company that ASIC uses commonly?

A.    Yes.

Q.    Okay.  And are they a California company?  No, it looks like they are in Mobile, Alabama.  They are national.

**Christine Binder - January 9, 2023**

Mr. Simpson arrived at.

Q. And is the report -- once it is received by ASIC, is it made part of the claim file?

A. Yes.

Q. And is it maintained thereafter by ASIC consistent with its obligations under California law?

A. Yes.

Q. Okay. And can you confirm this is the report that was produced by Assurant or by ASIC? Can you confirm that this is, in fact, the loss report as relates to my client's loss in March of 2020?

A. That's correct.

Q. Okay. Did ASIC ever take a recorded statement of my client?

A. Not that I am aware of.

Q. Did anyone -- its agent, Mr. Simpson, or anyone else, take a recorded statement?

A. Not that I am aware of.

Q. So any communications that Ms. Hickcox had with anyone at ASIC during the investigation, those would be just -- those wouldn't be recorded in any way?

A. Any calls that come in or go out are recorded.

Q. Okay. Do you have any recordings of calls from my client, other than the calls that came through Rocket?

**Christine Binder - January 9, 2023**

the file to suggest that the adjuster went out and found out there was no storm?

A. Correct. The findings were that there was a storm, a large storm, yeah.

Q. It says Interior Findings, the insured advised that there were no interior damages.

Do you see that?

A. Yes.

Q. So it sounds like, based on that finding, there was no investigation of the scope of damage or cost to repair the interior damage, right?

A. That is correct.

Q. It also said there was no damage to any personal property items. Do you understand why your investigator put that in there when there's no coverage for personal property?

A. They will still let us know if there's damage to personal property so we can reiterate with the customer that there is no personal property damage -- or coverage under the policy.

Q. Okay. Did you eventually become aware that -- strike that.

Did ASIC eventually become aware that there was, in fact, interior damage to the home?

A. Not that I am aware of, no.

**Christine Binder - January 9, 2023**

Q.   Did ASIC ever eventually become aware that there was damage to contents?

A.   Not that I am aware of.

Q.   Okay.  So as part of this loss report, Mr. Simpson took a bunch of photographs, right?

A.   Yes.

Q.   And he sent those over to ASIC, correct?

A.   Correct.

Q.   All right.  Page five of this Exhibit 20 is two photographs showing elevations of the rear of the home.

Do you see that?

A.   Yes.

Q.   And can you see -- would you agree with me that the deck was attached to the exterior of the home on the second story, below what appeared to be, I call them, French doors?

A.   I agree, yes.

Q.   And you see that there's an area in which the deck was connected to the home sort of by the siding right below the door?

A.   Yes.

Q.   Okay.  Did you or did ASIC review Mr. Simpson's estimate of the damages when it was received?

A.   Yes.

Q.   And ASIC concluded that it addressed all damage

**Christine Binder - January 9, 2023**

A.  Correct.

Q.  When ASIC receives an estimate like this, does this also get put into the claim file and maintained pursuant to California law?

A.  Yes.

Q.  Okay.  And I think your testimony was that ASIC reviewed this estimate when it came in and found it to be an accurate estimation of both the scope of damage and the cost to repair the home.

A.  Correct.

Q.  Ms. Binder, you understand that in California, the measure of indemnity for a loss like this is the amount it would cost the homeowner to make the repair, correct?

A.  Correct.

Q.  Okay.  And that's Insurance Code 2051, right?

A.  I am not familiar with the number.  I am familiar it is a code but --

Q.  Probably to your credit, Ms. Binder. Unfortunately, we coverage lawyers, we memorize these things, but fair enough.

At the time that ASIC adjusted this loss, was it aware that the claim had originally gone to CSAA, your former employer?

A.  That the claim -- I don't believe they were --

**Christine Binder - January 9, 2023**

we were aware of a claim.  I believe we were aware of a policy in effect.

Q.  Okay.  And did ASIC do anything to contact CSAA to determine whether it had any information about the loss?

A.  Not that I am aware of, no.

Q.  Okay.  As you sit here today, are you aware that CSAA conducted its own claim investigation?

A.  I am not.

Q.  Okay.  All right.  I am going to now show you Exhibit 33, which is a two-page letter from Assurant to my client dated October 29th, 2020.

Fair to say that this is a letter that was completed by American Security Insurance Company?

A.  Yes.

Q.  Okay.  And I would describe this as a payment letter.  Is that right?

A.  That would be correct.

Q.  And Ms. Donna Judd is a claims examiner employed by one of the Assurant entities, right?

A.  That is correct.

Q.  Okay.  In the claim letter it, again, indicates the cause of loss is windstorm; is that right?

A.  That is correct.

Q.  And in the payment letter it describes the

**Christine Binder - January 9, 2023**

repair or replacement cost as $7,882; it deducts a 2,500 deductible; it deducts what's described as recoverable depreciation; and indicates a total payment amount of $5,170.33.

Do you see that?

A.  Yes, sir.  That's correct.

Q.  Okay.  And the -- it says your mortgage lender is included as a payee on this check.

Do you see that?

A.  Yes.

Q.  In fact, the insured is Quicken Loans here, so it would be shocking if Quicken Loans was not on the check, because it is their insurance policy.  Right?

A.  Right, it is their insurance policy.

Q.  Why was Ms. Hickcox sent this claim -- the payment letter?

A.  So that she could follow the process with Quicken Loans to endorse the check.  She's also named as an additional insured, as being the borrower.

Q.  She is an additional insured under this policy?

A.  Right, because she's the borrower.

Q.  Ah.  So the policy itself describes her someplace as being another insured, even though she's not the named insured?

A.  Correct.

Christine Binder - January 9, 2023

Q. I understand. Okay.

So as she's an insured, she gets to make a claim -- with whatever Quicken Loans wants to do, she gets to make her own separate claim, and has all the rights of an insured?

A. Correct.

Q. Very good.

MR. LAURENCE: Well --

THE WITNESS: Sorry.

MR. LAURENCE: Objection; overbroad.

MR. SCHAFFER: Fair enough. I would concede that's a somewhat overbroad question, but I didn't actually know that she was an additional insured. That's good. That means I can sue ASIC, Ms. Binder. You just opened up a whole new lawsuit for us.

That was a joke, Mr. Laurence, possibly in poor taste.

MR. LAURENCE: Go ahead.

MR. SCHAFFER: Q. Okay. The next page of Exhibit 33. It says, "Please give your repairer a copy of the enclosed estimate before repairs begin. If the repairer believes there are additional damages or costs attributed to this loss, please contact us to discuss the differences."

So the idea is if she hires a contractor and

**Christine Binder - January 9, 2023**

Q.   Did ASIC get a competing estimate in this claim?

A.   Yes.

Q.   Okay.  Did it send an adequate written adjustment of the estimate?

A.   In a letter explaining why there was no additional payment made, yes.

Q.   But it never went through the estimate and explained why each line item was or was not covered, correct?

A.   It explained why the additional line items in the contractor's estimate weren't covered, in a paragraph form, not in an itemized line-by-line form.

Q.   Okay.  I am going to show you Exhibit 37, which is the -- an estimate that was -- is dated July 17th, 2021, from Taylor Made Construction in Placerville, California.

Can you see that on your screen, Ms. Binder?

A.   Yes.

Q.   So it is your recollection that ASIC received this competing estimate in the claim, right?

A.   Yes.

Q.   And you didn't pay -- ASIC didn't pay it, right?

A.   That is correct.

**Christine Binder - January 9, 2023**

A.   I believe he works for Pilot.

Q.   Okay.  So this is not the same person who went to the home, right?

A.   No.

Q.   Okay.  And then in the large paragraph below, it indicates that there was a supplement from a contractor, which is the Taylor Made estimate we were reviewing earlier, right?

A.   Yes.

Q.   And it says the contractor's dimensions of the deck are larger than ours.  And judging by the size of the rear elevation where the deck was located, there was no evidence to suggest that the deck was the size the contractor claimed it to be.  So one conclusion is that the deck Taylor Made intended to put back was larger than the deck that was actually there.  Right?

A.   Correct.

Q.   Okay.  Then it says the contractor estimate also included repairs to the slab, which there was none, and the cement footing, which there was no evidence that the concrete had been compromised.

Do you see that?

A.   Yes.

Q.   When CSAA -- sorry, when ASIC writes estimates for its customers' losses, it has to assure that the

**Christine Binder - January 9, 2023**

a letter, essentially stating the same information that is in that loss report, that it didn't find any of the additional money that was in the Taylor Made estimate to be part of the loss, right?

A.  That is correct.

Q.  Okay.  And I will just briefly show you that document so we can authenticate it.

Exhibit 47, is a two-page document from Assurant to my client dated December 17, 2021, and it is the -- this is the sole explanation that you were describing before, as to why ASIC is not going to pay any additional money after receiving the competing Taylor Made estimate, right?

A.  That is correct.

Q.  Okay.  And this document, like the others we were discussing, is maintained in Assurant's -- or ASIC's claim file pursuant to California law, right?

A.  That is correct.

Q.  Okay.  At some point ASIC received an updated Taylor Made estimate, right?

A.  I only recall seeing the one you just reviewed.

Q.  Oh, okay.  That's news.

So let me show you Exhibit 49.  Here we have an eight page document which is a January 22 estimate, eight page, from the same company, Taylor Made

# Exhibit L

Assurant
PO Box 979055
Miami, FL 33197-9055
www.assurant.com

**ASSURANT®**

July 11, 2020

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOSK PINES CA 95726

## Claim Information

| | | | |
|---|---|---|---|
| Claimant: | Nicole Hickcox | Claim Number: | 00201244613 |
| | | Policy Number: | Unknown |
| Cause of Loss: | Windstorm | Date of Loss: | 03-13-2020 |
| | | Reported Date: | 07-10-2020 |
| Property Address: | 4371 PARK WOODS DR  POLLOSK PINES, CA 95726 | | |

Dear Nicole Hickcox,

This letter confirms that we have received your claim. Your business is important to us and we are committed to servicing your needs and assisting you through the claim process.

We will investigate this claim with the express understanding that any such action is without prejudice to the rights of either party, nor shall it act as a waiver of the company's rights to disclaim coverage shall it deem such a denial proper. Nor shall the company, because of its announced actions be considered bound in any way to pay anything other than expenses in connection with the above-captioned case, in accordance with the provisions of this letter. Nor will it be considered an admission that the company is bound to reimburse you or anyone else, for any sum or sums paid by you or them in the settlement of this claim.

If you have questions about your claim, or you have additional information that you would like us to consider, please contact us at the number below. Our office hours are 8 a.m. to 6 p.m. Monday through Friday. We appreciate your business and thank you for being a valued customer.

[ASSURANT_004]

40693741/40693741

Case 2:22-cv-00437-TLN-CSK   Document 39-3   Filed 04/06/23   Page 202 of 261

Sincerely,

Ryan D. Miller
Global P&C Claims
Claims Examiner
T. 800-652-1262 Ext. 4018809
F. 866-728-7098
E. myclaiminfo@assurant.com

40693741/40693741

[ASSURANT_005]

# Exhibit M

**PILOT**

| | | |
|---|---|---|
| **Pilot Catastrophe Services, Inc.** | **LOSS REPORT** | |
| P.O . Box 91299 | **Final** | |
| Mobile, AL 36691-1299 | | |
| Phone: 1-866-607-6398 | | |

| | | |
|---|---|---|
| Reference: | Assurant Property | Report #: 0 |
| | | Catastrophe Number: |
| | | Policy Number: 2MR034043000 |
| | | Claim Number: 00201244613 |
| Insured: | NICOLE HICKCOX | Date of Loss: 3/12/2020 |
| | 4371 PARK WOODS DR | Type of Loss: Wind Damage |
| | POLLOCK PINES, CA 95726 | File Number: |

**ENCLOSURES:**

**COVERAGE:**

| | | |
|---|---|---|
| Building | $323,000.00 | Eff. Dates: From: 1/4/2020 To: 1/4/2021 |
| Other Structures | $32,300.00 | Mortgagee: |
| Tree Removal | $500.00 | Deductible: $2,500.00 |
| | | Co-Ins. Policy: Yes ☐ No ☑ |
| | | Forms: |

**NARRATIVE REPORT**

ASSIGNMENT RECEIVED:
This loss was assigned to Brian Simpson on 08/19/2020.  Assignment was received via electronic download from Assurant.
INITIAL CONTACT:
This adjuster contacted Nicole Hickcox on 08/19/2020 to discuss the scope of damages and schedule an inspection.
INSPECTION:
08/24/2020- I inspected the loss with Nicole Hickcox
CAUSE & ORIGIN:
This loss was assigned to us to investigate damage as a result of wind. The adjuster finds the proximate cause to be tree fell on deck causing damage. Insured reports that on 03/12/2020 during high winds, a large cedar tree fell on the deck at the rear elevation causing extensive damage
RISK AND POLICY TYPE:
The risk is a 2 story, dwelling, with a slab-on-grade foundation. It has wood siding and is in  average condition.
ADJUSTMENT AND GENERAL REMARKS:
EXTERIOR FINDINGS:
Exterior Elevation Damage
Rear Elevation: The deck is destroyed by a tree falling on it.  The deck was attached to the Risk.
INTERIOR FINDINGS:
Interior Damages: The insured advised that there were no interior damages.
OTHER STRUCTURES/ ADJACENT STRUCTURES:
There was no damage found or noted to the other structures during the inspection.

PERSONAL PROPERTY:
There was no damage to any Personal Property items.
Reserve Recommendation
I am recommending to open reserves at $7,700.00
OVERHEAD & PROFIT:
Due to the lack of complexity for work to be performed or the need for supervision and scheduling, no allowance for overhead and profit has been included in the settlement of this claim.
SUBROGATION:
There is no evidence of third-party negligence, therefore, subrogation does not apply.
SALVAGE:
The damages to the insured property are beyond repair and no salvage possibilities exist.
FIELD REVIEW/CONTINUING ACTION:
Should you elect to extend coverage on this claim, I've provided an estimate with photos that correspond to the details

outlined in this report. If there are edits and/or clarifications that need to be made to any of the documentation, please contact us.

**RECOMMENDATIONS:**

We recommend consideration based on the attached estimate. Please do not hesitate to contact us if we may be of further assistance.

_____    8/24/2020

Brian Simpson                                                          Date

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

**P.O . Box 91299**
**Mobile, AL 36691-1299**
**Phone: 1-866-607-6398**

Insured:    NICOLE HICKCOX

Claim #:    00201244613

Policy #:    2MR034043000



**1-Front Elevation**

Date Taken: 8/24/2020

Overview. No damage.



**2-Rear Elevation**

Date Taken: 8/24/2020

Overview. No damage.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

P.O . Box 91299
Mobile, AL 36691-1299
Phone: 1-866-607-6398

Insured:  NICOLE HICKCOX

Claim #:    00201244613

Policy #:    2MR034043000



### 3-Rear Elevation

Date Taken: 8/24/2020

Overview. Location of missing deck noted.



### 4-Rear Elevation

Date Taken: 8/24/2020

Overview. Location of deck noted.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

P.O . Box 91299
Mobile, AL 36691-1299
Phone: 1-866-607-6398

Insured:    NICOLE HICKCOX

Claim #:    00201244613

Policy #:    2MR034043000



**5-Rear Elevation**

Date Taken: 8/24/2020

Overview. No damage.



**6-Rear Elevation**

Date Taken: 8/24/2020

Overview. No damage.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

**P.O . Box 91299**
**Mobile, AL 36691-1299**
**Phone: 1-866-607-6398**

Insured: NICOLE HICKCOX

Claim #:   00201244613

Policy #:   2MR034043000



### 7-Deck

Date Taken: 8/24/2020

Debris from what is left of the demolished deck.



### 8-Deck

Date Taken: 8/24/2020

Debris from what is left of the demolished deck.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

P.O . Box 91299
Mobile, AL 36691-1299
Phone: 1-866-607-6398

Insured:     NICOLE HICKCOX

Claim #:     00201244613

Policy #:    2MR034043000



**9-Deck**

Date Taken: 8/24/2020

Debris from what is left of the demolished deck.



**10-Deck**

Date Taken: 8/24/2020

Debris from what is left of the demolished deck.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

P.O . Box 91299
Mobile, AL 36691-1299
Phone: 1-866-607-6398

Insured:     NICOLE HICKCOX

Claim #:     00201244613

Policy #:     2MR034043000



**11-Deck**

Date Taken: 8/24/2020

Debris from what is left of the demolished deck.



**12-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

**P.O . Box 91299**
**Mobile, AL 36691-1299**
**Phone: 1-866-607-6398**

Insured:   NICOLE HICKCOX

Claim #:    00201244613

Policy #:   2MR034043000



**13-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.



**14-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

**P.O . Box 91299**
**Mobile, AL 36691-1299**
**Phone: 1-866-607-6398**

Insured:    NICOLE HICKCOX

Claim #:    00201244613

Policy #:    2MR034043000



**15-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.



**16-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

P.O . Box 91299
Mobile, AL 36691-1299
Phone: 1-866-607-6398

Insured:    NICOLE PIICKCOX

Claim #:    00201244613

Policy #:    2MR034043000



**17-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.



**18-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.

# Photo Sheet

**Pilot Catastrophe Services, Inc.**

P.O . Box 91299
Mobile, AL 36691-1299
Phone: 1-866-607-6398

Insured:    NICOLE HICKCOX

Claim #:    00201244613

Policy #:    2MR034043000



**19-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.



**20-Tree**

Date Taken: 8/24/2020

Overview of tree and debris that damaged the deck.

# Exhibit N

ASSURANT®

American Security Insurance Company
PO Box 979055
Miami, FL 33197-9055
www.assurant.com

October 29, 2020

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOSK PINES CA 95726

## Claim Information

| | | | |
|---|---|---|---|
| Insured: | QUICKEN LOANS LLC | Claim Number: | 00201244613 |
| Additional Name: | Nicole Hickcox | Policy Number: | 2MR034043000 |
| Cause of Loss: | Windstorm | Date of Loss: | 03-13-2020 |
| Loan Number: | 3432945629 | Reported Date: | 07-10-2020 |
| Property Address: | 4371 PARK WOODS DR | | |
| | POLLOCK PINES, CA 95726-9580 | | |

**This letter has been sent to: note.2nicole@yahoo.com**

Dear Nicole Hickcox

Please find the attached letter for your records. This is a copy of the original letter sent to Nicole Hickcox on October 29, 2020.

Sincerely,

Donna Judd
Claims Examiner
Global P&C Claims
T. 800-652-1262 Ext. 4019820
F. 866-728-7098
E. myclaiminfo@assurant.com

Enclosure:       Incoming

cc:       Nicole Hickcox

43096613/43096611

## ASSURANT ®

American Security Insurance Company
PO Box 979055
Miami, FL 33197-9055
www.assurant.com

October 29, 2020

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES CA 95726-9580

## Claim Information

| | | | |
|---|---|---|---|
| Insured: | QUICKEN LOANS LLC | Claim Number: | 00201244613 |
| Additional Name: | Nicole Hickcox | Policy Number: | 2MR034043000 |
| Cause of Loss: | Windstorm | Date of Loss: | 03-13-2020 |
| Loan Number: | 3432945629 | Reported Date: | 07-10-2020 |
| Property Address: | 4371 PARK WOODS DR | | |
| | POLLOCK PINES, CA 95726-9580 | | |

Dear Nicole Hickcox,

We have completed our review of your claim. The following payment has been issued and mailed separately. A copy of the adjuster's estimate is included for your review.

### CRH-Dwelling, Residential-Extended Cov         Dwelling

| | |
|---|---|
| Repair/Replacement Cost: | $7,882.20 |
| Deductible: | $2,500.00 |
| Recoverable Depreciation: | $211.87 |
| Non-recoverable Depreciation: | $0.00 |
| Previous Payments: | $0.00 |
| **Total Payment Amount:** | **$5,170.33** |
| Date Issued: | 10/28/2020 |

| | |
|---|---|
| Payment Made Payable to: | NICOLE HICKCOX and QUICKEN LOANS LLC |
| Payment Mailed to: | NICOLE HICKCOX |
| | 4371 PARK WOODS DR |
| | POLLOCK PINES, CA 95726-9580 |

Your mortgage lender is included as a payee on this check.  All payees must endorse prior to depositing.  Please contact your lender directly for instructions on obtaining their endorsement.

43096611/43096611

# Exhibit O



**Detail Information**

| | | | |
|---|---|---|---|
| Policy No | CFP267930201 | Notification Sent On: | 07/28/2021 |
| Action | Renewal Bill | Notification Type | Rejected |
| Action Effective Date | 09/26/2021 | Batch Number | |
| Is Returned Mail? | No | Transaction ID | M614698912 |
| Customer Transaction ID | 4503245 | Mail ID | |
| Premium Amount | 1747.00 | IMb Number | |
| Insured Name | NICOLE HICKCOX | Tracker Name | |
| Property | 4371 PARK WOODS DR; POLLOCK PINES; CA; 95726; | | |

| | Address Provided | Address Sent To |
|---|---|---|
| **Lender Name:** | QUICKEN LOANS | REJECTED TWO TIMES BY US POSTAL SERVICE |
| **Lender Address:** | 1050 WOODWARD AVE | TRANSACTION NOT FORWARDED |
| **Lender City:** | DETROIT | - |
| **Lender State / Country:** | MI / USA | - / USA |
| **Lender Zip:** | 48226 | 0 |

CFP 0014



## Detail Information

| | | | |
|---|---|---|---|
| Policy No | CFP267930201 | Notification Sent On: | 08/30/2021 |
| Action | Renewal Bill | Notification Type | Rejected |
| Action Effective Date | 09/26/2021 | Batch Number | |
| Is Returned Mail? | No | Transaction ID | M620105183 |
| Customer Transaction ID | 4566447 | Mail ID | |
| Premium Amount | 1747.00 | IMb Number | |
| Insured Name | NICOLE HICKCOX | Tracker Name | |
| Property | 4371 PARK WOODS DR; POLLOCK PINES; CA; 95726; | | |

| | Address Provided | Address Sent To |
|---|---|---|
| Lender Name: | QUICKEN LOANS | REJECTED TWO TIMES BY US POSTAL SERVICE |
| Lender Address: | 1050 WOODWARD AVE | TRANSACTION NOT FORWARDED |
| Lender City: | DETROIT | - |
| Lender State / Country: | MI / USA | - / USA |
| Lender Zip: | 48226 | 0 |

CFP 0015



**Detail Information**

| | | | |
|---|---|---|---|
| Policy No | CFP267930201 | Notification Sent On: | 10/05/2021 |
| Action | Cancellation - Non-Payment of Premium | Notification Type | Rejected |
| Action Effective Date | 09/26/2021 | Batch Number | |
| Is Returned Mail? | No | Transaction ID | M625680395 |
| Customer Transaction ID | 4639680 | Mail ID | |
| Premium Amount | 1747.00 | IMb Number | |
| Insured Name | NICOLE HICKCOX | Tracker Name | |
| Property | 4371 PARK WOODS DR; POLLOCK PINES; CA; 95726; | | |

| | Address Provided | Address Sent To |
|---|---|---|
| **Lender Name:** | QUICKEN LOANS | REJECTED TWO TIMES BY US POSTAL SERVICE |
| **Lender Address:** | 1050 WOODWARD AVE | TRANSACTION NOT FORWARDED |
| **Lender City:** | DETROIT | - |
| **Lender State / Country:** | MI / USA | - / USA |
| **Lender Zip:** | 48226 | 0 |

CFP 0011

# Exhibit Q



California FAIR Plan Association

725 S. Figueroa Street, Suite 3900
Los Angeles, CA 90017
(800) 339-4099
**www.cfpnet.com**

| | |
|---|---|
| **DATE OF THIS LETTER** | 09/21/2021 |
| **POLICY NUMBER** | CFP 2679302 01 |
| **POLICY EXPIRATION DATE** | 09/26/2022 |
| **INSURED PHONE NUMBER** | (530) 409-0520 |

**INSURED NAME AND MAILING ADDRESS**
NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA 95726

**YOUR INSURANCE BROKER**
AMERICAN AUTOMOBILE ASSOC OF NORTH CAL
DBA: AAA NORTHERN CALIFORNIA INS AGENCY
1277 TREAT BOULEVARD, STE 1000
WALNUT CREEK, CA 94597
**PHONE NUMBER  (833) 760-9976**

**PROPERTY LOCATION**

4371 PARK WOODS DR, , POLLOCK PINES, CA 95726

Dear Insured / Broker,

Our attempt to deliver mail to the mortgagee listed below was unsuccessful.  If the mailing address for the mortgagee has changed, please let us know. If the mortgagee needs to be changed or deleted from the policy, let us know.

Below is the mortgagee information we currently have on file:
QUICKEN LOANS
1050 WOODWARD AVE
DETROIT MI 48226

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA 95726

I

CFPG-11NA (07/2019)

# Exhibit P

California FAIR Plan Association

# CANCELLATION CONFIRMATION NOTICE OF DWELLING FIRE POLICY

**CALIFORNIA FAIR PLAN**
PROPERTY INSURANCE

725 S. Figueroa Street, Suite 3900
Los Angeles, CA 90017
(800) 339-4099
**www.cfpnet.com**

**DATE OF THIS NOTICE** 10/01/2021
**POLICY NUMBER** CFP 2679302 01
**POLICY PERIOD** 09/26/2021 To 09/26/2022
12:01 a.m. at the property location

**INSURED NAME AND MAILING ADDRESS**
NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA 95726

**EFFECTIVE DATE OF CANCELLATION** 09/26/2021

**YOUR INSURANCE BROKER**
AMERICAN AUTOMOBILE ASSOC OF NORTH CAL
DBA: AAA NORTHERN CALIFORNIA INS AGENCY
1277 TREAT BOULEVARD, STE 1000
WALNUT CREEK, CA 94597
**PHONE NUMBER (833) 760-9976**

**PROPERTY LOCATION**
4371 PARK WOODS DR
POLLOCK PINES, CA 95726

---

## IMPORTANT NOTICE

**This is notice that the insurance policy cancelled effective 09/26/2021 at 12:01 A.M. because the renewal premium payment was not received on or before the Payment Due Date listed on the Renewal Premium Due Notice that was previously sent to you.**

The policy may be reinstated without lapse but only if the premium payment is received by **10/15/2021** and if the insured property has not suffered any damage between the date of cancellation and the date your check is honored.

Payments may be made online at www.cfpnet.com.

If your check is not honored when we first present it to your financial institution, or your online payment is reversed for any reason, any notice we may send conditionally acknowledging payment or reinstating your policy will be void and the policy will remain cancelled effective 09/26/2021 at 12:01 A.M.

Right of Appeal:  Any insured shall have the right of appeal to the Governing Committee of the California FAIR Plan. A decision of the Committee may be appealed to the insurance commissioner within 30 days of the action or decision of the Committee. *(See appeal procedure attached)*

If you have a California Earthquake Authority (CEA) policy, coverage under that policy terminates effective the same date as your California FAIR Plan companion policy terminates.

An applicant or insured may search for insurance companies and licensed agents/brokers that are appointed with them who have been identified to sell homeowners, renters, condominium, or mobile home insurance using the Home Insurance Finder on the Department of Insurance website at www.insurance.gov.

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES  CA 95726

I        C# 1 (6337106.6640655.8180415)

CFPCAN3 (08/2021)

# APPLICANT'S AND INSURED'S APPEAL PROCEDURE

In the  event an applicant or insured does not agree with  the findings of the inspector or the decision of the California FAIR Plan Association to not insure the property described in the application or Declaration, the applicant or insured may appeal the matter within sixty days of the written notification of the findings.

1.  The applicant  or insured shall write a letter to  Anneliese Jivan, President, California  FAIR Plan Association, P.O. Box 76924, Los Angeles, CA 90076, and set forth the reasons for not agreeing with the inspector's findings or the California FAIR Plan's decision.

2.  The broker (or the applicant or insured in lieu of the broker) shall also write a letter which shall include a summary of his/her efforts to place the risk in the standard or surplus lines market and  indicate the premium and terms and conditions quoted, if any were made. The broker may also set forth his/her reasons for not agreeing with the inspector's findings or the California FAIR Plan's decision and may include any other information pertinent to the appeal.

3.  The applicant or insured and the broker shall be advised of the next hearing date of the Underwriting  Committee, a sub-committee of the Governing Committee, and may either appear personally at the hearing or allow the appeal to be decided on the written statements as outlined in 1 and 2 above.

4.  If the decision of the Underwriting Committee is unfavorable to the appellant, the file and any additional information the  applicant, insured  or broker  wishes to  include shall upon request be referred to the Executive Committee of the Governing Committee or the full Governing Committee, whichever meets first. The appellant may appear at this review.

5.  If the Executive Committee or the Governing Committee sustains the decision of the Underwriting Committee, the appellant may, within thirty days after the Governing Committee's decision, appeal in writing to the Insurance Commissioner of the State of California. The Department of Insurance can be reached online through their website at  www.insurance.gov;  by telephone at (800) 927-HELP(4357); or by mail at 300 S Spring Street, Los Angeles, CA 90013.

Pete Ducich, Vice President - Underwriting will acknowledge  the appeal and send notification of the decision made by the Committee.

An appeal does not extend coverage to a new applicant, extend the term of a policy if a policy is in effect, nor change the effective date of cancellation.

# Exhibit R

**From:**  Nicole Hickcox on behalf of Nicole Hickcox <note.2nicole@yahoo.com>
**To:**  Wilburn, Patty
**Subject:**  [  External] Fwd: Correct mortgage information
**Date:**  Tuesday, February 22, 2022 1:42:23 PM

Loan Account number:
3432945629

Quick and loan, i.e. Rocket mortgage is claiming that they were NOT receiving bills from fair plan due to wrong mailing address? I find it strange as your (AAA) bills were received ? if there was an error in billing address.. this should clear it up. Please let me know at your earliest convenience. I called Saturday when my attorney made me aware, on the off chance I could catch you. I know it's presidents weekend and only Tuesday. I need to get this policy in place. Let me know when we can move forward? Also your thoughts on the billing address?

Thank you
Nicki 530 409 0520

Begin forwarded message:

**From:** Dylan Schaffer <dylan@kslaw.us>
**Date:** Feb 19, 2022 at 8:57 AM
**To:** Nicole Hickcox <note.2nicole@yahoo.com>
**Subject: Correct mortgage information**

Rocket Mortgage LLC
ISAOA P.O. Box 202070
Florence, SC 29502

**Dylan Schaffer**
**KERLEY SCHAFFER LLP**
1939 Harrison Street, #900
Oakland, CA 94612
510.379.5801 Ext. 204
510.228.0350 (fax)
dylan@kslaw.us
www.kerleyschaffer.com

# Exhibit S

**ASSURANT** ®

Assurant
PO Box 979055
Miami, FL 33197-9055
www.assurant.com

July 11, 2020

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOSK PINES CA 95726

## Claim Information

| | | | |
|---|---|---|---|
| Claimant: | Nicole Hickcox | Claim Number: | 00201244613 |
| | | Policy Number: | Unknown |
| Cause of Loss: | Windstorm | Date of Loss: | 03-13-2020 |
| | | Reported Date: | 07-10-2020 |
| Property Address: | 4371 PARK WOODS DR  POLLOSK PINES, CA 95726 | | |

Dear Nicole Hickcox,

This letter confirms that we have received your claim. Your business is important to us and we are committed to servicing your needs and assisting you through the claim process.

We will investigate this claim with the express understanding that any such action is without prejudice to the rights of either party, nor shall it act as a waiver of the company's rights to disclaim coverage shall it deem such a denial proper. Nor shall the company, because of its announced actions be considered bound in any way to pay anything other than expenses in connection with the above-captioned case, in accordance with the provisions of this letter. Nor will it be considered an admission that the company is bound to reimburse you or anyone else, for any sum or sums paid by you or them in the settlement of this claim.

If you have questions about your claim, or you have additional information that you would like us to consider, please contact us at the number below. Our office hours are 8 a.m. to 6 p.m. Monday through Friday. We appreciate your business and thank you for being a valued customer.

40693741/40693741

Sincerely,

Ryan D. Miller
Global P&C Claims
Claims Examiner
T. 800-652-1262 Ext. 4018809
F. 866-728-7098
E. myclaiminfo@assurant.com

40693741/40693741

# Exhibit T

# Assurant Specialty Property

## LOSS NOTICE

| | BUSINESS UNIT | MAJOR NUMBER |
|---|---|---|

| PRODUCER | POLICY NUMBER | CLAIM NUMBER<br>**00201244613** | OFFICE<br>**ATLANTA** | DATE OF LOSS<br>**03-13-2020** | DATE REPORTED<br>**07-10-2020** |
|---|---|---|---|---|---|

| EFFECTIVE DATE | EXPIRATION DATE | PRODUCT | CAUSE OF LOSS<br>**WINDSTORM** | INSURED CONTACT PHONE |
|---|---|---|---|---|

| PROPERTY ADDRESS<br>,<br>, , | LOSS AND DAMAGE DESCRIPTION<br>**WINDSTORM:03-13-2020 EST DOL: DUE TO BAD STORM THE DECK OF THE INSURED GOT DAMAGE.SOME TREES FELL OFF. NO FURTHER DAMAGE REPORTED.** |
|---|---|

| UNITDESCRIPTION<br>**x** | SERIAL NUMBER | LOAN NUMBER | CLAIMANT CONTACT PHONE |
|---|---|---|---|

| ROLE | CLIENT NAME | CONTACT PHONE | STATE | CITY | ADDRESS LINE 1 |
|---|---|---|---|---|---|
| CLMT | NICOLE HICKCOX | (530)409-0520 | CA | POLLOSK PINES | 4371 PARK WOODS DR |

| COMMENTS<br>**Reported by: NICOLE HICKCOX-INSR~ - REPORTED BY NICOLE HICKCOX BTTC : ANYTIME DURING THE DAY CONTACT NO 5304090520 LENDER QUICKEN LOANS - Email= - Adjuster:  MILLER, RYAN D** |
|---|

| ADJUSTER ASSIGNED<br>**RYAN D. MILLER** | CLAIM HANDLER ASSIGNED<br>**RYAN D. MILLER** | HANDLER PHONE<br>**(800)358-0600 x18809** |
|---|---|---|

NOL-1013 40691894/40691894

# Exhibit U

**California FAIR Plan PROPERTY INSURANCE**

**YOUR INSURANCE BROKER**
AMERICAN AUTOMOBILE ASSOC OF NORTH CAL
DBA: AAA NORTHERN CALIFORNIA INS AGENCY
1277 TREAT BOULEVARD, STE 1000
WALNUT CREEK, CA 94597
**PHONE NUMBER  (833) 760-9976**

# Important Information for
# New Policyholders

We are pleased to enclose your California FAIR Plan insurance policy.

**The California FAIR Plan is the property insurance market of last resort and should be used only after a diligent effort to obtain coverage in the voluntary market has been made. The FAIR Plan policy generally provides <u>less coverage</u> than other companies.**

Follow these simple steps to ensure you have the coverage you need when you need it most.

✓ REVIEW YOUR POLICY
Do you have the right amount and type of insurance in case of a loss? Selecting the amount and type of insurance coverage appropriate for your needs is YOUR responsibility.
*Ask your Broker to help guide you in making these selections.*

✓ KNOW WHAT YOUR FAIR PLAN POLICY IS MISSING
If you cannot get insurance with another company, consider purchasing a Difference in Conditions (DIC) policy that provides important coverages not available in your FAIR Plan policy such as water, theft and liability coverage.
**SEE THE INSURANCE COMPARISON CHART ON THE REVERSE.**
*Contact your Broker for more information.*

✓ SHOP AROUND BEFORE YOUR NEXT RENEWAL
γ    Ask your neighbors which insurance company they use
γ    Call insurance companies on your own
γ    Do not rely on just one source for your insurance information
*The insurance market is constantly changing and better coverage may be available through another carrier.*

NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA 95726

*continued on reverse side*                                    CFP-R3b (04/2019)

California FAIR Plan Association
## INSURANCE POLICY COMPARISON CFP DWELLING POLICY TO ISO HO-3

| IMPORTANT NOTICE |
|---|
| This chart summarizes some of the significant differences between the coverage provided by the FAIR Plan's basic dwelling policy and the coverage provided by insurance advisory organization Insurance Service Office, Inc. (ISO) more comprehensive California homeowners (HO-3) policy form.  You should consider purchasing a companion policy, commonly known as a Difference in Conditions (DIC) policy to supplement what the FAIR Plan policy provides.  For a complete, specific understanding of all of the similarities and differences between the FAIR Plan dwelling policy and the insurance available in the standard market, you should consult with a licensed insurance broker. In all cases, the specific language of the policy shall constitute the terms and conditions of the coverage provided.    **THIS CHART IS NOT ALL-INCLUSIVE.** |

| PERILS INSURED AGAINST (not all-inclusive) | CFP POLICY | ISO HO-3 |
|---|---|---|
| **DWELLING** | | |
| All physical loss unless specifically excluded (including water damage) | no coverage | ✓ |
| Fire or Lightning | ✓ | ✓ |
| Smoke | ✓ | ✓ |
| Internal Explosion | ✓ | ✓ |
| Extended Coverage (windstorm or hail, explosion, riot, aircraft, vehicles) | **Optional** | ✓ |
| Vandalism or Malicious Mischief | **Optional** | ✓ |
| **CONTENTS** | | |
| Fire or Lightning | ✓ | ✓ |
| Smoke | ✓ | ✓ |
| Internal Explosion | ✓ | ✓ |
| Extended Coverage (windstorm or hail, explosion, riot, aircraft, vehicles) | **Optional** | ✓ |
| Vandalism or Malicious Mischief | **Optional** | ✓ |
| Theft | no coverage | ✓ |
| Falling Objects | no coverage | ✓ |
| Weight of Ice, Snow or Sleet | no coverage | ✓ |
| Accidental Discharge or Overflow of Water or Steam | no coverage | ✓ |
| Freezing | no coverage | ✓ |
| Sudden Accidental Damage from Artificially Generated Electrical Current | no coverage | ✓ |
| **LIABILITY COVERAGES** | | |
| Personal Liability | no coverage | ✓ |
| Medical Payments to Others | no coverage | ✓ |
| Damage to Property of Others | no coverage | $1,000 Limit |

| OTHER COVERAGES, LIMITS AND CONDITIONS (not all inclusive) | | |
|---|---|---|
| | **CFP POLICY** | **ISO HO-3** |
| Replacement Cost | **Optional** | ✓ |
| Other Structures | Use up to 10% of Dwelling Limit (reduces dwelling limit), or **Optional -** you may buy additional Other Structures coverage | 10% of Dwelling Limit (does not reduce Dwelling Limit, and you may buy additional Other Structures coverage) |
| Additional Living Expense | no coverage | ✓ |
| Fair Rental Value | Use up to 10% of Dwelling Limit (reduces dwelling limit), or **Optional-** you may buy up to 20% of Dwelling Limit in additional Fair Rental Value coverage | ✓ |
| Ordinance or Law | **Optional -** you may buy up to 10% of Dwelling Limit in Ordinance or Law Coverage | 10% of Dwelling Limit (does not reduce Dwelling Limit, and you may buy additional Ordinance or Law coverage) |
| Debris Removal | Included in Limit of Liability applying to damaged property (reduces applicable limit), or  **Optional-** you may buy up to 5% of Dwelling, Other Structures and Personal Property Combined Limits in additional Debris Removal coverage | Included in Limit of Liability applying to damaged property, but adds 5% to that limit, if necessary, for debris removal |

# DWELLING INSURANCE POLICY DECLARATIONS

**California FAIR Plan PROPERTY INSURANCE**

3435 Wilshire Blvd. # 1200
Los Angeles, CA 90010
(800) 339-4099
**www.cfpnet.com**

**TRANSACTION TYPE**     **Dwelling - New Business**

**YOUR INSURANCE BROKER**
AMERICAN AUTOMOBILE ASSOC OF NORTH CAL
DBA: AAA NORTHERN CALIFORNIA INS AGENCY
1277 TREAT BOULEVARD, STE 1000
WALNUT CREEK, CA 94597
**PHONE NUMBER  (833) 760-9976**

**DATE ISSUED**     08/12/2019
**POLICY NUMBER**   CFP  2582186  00
**POLICY PERIOD**   08/11/2019  To  08/11/2020
                    12:01 a.m. at the property location

**INSURED NAME AND MAILING ADDRESS**
NICOLE HICKCOX
4371 PARK WOODS DR
POLLOCK PINES, CA 95726

**PROPERTY LOCATION**
4371 PARK WOODS DR
POLLOCK PINES, CA 95726

## IMPORTANT NOTICE TO INSURED

The FAIR Plan does not estimate the cost to rebuild your home, or the cost of labor and materials in your (or any other) area, or determine the appropriateness of the coverage you select. Instead, those are your responsibilities. However, we are required by law to tell you that, "The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home".

## RATING INFORMATION

| YEAR BUILT | OCCUPANCY | # OF UNITS | CONSTRUCTION TYPE | DEDUCTIBLE |
|---|---|---|---|---|
| 2000 | OWNER | 1 | FRAME | $2500 |

**COVERAGE AND PREMIUM INFORMATION**
In case of loss we cover only that part of the loss which exceeds the deductible shown. Insurance is provided against only those perils with a premium charge.  We provide only those coverages, endorsements and perils shown below as selected  ( ✓ ). These are brief summary descriptions; please read the entire policy for details. Please ask your broker for assistance if you wish to obtain information about coverages you have not purchased.

## COVERAGES AND PERILS INSURED AGAINST

| | SELECTED COVERAGES | LIMITS |
|---|---|---|
| ✓ | A - Dwelling | $ 323,000 |
| | B - Other Structures | $ 0 |
| ✓ | C - Personal Property | $ 100,000 |
| ✓ | D - Fair Rental Value | $ 64,000 |
| ✓ | Ordinance or Law Coverage | $ 15,000 |
| ✓ | Debris Removal | $ 15,000 |
| ✓ | Dwelling Replacement Cost | INCLUDED |
| ✓ | Inflation Guard | INCLUDED |
| ✓ | Personal Property Replacement Cost | INCLUDED |
| | Fences | $ 0 |
| | Permitted Incidental Occupancy | $ 0 |
| | Plants, Shrubs and Trees | $ 0 |
| | Outdoor Radio and TV Equipment | $ 0 |
| | Awnings | $ 0 |
| | Signs | $ 0 |
| | Improvements, Alterations and Additions | $ 0 |

| | PERILS INSURED AGAINST | PREMIUM |
|---|---|---|
| ✓ | Fire or Lightning, Internal Explosion and Smoke Damage | $ 1,328 |
| ✓ | Extended Coverages | $ 98 |
| ✓ | Vandalism or Malicious Mischief | $ 19 |

| **Total Annual Premium** | **$ 1,445** |
|---|---|

## THIS IS NOT A BILL

**You will be billed separately for any remaining balance.**

*continued on reverse side*
Insured Copy

CFP-005A (07/2017)

*Selecting the amount and type of insurance coverage appropriate for your needs is your responsibility.*

| FORMS AND ENDORSEMENTS APPLICABLE TO THIS POLICY NUMBER | CFP 2582186 00 |
|---|---|

CFP 00 01 (07/2017) Dwelling Property Policy Form, CFP0001E (04/2019) Amendatory Endorsement, DP438 (06/2012) Lenders Loss Payable Endorsement

## MORTGAGEE/LOSS PAYEES

Subject to the provisions of the loss payable clauses attached hereto, loss, if any, on dwelling (and other structures, if applicable) shall be payable to:

**1ST MORTGAGEE**                                   **2ND MORTGAGEE**
QUICKEN LOANS
1050 WOODWARD AVE
DETROIT, MI 48226-1906
LOAN NUMBER  3432945629

THESE DECLARATIONS WITH FORMS AND ENDORSEMENTS LISTED ABOVE ARE YOUR INSURANCE POLICY

## MESSAGE BOARD

✓  This policy is a contract between us and the Named Insured(s) and any loss payees identified on this Declarations Page. This policy does not provide coverage to any person or entity not named here.

**California FAIR Plan Association**
**PRIVACY NOTICE**
## How We Collect, Use, Disclose and Protect Your Personal Information

When you apply for insurance with the California FAIR Plan Association (the FAIR Plan), you entrust us with some personal information about yourself. This notice briefly describes our practices regarding your personal information, including what information we gather, how we protect it, and how you can help ensure its accuracy.

How We Collect Information
In order that we may properly issue or modify a policy of insurance, which requires us to evaluate and rate the risk, relevant information must be obtained. In most cases, applications for insurance, submitted to us on your behalf either by you or your insurance broker, provide the information we need to decide whether or not to issue a policy to you and, if so, the premium we will charge and the terms and conditions of that coverage. If we need further information, or to verify information provided, we will contact either you or your insurance broker, or we will get that information from sources we consider reliable, which may include persons other than you or those whose property interests are proposed for coverage. We collect the same information if you or your insurance broker ask us to modify a policy that we have issued to you.

In servicing the insurance policy we issue to you, such as settling an insurance claim you make, we may also collect information from outside sources, such as property inspection companies and companies that collect data concerning you or the property in which you and/or others have an interest. We may cause a property inspection to be made and/or collect personal information from public records, consumer reporting agencies, appraisers, adjusters, insurers and other third parties, who may gather information concerning your occupation, general reputation, character, habits and other personal characteristics.

How We Use and Disclose Information
We use information we collect about you and your property to handle our insurance transactions with you, such as issuing policies and modifying them at your request, or in settling insurance claims you make. We also may use your personal information to communicate with you about insurance features and options that we believe may interest you.

The FAIR Plan does not disclose any personal information to companies or organizations not affiliated with us that would use the information provided to contact you about their own products or services. However, as permitted by law, we may disclose information about you without your prior permission to persons or organizations to protect their interests or to enable them to perform their business, professional insurance or regulatory functions, including:

- ✓ your insurance broker to perform their functions in insurance transactions involving you;
- ✓ insurance support organizations for their use as permitted by law;
- ✓ other insurance companies to perform their functions in insurance transactions involving you;
- ✓ independent claim adjusters, to enable them to provide information to us to be used for the purpose of determining your eligibility for insurance benefits;
- ✓ independent property inspection companies to enable them to provide information to us to be used for the purpose of determining your eligibility for insurance;
- ✓ businesses that conduct actuarial or research studies;
- ✓ insurance regulatory, law enforcement or other government authorities;
- ✓ FAIR Plan participating companies in connection with FAIR Plan matters;
- ✓ persons or organizations requesting information by administrative or judicial order, including search warrant or subpoena;
- ✓ policyholders and loss payees for the purpose of providing information regarding the status of insurance transactions;
- ✓ lienholders, mortgagees, assignees, lessors or other persons shown on our records as having a legal or beneficial interest in a policy of insurance on your property.

If you make an insurance claim with respect to property, information on the claim may be entered into a database operated by Insurance Services Office, Inc. (ISO), called the ISO ClaimSearch® System for use by ISO customers. These customers include insurance companies, self-insureds, third-party administrators, automobile rental, auction, and finance organizations, state workers compensation funds, and by law enforcement, criminal justice and regulatory agencies and their personnel, state fraud bureaus, state fire marshals and ISO and National Insurance Crime Bureau personnel in investigating the legitimacy of that claim and/or other claims for loss. Information which

may be entered into the ISO ClaimSearch® System may include such information as name(s) by which you have been known, age and sex, current and previous addresses, loss location, insurance policy information, description and cause of loss, type of property damaged, destroyed or lost, identification of others who have an interest in the property or who are involved in the claimed loss, including partners, agents, attorneys, corporate officers (if applicable), company, independent and/or public adjusters, contractors, tenants, property occupants and mortgagees. Such information may be collected by an insurer or an adjuster by questioning you and such persons as your spouse, others who have an interest in the property, those who are involved in the claimed loss, and fire department personnel. Information on you will be given by ISO to insurance companies that subscribe to its services for use in investigating insurance claims.

On request, ISO will tell you whether it has information on you, will let you see and copy such information (in person or by mail), and will give you the nature and substance of such information by telephone. Upon request, you may also be entitled to obtain additional information concerning the types of sources and investigative techniques used to obtain any personal information on you and the types of disclosures which may be made under the ISO ClaimSearch® System, including the circumstances under which the disclosures are made without prior authorization and frequency of the same. ISO may charge a reasonable fee for copies of information provided. If you think information on you is incomplete or inaccurate, you may request ISO make corrections. ISO will then investigate and: (1) give your correction to subscribers who previously received such information; or (2) inform you that it refuses to make your corrections and give you its reasons. If ISO refuses to make your corrections, you can have a statement of the reasons for your disagreement placed in the ISO ClaimSearch® System; and all subscribers who received or will receive information on you will also receive a copy of the statement. Information on your claim will normally be stored in the ISO ClaimSearch® System for five years. Inquiries to ISO should be addressed to: ISO ClaimSearch® Customer Service Department, 545 Washington Boulevard, Jersey City, NJ 07310-1686, (800) 888-4476.

The Type of Information We Disclose About You
Both while you are our policyholder and thereafter we may disclose your identity and information about you, including information about the following: Your current and previous addresses, telephone numbers, fax numbers, email addresses, the insurance policies we and other companies have issued or offered to you, your property and interests therein, and your mortgages, agreements, claims, losses, and the payments you receive. That information may (but need not) also include information identifying an individual and relating to an insurance claim or civil or criminal proceeding involving that individual, collected in connection with, or in reasonable anticipation of, a claim for insurance benefits or a civil or criminal proceeding involving that individual.

How We Protect Your Personal Information
Your personal information is available to FAIR Plan employees and other individuals authorized to perform functions at the FAIR Plan office that may need knowledge of such information to provide services to you or our other customers. We have in place organizational, electronic and physical safeguards to protect customer information. We conduct periodic reviews of our policies and procedures concerning electronic information systems to ensure the privacy of customer information.

When we share your personal information with other persons or organizations to enable them to perform business, professional or insurance functions for us, we protect that personal information where required by law with agreements by such persons and organizations not to disclose the information further without your written authorization, unless the further disclosure is reasonably necessary for such persons or organizations to perform such functions for us.

Accessing and Correcting Information
You have the right to know what personal information is contained in your file, and to request its correction if you believe it is inaccurate. These rights do not extend to information that relates to and is collected in connection with our in reasonable anticipation of a claim or civil or criminal proceeding involving you. If we request an investigative consumer report, you may ask to be interviewed in connection with its preparation. You are entitled to receive a copy of the report upon request. Please contact (800) 339-4099 or (213) 487-0111 if you have any questions regarding this notice.

Notice To The Insured
Neither the issuance of the enclosed policy, nor any other act or omission by the FAIR Plan, or by any person or entity for the FAIR Plan described in the policy, constitutes an express or implied representation concerning the safety of the property, or a representation of the adequacy of the amount or nature of your coverage.

# Exhibit V



**California FAIR Plan Association**

**3435 Wilshire Blvd., Suite 1200**

**Los Angeles, CA 90010**

**www.cfpnet.com**

# DWELLING PROPERTY POLICY

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**CFP 00 01 (07/2017)**

This policy is issued on behalf of those insurers that by law participate in the writings, expenses, profits and losses of the CALIFORNIA FAIR PLAN ASSOCIATION for the kind of risks insured against by this policy. The names of such participating insurers, and the extent of their respective participations, are on file with, and may be obtained from, either the CALIFORNIA FAIR PLAN ASSOCIATION or the Insurance Commissioner of the State of California. The policy period as shown in the Declarations Page shall begin and end at 12:01 A.M. standard time at the location of the property involved.

---

## DEFINITIONS

---

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance.

---

## AGREEMENT

---

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

---

## COVERAGES

---

This insurance covers the property at the address shown under PROPERTY LOCATION (the "Described Location") in the DWELLING INSURANCE POLICY DECLARATIONS (the "Declarations").

**If there is a checkmark ☑ next to A - Dwelling in the Declarations, the following applies:**

**COVERAGE A - Dwelling**

We cover:

**1.** the dwelling on the Described Location shown in the Declarations, used principally for dwelling purposes, including structures attached to the dwelling;

**2.** materials and supplies located on or next to the Described Location used to construct, alter or repair the dwelling or other structures on the Described Location; and

**3.** if not otherwise covered in this policy, building equipment and outdoor equipment used for the service of and located on the Described Location.

This coverage does not apply to land, including land on which the dwelling is located.

**COVERAGE B - Other Structures**

We cover other structures on the Described Location, set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a covered walkway, wall, fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

**1.** used in whole or in part for commercial, professional, manufacturing or farming purposes; or

**2.** rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

You may use up to 10% of the Coverage A limit of liability for loss by a Peril Insured Against to other structures. Payment under this coverage reduces the Coverage A limit of liability by the amount paid for the same loss.

**If there is a checkmark ☑ next to B - Other Structures in the Declarations, the following applies:**

We cover those Other Structures described in the Schedule to the Declarations up to the Limit of Liability stated for each such structure identified in the Schedule to the Declarations.

This coverage is in addition to your ability to elect to use up to 10% of the Coverage A Limit of Liability for loss to Other Structures.

**If there is a checkmark ☑ next to C - Personal Property in the Declarations, the following applies:**

**COVERAGE C - Personal Property**

We cover personal property usual to the occupancy as a dwelling and owned or used by you or members of your family residing with you while it is on the Described Location.  At your request, we will cover personal property owned by a guest or household employee while the property is on the Described Location.

If you remove personal property from the Described Location to a newly acquired principal residence, the Coverage C limit of liability will apply at each residence for the 30 days immediately after you begin to move the property there.  This time period will not extend beyond the termination of this policy.  Our liability is limited to the proportion of the limit of liability that the value at each residence bears to the total value of all personal property covered by this policy.

**Property not covered.**  We do not cover:

1.  whether real or digital, accounts, bank notes, bills, bullion, coins, currency, deeds, evidences of debt, gold other than goldware, letters of credit, manuscripts, medals, money, notes other than bank notes, passports, personal records, platinum, securities, silver other than silverware, tickets and stamps;

2.  animals, birds or fish;

3.  aircraft and parts except model or hobby aircraft not used or designed to carry people or cargo;

4.  motor vehicles or all other motorized land conveyances.  This includes:

    a.  their equipment and accessories; or

    b.  any device or instrument for transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:

        i.  accessories or antennas; or

        ii. tapes, wires, records, discs or any other media for use with any such device or instrument;

        while in or upon the vehicle or conveyance.

    We do cover vehicles or conveyances not subject to motor vehicle registration which are used to service the Described Location, or are designed for assisting the handicapped.

5.  watercraft, other than rowboats, kayaks and canoes;

6.  data, including data stored in:

    a.  books of account, drawings or other paper records; or

    b.  electronic data processing tapes, wires, records, discs or other software media.

However, we do cover the cost of blank recording or storage media, and of pre-recorded computer programs available on the retail market.

**7.** credit cards, gift cards, debit cards or fund transfer cards.

**8.** business personal property, meaning property of any nature that is used in your business including, without limitation, inventory and equipment.

> **If there is a checkmark ☑ next to Permitted Incidental Occupancy in the Declarations, the following applies:**
>
> In addition to covering personal property usual to the occupancy as a dwelling, we cover personal property usual to the occupancy of the dwelling for the purpose described in the Schedule to the Declarations for loss caused by a Peril Insured Against at the Described Location.  The personal property must be owned or used by you or members of your family residing with you while it is on the Described Location.  We shall not be liable for more than the limit of liability shown in the Declarations for this coverage.

**9.** natural or artificial lawns, plants, shrubs or trees outside of buildings.

> **If there is a checkmark ☑ next to Plants, Shrubs and Trees in the Declarations, the following limited exception to the above exclusion will apply:**
>
> We insure for loss caused by the Perils Insured Against to plants, shrubs and trees.  We do not cover property grown for commercial purposes. We shall not be liable for more than our proportion of $250 on any one plant, shrub or tree including expense incurred for removing debris thereof. We shall not be liable for more than the limit of liability shown in the Declarations for this coverage.
>
> We do not insure loss to plants, shrubs or trees grown in violation of, or otherwise made illegal or unlawful by, any federal, state or local law.

## COVERAGE D - Fair Rental Value

If a loss covered under this policy makes that part of the Described Location rented to others, held for rental or occupied by you unfit for its normal use, we cover its "Fair Rental Value", meaning the fair rental value of that part of the Described Location rented to others, held for rental or occupied by you less any expenses that do not continue while that part of the Described Location rented, held for rental or occupied by you is not fit to live in.

Payment will be for the shortest time required to repair or replace that part of the Described Location rented, held for rental or occupied by you.

We will pay no more than 1/12 of this coverage for each month the Described Location is unfit for its normal use and the amount due under this coverage shall be calculated based on a 30 day month.  Payment under this coverage shall not be more than the monthly fair rental value of that part of the Described Location rented to others, held for rental or occupied by you.

If you have personal property coverage, Fair Rental Value will be determined based on an equivalent furnished property. If you do not have personal property coverage, Fair Rental Value will be determined based on an equivalent unfurnished property.

If a civil authority prohibits you from use of the Described Location as a result of direct damage to a neighboring location by a Peril Insured Against in this policy, we cover the Fair Rental Value loss for no more than two weeks.

The periods of time referenced above are not limited by the expiration of the policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

You may use up to 10% of the Coverage A limit of liability for loss of Fair Rental Value.  Payment under this coverage reduces the Coverage A limit of liability by the amount paid for the same loss.

**If there is a checkmark ☑ next to D - Fair Rental Value in the Declarations, the following applies:**

We will pay Fair Rental Value up to the Limit of Liability stated for Fair Rental Value in the Declarations.

This coverage is in addition to your ability to elect to use up to 10% of the Coverage A Limit of Liability for loss of Fair Rental Value.

**OTHER COVERAGES**

1. **Debris Removal**.  We will pay your reasonable expense for the removal of:

   **a.** debris of covered property damaged by a loss we cover;  or

   **b.** ash, dust or particles from a volcanic eruption that has caused a direct loss to a covered building or property contained in a building.

   Debris removal expense is included in the limit of liability applying to the damaged property.  You may use any amount of the Limit of Liability shown in the Declarations under Coverage A, B or C for the reasonable expenses you incur for the removal of debris damaged by a loss we cover.  Payment under that coverage reduces the Limit of Liability for that coverage by the amount paid for the same loss.

   **If there is a checkmark ☑ next to Debris Removal in the Declarations, the following applies:**

   We will pay the reasonable expenses you incur for removal of debris of covered property damaged by a loss we cover, up to the Limit of Liability stated for Debris Removal in the Declarations.  This Debris Removal coverage applies to each coverage (Coverage A - Dwelling, Coverage B - Other Structures and Coverage C - Personal Property) you have purchased, as shown in the Declarations.

   This additional Debris Removal coverage does not include abatement of hazardous materials from the damaged covered property, nor the removal of property that did not suffer direct physical damage as a result of a loss we cover, even if an ordinance or law requires removal of the property (or any portion of the property) as a condition to permitting repairs or rebuilding following a loss we cover.

2. **Improvements, Alterations and Additions**.  If you are a Condominium Unit owner or tenant of the Described Location, you may use up to 10% of the Coverage C limit of liability for loss by a Peril Insured Against for improvements, alterations and additions, made or acquired at your expense, to that part of the Described Location used only by you.

   Payment under this coverage reduces the Coverage C limit of liability by the amount paid for the same loss.

   **If there is a checkmark ☑ next to Improvements, Alterations and Additions in the Declarations, the following applies:**

   We cover Improvements, Alterations and Additions made at your expense to your part of the Described Location whether rented to others or not.  We shall not be liable for more than the limit of liability shown in the Declarations for this coverage.

3. **World-Wide Coverage**.  You may use up to 10% of the Coverage C limit of liability for loss by a Peril Insured Against to property covered under Coverage C while anywhere in the world.  This coverage does not apply to property of guests or household employees, or to rowboats, kayaks or canoes.

   Payment under this coverage reduces the Coverage C limit of liability by the amount paid for the same loss.

**4. Reasonable Repairs**.  In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage, subject to the provisions of Condition 5., below.  If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

**a.** does not increase the limit of liability that applies to the covered property; and

**b.** does not relieve you of your duties, in case of a loss to covered property, as set forth in Condition 5.b., below.

**5. Property Removed**.  We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than five days while removed.  This coverage does not change the limit of liability that applies to the property being removed.

**6. Fire Department Service Charge**.  We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against.  We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance.  No deductible applies to this coverage.

## PERILS INSURED AGAINST

Unless the loss is excluded in the General Exclusions, or below, we insure for "direct physical loss", which is defined as any actual loss or physical damage, evidenced by permanent physical changes, to the covered property caused by:

**1. Fire or Lightning**.

**2. Internal Explosion,** meaning explosion occurring in the dwelling or other structure covered on the Described Location or in a structure containing covered personal property.

Explosion does not mean:

**a.** electric arcing;

**b.** breakage of water pipes; or

**c.** breakage or operation of pressure relief devices.

This peril does not include loss by explosion of steam boilers, or steam pipes, if owned or leased by you or operated under your control.

**3.  Smoke Damage**.

**a.** When used in this policy, "smoke damage" means sudden and accidental direct physical loss from smoke (including airborne, windborne, or wind-driven combustion by-products or particulates such as carbon/soot/ash/char/debris) that is visible to the unaided human eye, or odor from smoke or ash that is detected by the unaided human nose of an average person, and not by the subjective senses of you or by laboratory testing.

**b.** Loss caused by smoke is excluded entirely if the smoke comes from agricultural smudging or industrial operations, or from intentional fire sources routinely found in or around homes including, but not limited to, smoke from

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Continued from page 5

fireplaces, fire pits, devices used to barbeque or cook food, lanterns or smoke or ash from other intentional use of flames.

**c.** The amount of coverage (money available for smoke damage) is determined by timeliness of claim reporting. Time is measured from the date of the fire's full containment as determined by Cal Fire or the local fire agency overseeing fire suppression efforts to the date of the first report of smoke damage to us:

   **i.** smoke damage losses that are reported within 45 days of the fire's full containment are covered up to the applicable policy limit;

   **ii.** smoke damage losses that are reported after 45 days are limited to $1,500.

**d.** Dispute resolution of smoke damage claims:

   **i.** any dispute regarding whether smoke damage has occurred will be resolved by either Method 1 or 2 below (at your election):

   Method 1: You and we will each select a competent and disinterested person, and those two will select a third person (the Umpire) all in the same manner provided in the Condition 9, Appraisal, below. The three people will inspect the premises and decide by majority vote whether they can see or smell smoke damage, and their decision is binding. If there is smoke damage, the claim will then be adjusted to determine the amount of the loss.

   Method 2: A single, sole neutral Umpire can decide whether there is smoke damage. If the parties cannot agree on the identity of that individual, a judge of a court of record in the State of California will select the Umpire. Each side will pay 1/2 of the fee for the Umpire.

   **ii.** if the parties agree there is smoke damage, or smoke damage has been found using Method 1 or 2 above, but the amount of the loss is in dispute, that issue of the amount of loss will be decided by a new appraisal, as set forth at Condition 9, Appraisal below.

**If there is a checkmark ☑ next to Extended Coverages in the Declarations, Perils 4 through 9 are made part of Perils Insured Against.**

**4.   Windstorm or Hail**.

This peril does not include loss:

**a.** to the interior of a building or property contained in a building caused by rain, snow, sleet, sand or dust unless:

   **i.** the direct force of the wind or hail damages the building causing an opening in a permanent roof or permanent wall and the rain, snow, sleet, sand or dust enters through this opening; or

   **ii.** the direct force of the wind or hail damages the building causing an opening in a temporary roof applied or temporary wall erected (after initial insured damage) to protect the property from further damage from rain, snow, sleet, sand or dust entering through this opening, in accordance with Condition 5.b., below.

**b.** to the following when outside of the building:

   **i.** awnings, signs or any device used to gather signals for electronic equipment, such as radio or television antennas, aerials or satellite dishes, including lead-in wiring, masts or towers; or

   **ii.** rowboats, kayaks and canoes.

   We insure for direct loss by windstorm or hail only to those items below for which a limit of liability is shown in this policy for this coverage.

**If there is a checkmark ☑ next to Outdoor Radio and TV Equipment in the Declarations, the following applies:**

We insure for direct loss by windstorm or hail to radio and TV antennas and aerials, including their lead-in wiring, masts and towers. We shall not be liable for more than the limit of liability shown in the Declarations for this coverage.

**If there is a checkmark ☑ next to Awnings in the Declarations, the following applies:**

We insure for direct loss by windstorm or hail to awnings or canopies, including their supports. We shall not be liable for more than the limit of liability shown in the Declarations for this coverage.

**If there is a checkmark ☑ next to Signs in the Declarations, the following applies:**

We insure for direct loss by windstorm or hail to signs.  We shall not be liable for more than the limit of liability shown in the Declarations for this coverage.

   **c.** that occurs due to pre-existing disrepair of the property.

**5. Explosion**.  This peril does not include loss by explosion of steam boilers or steam pipes, if owned or leased by you or operated under your control.

Explosion does not mean:

**a.** electric arcing;

**b.** breakage of water pipes; or

**c.** breakage or operation of pressure relief devices.

This peril replaces Peril 2.

**6. Riot or Civil Commotion**.

**7.  Aircraft**, including self-propelled missiles and spacecraft.

**8.  Vehicles**.

This peril does not include loss:

**a.** caused by a vehicle owned or operated by you or a resident of the Described Location; or

**b.** caused by any vehicle to fences, driveways and walks.

**9.  Volcanic Eruption** other than loss caused by earthquake, land shock waves or tremors.

**If there is a checkmark ☑ next to Vandalism or Malicious Mischief in the Declarations, the following is made part of Perils Insured Against:**

**10. Vandalism or Malicious Mischief**, meaning willful and malicious damage to, or destruction of, the described property.

This peril does not include loss;

**a.** to glass or safety glazing material constituting a part of the building other than glass building blocks;

**b.** by pilferage, theft, burglary or larceny, but, we will be liable for damage to the covered building caused by burglars;

   **c.** by modification or alteration to rental property made without the owner's permission; or

   **d.** to property on the Described Location if the dwelling has been vacant or unoccupied for more than 30 consecutive days immediately before the loss. A dwelling being constructed is considered "vacant" if it lacks the furniture and the furnishings minimally necessary for human habitation. A dwelling is considered "unoccupied" if there is no person residing lawfully in it.

---

## GENERAL EXCLUSIONS

We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

**1. Ordinance or Law**, meaning any ordinance or law:

   **a.** requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris;

   **b.** the requirements of which result in a loss in value to property; or

   **c.** requiring you or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of the pollutants.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including, without limitation, asbestos, lead, mold, fungus, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This exclusion applies whether or not the property has been physically damaged.

    **If there is a checkmark ☑ next to Ordinance or Law in the Declarations, the above exclusion does not apply, and the following applies:**

    We will pay for the increased costs you incur due to the enforcement against you of any ordinance or law which requires or regulates construction, demolition, renovation or repair, but only as it applies to that part of a covered building or other structure damaged by a Peril Insured Against. We will not pay for any such costs incurred by you for work done on undamaged property.

    Ordinance or Law coverage is provided only if the damaged covered building or other structure for which claim is made satisfied all applicable building code requirements in effect when it was built, last repaired or last remodeled before such damage occurred.

    We shall not be liable for more than the limit of liability shown in the Declarations for this coverage.

    We do not cover:

    (1) any loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

    (2) due to enforcement against you, in actual repair of damage to covered property caused by a Peril Insured Against, the costs to comply with any ordinance or law which requires you or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants from, in or on any covered building or other structure.

Notwithstanding the foregoing, we will pay the costs to comply with any ordinance or law which requires you or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of asbestos or lead only. We shall pay only the costs actually incurred by you, due to enforcement against you, in actual repair of damage to covered property caused by a Peril Insured Against. We will not pay for any such costs incurred by

you for work done to portions of the property which did not incur direct physical damage from the covered peril. Coverage for remediation of lead and/or asbestos shall be limited to the aggregate amount of $10,000 or the amount actually incurred, whichever is less.

2. **Earth Movement**, meaning earthquake, including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss by:

   **a.** fire; or

   **b.** explosion;

   ensues and then we will pay only for the ensuing loss.

3. **Water Damage**, meaning:

   **a.** flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

   **b.** water which backs up through sewers or drains or which overflows from a sump; or

   **c.** water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

   Direct loss by fire or explosion resulting from water damage is covered.

4. **Power Failure**, meaning the failure of power or other utility service if the failure takes place off the Described Location. But if the failure of power or other utility service results in a loss, from a Peril Insured Against on the Described Location, we will pay for the loss or damage caused by that Peril Insured Against.

5. **Neglect**, meaning your neglect to use all reasonable means to save and preserve property at and after the time of a loss.

6. **War**, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

7. **Nuclear Hazard**, to the extent set forth in the Nuclear Hazard Clause of the Conditions.

8. **Intentional Loss**, meaning any loss arising out of any act committed:

   **a.** by or at the direction of you or any person or organization named as an additional insured; and

   **b.** with the intent to cause a loss.

---

## CONDITIONS

1. **Policy Period**. This policy applies only to loss which occurs during the policy period.

2. **Insurable Interest and Limit of Liability**. Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   **a.** for an amount greater than the interest of a person insured under this policy; or

   **b.** for more than the applicable Limit of Liability.

3. **Your Duties to Select and Maintain Policy Limits.** It is your sole responsibility to select and maintain adequate amounts and types of insurance.

**If there is a checkmark ☑ next to Inflation Guard in the Declarations, you have given us permission to increase the Limits of Liability for Coverage A - Dwelling and, if purchased, Coverage B and Ordinance or Law coverage at each renewal of your policy.**

We may increase the Limits of Liability for Coverage A - Dwelling and, if present, Ordinance or Law Coverage to reflect changes in the cost of construction, if any.

Any increase in these Limits of Liability will be made on the renewal date of the policy.

Any increase in these Limits of Liability will be made according to construction cost factors published by a third party vendor and/or other factors we consider reasonable. The percentage increase in such construction cost factors will be applied only to your existing Limits of Liability as of the renewal date of the policy.

Regardless of any increase in the Limits of Liability pursuant to this coverage, we offer no opinion, and make no representation or guarantee, that the insurance provided by this policy is or will be appropriate or sufficient to cover the full replacement cost of the dwelling, or to cover the full amount of any loss or damage.

You should not rely on us to determine whether you have appropriate or sufficient insurance.

The sum of the Limits of Liability for all coverages under your policy may not exceed the maximum policy limits that we offer. We will restrict any Limit of Liability increases under this coverage so that that sum does not exceed the maximum limits we offer, first increasing the Limit of Liability for Coverage A - Dwelling to the extent permitted by this maximum amount. Then we will use any remaining part of the maximum amount to increase the Limit of Liability for Ordinance or Law Coverage.

4. **Concealment or Fraud**.  With respect to all persons insured under this policy, we provide no coverage for loss if, whether before or after a loss, one or more persons insured under the policy have:

   **a.** intentionally concealed or misrepresented a material fact or circumstance;

   **b.** engaged in fraudulent conduct; or

   **c.** made false statements;

   related to this insurance.

5. **Your Duties After Loss**.  In case of a loss to covered property, you must see that the following are done:

   **a.** give prompt notice to us;

   **b.** protect the property from further damage;

   **c.** make reasonable and necessary repairs to protect the property;

   **d.** keep an accurate record of repair expenses;

   **e.** if you make repairs to protect the property, set aside the damaged part(s) for our inspection and, if possible, photograph the damage; and

   **f.** prepare an inventory of damaged personal property to the best of your ability:

      **i.** show the quantity, description, date of purchase, place of purchase or from whom acquired and amount of loss;

      **ii.** attach all records, bills, receipts and related documents that justify the figures in the inventory;

**g.** as often as we reasonably require, and subject to the provisions of California Insurance Code § 2071.1:

**i.** exhibit the damaged property;

**ii.** provide us with records and documents we request and permit us to make copies. We may request your tax returns. These documents are generally privileged against disclosure under applicable law, but may be necessary to process or determine your claim;

**iii.** submit to examination under oath, while not in the presence of any other named insured, and sign the transcript under penalty of perjury; and

**iv.** produce employees, members of your household or others for examination under oath to the extent it is within your power to do so;

**h.** submit to us, within 60 days after we request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

**i.** the time and cause of loss;

**ii.** interest of you and all others in the property involved and all encumbrances on the property;

**iii.** other insurance which may cover the loss;

**iv.** changes in title or occupancy of the property during the term of the policy;

**v.** specifications of any damaged building and detailed estimates for repair of the damage;

**vi.** an inventory of damaged personal property described in 5.f., above; and

**vii.** records supporting any Fair Rental Value loss.

**6. Loss Settlement.** Subject to Condition 2. (Insurable Interest and Limit of Liability), we will pay the following amounts for covered property losses:

**a.** Coverages A and B Losses: for losses to covered property described in Coverages A and/or B, the following applies:

**i.** Total Loss: in case of a Total Loss to the property, we will pay the actual cash value before the loss as measured by the fair market value of the covered property, up to the policy limit;  or

**ii.** Partial Loss**:** in case of Partial Loss to the property, we will pay the actual cash value of the Partial Loss as measured by the amount it would cost you to Repair, rebuild, or Replace the thing lost or damaged less a fair and reasonable deduction for physical Depreciation based upon its condition at the time of the loss, or the policy limit, whichever is less. A deduction for physical Depreciation shall apply only to components of a structure that are normally subject to Repair and Replacement during the useful life of that structure.

**b.** Coverage C Losses: For loss to covered property described in Coverage C - Personal Property, we will pay the amount it would cost you to Repair, rebuild, or Replace the thing lost or damaged less a fair and reasonable deduction for physical Depreciation based upon its condition at the time of the loss or the policy limit, whichever is less.

**c.** Definitions for Coverages A, B and C Losses:

**i.** "Total Loss" to property for Coverages A and B means the property is completely destroyed, such that it loses its identity and character as a structure;

ii.   "Partial Loss" to property for Coverages A and B means any loss not considered a "Total Loss", as defined in c.i.;

iii.   "Depreciation", when taken, will be for physical depreciation, or wear and tear, based upon the condition of the property measured as of the time of loss, and will be taken separately for each damaged part of the property, not for any property taken as a whole;

iv.   "Replace" means to provide functionally equivalent, but not necessarily identical, property at the same location;

v.   "Repair" includes rebuild and means to restore property to the same design, size and dimensions, and at the same location as before loss, using materials identical in kind and quality.

**If there is a checkmark ☑ next to Dwelling Replacement Cost in the Declarations, the above Loss Settlement provision with respect to Coverage A and B losses does not apply and the following Loss Settlement Provision will apply with respect to Coverage A and B losses, only.**

Covered property loss to any building under Coverage A or B will be settled as follows:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the lower of the full cost to reconstruct or replace the building immediately before the loss, we will pay the cost to reconstruct or replace the part of the building damaged, after application of the deductible and without depreciation, but not more than the least of the following amounts:

   a)  the Limit of Liability under this policy that applies to the building;

   b)  the lower of either the reconstruction or replacement cost of the damaged part of the building; or

   c)  the necessary amount actually spent to reconstruct or replace the damaged part of the building.

(2) If, at the time of loss, the amount of insurance under this policy on the damaged building is less than 80% of the lower of the full cost to reconstruct or replace the building immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Liability under this policy that applies to the building:

   a)  the amount payable for the loss under Condition 6, above; or

   b)  that proportion of either the lower of the cost to reconstruct or replace the part of the building damaged, without deduction for depreciation, which the total amount of insurance under this policy on the damaged building bears to 80% of the lower of the full cost either to reconstruct or replace the building immediately before the loss.

(3) To determine the amount of insurance required to equal 80% of the lower of the full cost to reconstruct or replace the building immediately before the loss, we do not include the value of:

   a)  excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

   b)  those supports in a. above which are below the surface of the ground inside the foundations walls, if there is no basement; and

   c)  underground flues, wiring and drains.

(4) You may meet the 80% requirement by having in force at the time of the loss another policy of insurance subject to the same plan, terms, conditions and provisions as the insurance under this policy. If you do, we will pay our pro rata share of the loss.

If, at the time of the loss, there is insurance covering the loss other than as described above, such as an excess insurance policy, you may include the amount of that insurance in meeting the 80% requirement.

(5)  We will pay no more than the amount payable for the loss under Condition 6, above, unless:

a) actual reconstruction or replacement is complete at the Described Location shown in the Declarations; or

b) actual reconstruction or replacement is complete at a location other than the Described Location; or

c) the cost to reconstruct or replace the damage is both:

i)  less than 5% of the amount of insurance under this policy on the damaged building; and

ii) less than $5,000.

Regardless of whether the reconstruction or replacement is completed at the Described Location pursuant to subparagraph a. above, or at a location other than the Described Location, pursuant to subparagraph b. above, the measure of indemnity shall be based upon the replacement cost of the insured property and shall not be based upon the cost to repair, rebuild or replace at a location other than the insured premises.

(6) You may disregard the reconstruction and replacement cost loss settlement provisions and make a claim for the loss based on Condition 6.a., above. After 5.a. or 5.b. immediately above are satisfied, but not later than 12 months after first payment under Condition 6., above, you may make claim for any additional benefits provided under this Dwelling Replacement Cost section. In the event you are unable to satisfy 5.a. or 5.b. immediately above within 12 months after such first payment because of circumstances beyond your control, you may request an extension of time in which to do so. Additional extensions of six months shall be provided to you for good cause.

(7) In the event of a loss relating to a "state of emergency" as defined in Section 8558 of the Government Code, you may satisfy 5.a. and 5.b. immediately above within 24 months from the first payment under Condition 6, above.

**If there is a checkmark ☑ next to Personal Property Replacement Cost in the Declarations, the Loss Settlement provision above with respect to Coverage C losses does not apply and the following Loss Settlement Provision will apply with respect to Coverage C losses, only.**

Covered loss to personal property will be settled as follows:

(1) Property Covered:

We cover personal property under Coverage C at replacement cost at the time of the loss, unless that personal property is listed in Property Not Covered, below.  Payment will not exceed the least of the following:

a) replacement cost at the time of the loss without deduction for depreciation;

b) the reasonable amount to have the property repaired at the time of loss;

c) the amount it reasonably costs to replace the article with a new one substantially identical to the article damaged or destroyed; or

d) the Personal Property Coverage C Limit of Liability shown in the Declarations.

(2) Property Not Covered:

The following personal property is not eligible for replacement cost settlement.  Any loss or damage to these items shall be settled at actual cash value at time of the loss, but not exceeding the amount necessary to repair or replace:

    a)  property not maintained in good or workable condition;

    b)  property that exhibits signs of excessive wear;

    c)  property that is outdated or obsolete and is stored or not being used;

    d)  antiques, fine arts, paintings and similar articles of uniqueness, rarity or antiquity which cannot be replaced;

    e)  memorabilia, souvenirs, collectors' items and similar articles whose age or history contribute to their value; or

    f)  property not owned by any insured.

(3) Conditions

    a)  We will pay the difference between actual cash value and the cost to repair or replace the property only after the damaged or destroyed property has actually been repaired or replaced.

    b)  If you receive a settlement under this policy for damaged personal property on an actual cash value basis, you may make an additional claim for payment provided:

        i)  repair or replacement is completed within one year of the first payment for damage to your personal property.  In the event you are unable to complete the repair or replacement of your damaged personal property within one year after such first payment because of conditions beyond your control, you may request an extension of time in which to do so.  Additional extensions of six months shall be provided to you for good cause;

        ii)  if the loss or damage relates to a "state of emergency" as defined in Section 8558 of the Government Code, this time period shall be extended to two years after the first payment for damage to your personal property; or

        iii)  you have not reached the applicable limit of liability under this policy.

**7.  Loss to a Pair or Set**.  In case of loss to a pair or set we may elect to:

    **a.**  repair or replace any part to restore the pair or set to its value before the loss; or

    **b.**  pay the difference between actual cash value of the property before and after the loss.

**8. Glass Replacement**.  Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

**9.  Appraisal**.  If you and we fail to agree on the amount of loss, either may request an appraisal of the loss:

    **a.**  if the loss arises out of a government-declared disaster, as defined in the California Government Code, appraisal may be requested by either party but may not be compelled;

    **b.**  if the loss does not arise out of a government-declared disaster, as defined in the California Government Code, or if the parties agree to appraisal following a government-declared disaster:

        **i.**  each party shall choose a competent and disinterested appraiser within 20 days after a written request. The two appraisers will choose an umpire.  If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record  in the State of California;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**CFP 00 01 (07/2017)**          **Page 14 of 18**

    ii.   the appraisers will separately set the amount of loss.  If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will set the amount of the loss;

    iii.   each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally; and

    iv.   the appraisal proceedings will be informal unless you and we agree otherwise, meaning that no formal discovery will be taken during the appraisal proceeding, the formal rules of evidence will not be applied during the appraisal proceeding, and no court reporter will record the proceedings.  The procedures set forth in this paragraph do not limit or expand the parties' rights set out elsewhere in the policy, and do not limit the rights of either party in the event of suit.

**10.  Other Insurance**.

    **a.**   You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this policy.  If you do, we will pay our share of the covered loss or damage.  Our share is the proportion that the applicable Limit of Liability under this policy bears to the Limits of Liability of all policies covering on the same basis.

    **b.**   If there is other insurance covering the same loss or damage, other than described in a. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not.  But, we will not pay more than the applicable Limit of Liability.

**11.  Transfer to Us of Salvage, Subrogation**. If there is a covered loss, we have the right of salvage, which is the right to take all or any part of the insured property upon our payment for the loss or damage to that property, at the agreed or appraised value.

In addition to our right of salvage, we have the right of subrogation, which means that we have the right to seek repayment from any person or persons who may have caused the loss or damage.  You must protect our subrogation rights, and help us enforce those rights if we ask you to do so.  If we ask you to sign documents to help us enforce those rights, you must do so.

Our total recovery under this provision will not exceed the amount we pay for your loss or damage, plus our costs of recovery, including any attorney's fees we incur.

**12. Suit Against Us**.  No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

**13. Our Option**.  If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may pay to repair or replace any part of the damaged property with like property.  We may also take all, or any part, of the damaged property at the agreed or appraised value.

**14.  Loss Payment**.  We will adjust all losses with you or your properly authorized representative.  We will pay you unless some other person is named in the policy or is legally entitled to receive payment.  Your loss will be payable 30 days after we receive proof of loss and:

    **a.**   reach an agreement with you;

    **b.**   there is an entry of a final judgment; or

    **c.**   there is a filing of an appraisal award with us.

**15.  Abandonment of Property**.  We need not accept any property abandoned by you.

**16.  Mortgage Clause**. The word "mortgagee" includes trustee.

If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

**a.** notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

**b.** pays any premium due under this policy on demand if you have neglected to pay the premium; and

**c.** submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date of cancellation or non-renewal takes effect.

If we pay the mortgagee for any loss and deny payment to you:

**a.** we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

**b.** at our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all the securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

17. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

18. **Cancellation**.

**a.** You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

**b.** We may cancel this policy only for the reasons stated in this condition by notifying you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.

**c.** Proof of mailing shall be sufficient proof of notice.

**d.** When you have not paid the premium, we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect.

**e.** When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 20 days before the date cancellation takes effect.

**f.** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel if there has been:

   **i.** conviction of any named insured of a crime having as one of its necessary elements an act increasing any hazard insured against; or

   **ii.** discovery of fraud or material misrepresentation by either of the following:

      **1)** you or your representative, in obtaining the insurance; or

      **2)** you or your representative in pursuing a claim under the policy; or

   **iii.** discovery of grossly negligent acts or omissions by you or your representative substantially increasing any of the hazards insured against; or

    **iv.** physical changes in the insured property which result in the property becoming uninsurable.

This can be done by notifying you at least 30 days before the date cancellation takes effect.

**g.** We may cancel for any reason at the anniversary date of the policy by notifying you at least 45 days before the date cancellation takes effect.

    **i.** When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded on a pro rata basis.

    **ii.** If, when we cancel this policy, the return premium is not refunded with the notice of cancellation, we will refund it within 25 days after the date cancellation takes effect.

**19. Non-renewal**.

**a.** We may elect not to renew this policy, subject to the provisions of b., immediately below. We may do so by delivering to you at your mailing address shown in the Declarations, written notice at least 45 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

**b.** If this policy is written for a period of less than one year, we agree not to refuse to renew except at the end of an annual period commencing with the original or renewal effective date.

**20. Liberalization Clause**. If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations. This Liberalization Clause does not apply to changes implemented through the introduction of a subsequent edition of our policy.

**21. Waiver or Change of Policy Provisions**. A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

**22. Assignment**. Assignment of this policy is not permitted.

**23. Death**. If you die, we insure, for the remainder of this policy period:

**a.** your legal representatives but only with the respect to the property of the deceased covered under the policy at the time of death;

**b.** with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

**24. Nuclear Hazard Clause**

**a.** "Nuclear Hazard" means any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

**b.** Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

**c.** This policy does not apply to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**25. Recovered Property**. If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, that property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

**26.Volcanic Eruption Period**. One or more volcanic eruptions that occur within a 72 hour period will be considered as one volcanic eruption.

27. **Loss Deductible Clause**.  The amount of deductible shown in the Declarations of this policy shall be deducted from the amount of loss to all property covered hereunder in any one occurrence resulting from the perils insured against.

This clause does not apply to Fair Rental Value or any Fire Department Service Charge.

28. **Your Right to Copies of Certain Claim Documents**.  You may obtain from us, within 15 calendar days after our receipt of your written request, copies of documents that relate to the evaluation of damages.  These documents may include repair and replacement estimates and bids, appraisals, scopes of loss, drawings, plans, reports, third party findings on the amount of loss, covered damages and cost of repairs, and all other valuation, measurement, and loss adjustment calculations of the amount of loss, covered damage and cost of repairs.

These documents do not include attorney work product privileged documents, documents reflecting privileged confidential attorney-client communications, documents that indicate fraud by you or any insured, documents that contain medically privileged information.  The right to obtain documents under this paragraph will not limit or expand the parties' rights set out elsewhere in the policy, and will not limit the rights of either party in the event of a suit.

29. **Adjusters**.  If, within a six-month period, we assign a third or subsequent adjuster to be primarily responsible for your claim, we shall provide you with a written status report that includes a summary of any decisions or actions are substantially related to the disposition of the claim, including the amount of losses to structures or contents, whether we have retained any design or construction professionals, the amount of coverage for losses to structures or contents, and all items of dispute.

30. **Right to Obtain a Copy of the Policy.**  After a covered loss, we will provide, free of charge, a complete, current copy of your policy within 30 calendar days after we receive your request for a copy.  The time period for us to provide this copy may be extended by the Insurance Commissioner.

If you would like a copy of your policy but have not experienced a covered loss, upon your request we will provide you with one free copy of your policy per year.

IN WITNESS WHEREOF,

*Chair, Governing Committee*                                      *Secretary, Governing Committee*